No. 21-70282

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY AND COUNTY OF SAN FRANCISCO,

*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

On Petition for Review of Agency Action of the
U.S. Environmental Protection Agency

## BRIEF OF PETITIONER CITY AND COUNTY OF SAN FRANCISCO

John Roddy
Estie Kus
*Deputy City Attorneys*
Office of City Attorney Dennis Herrera
City and County of San Francisco
City Hall, Room 234
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
Telephone No.: (415) 554-3986
John.S.Roddy@sfcityatty.org
Estie.Kus@sfcityatty.org

Andrew C. Silton
Richard S. Davis
BEVERIDGE & DIAMOND, P.C.
1900 N Street NW, Suite 100
Washington, DC 20036
Telephone No.: (202) 789-6000
asilton@bdlaw.com
rdavis@bdlaw.com

*Attorneys for Petitioner City and County of San Francisco*

August 25, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

GLOSSARY.............................................................................x

INTRODUCTION ......................................................................1

JURISDICTIONAL STATEMENT ...................................................2

ISSUES PRESENTED................................................................3

PERTINENT STATUTES AND REGULATIONS ..................................3

STATEMENT OF THE CASE.......................................................4

    A.    The Clean Water Act.................................................4

        1.    The Act's Permitting Program .................................4

        2.    Protecting Water Quality in Permits...........................6

        3.    Regulating Discharges from Combined Sewer Systems ...........8

    B.    Factual Background...............................................12

        1.    San Francisco's Oceanside Facilities.........................12

        2.    The City's CSO Control Efforts ...............................15

        3.    San Francisco's CSO Policy Exemption and Prior Permits .....18

    C.    Proceedings Before the Agency .......................................19

        1.    The Draft Permit and San Francisco's Comments ..................19

        2.    The Final Permit.............................................20

        3.    San Francisco's Appeal to the Environmental Appeals Board.24

SUMMARY OF THE ARGUMENT ...................................................27

STANDARD OF REVIEW ...........................................................31

ARGUMENT ....................................................................................32

I. The Generic Prohibitions cannot be reconciled with the Act, EPA's regulations, or the record. ..............................................32

    A. EPA violated its duty to define San Francisco's water quality-based obligations in the Permit. ......................................33

    B. EPA's imposition of the Generic Prohibitions disregarded the Agency's permitting procedures. .........................................36

    C. EPA arbitrarily imposed the Generic Prohibitions. ...........................40

        1. EPA marshalled no record support for these terms. .................40

        2. The record contradicts EPA's claim that the Generic Prohibitions are necessary.........................................43

II. The Permit's requirement to revise San Francisco's Long-Term Control Plan is inconsistent with the CSO Policy. ..........................................47

    A. EPA did not make the finding necessary to require San Francisco to update its LTCP.................................................48

        1. EPA may require an update to a fully-implemented LTCP only if the Agency finds that the plan is not protecting water quality standards.................................................48

        2. The Agency has made no such finding....................................51

    B. EPA's rationales for imposing the LTCP Update are divorced from the CSO Policy. ...................................................53

    C. The LTCP Update's provisions addressing sensitive areas exceed the Agency's authority. ..............................................55

        1. San Francisco's CSO Policy exemption precludes EPA from requiring any sensitive areas analysis.......................................56

        2. The Permit's sensitive areas requirements are overly broad. ...57

III.   The Court's relief must reflect that EPA and the State jointly approved a single Permit. ......................................................................................58

      A.   The Permit's text shows it to be a single, jointly-approved NPDES permit.......................................................................................60

      B.   The record confirms that EPA's decision concerned a single, joint permit......................................................................................62

CONCLUSION ...........................................................................................65

CERTIFICATE OF COMPLIANCE ....................................................................66

# TABLE OF AUTHORITIES

## Cases

*American Paper Institute, Inc. v. EPA*,
996 F.2d 346 (D.C. Cir. 1993)......................................................6, 7

*Amerijet International, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014)..................................................41

*Attias v. Crandall*,
968 F.3d 931 (9th Cir. 2020) .......................................................37

*Chemical Manufacturers Association v. EPA*,
28 F.3d 1259 (D.C. Cir. 1994).....................................................41

*Chubb Custom Insurance Co. v. Space Systems/Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ......................................................40

*City & County of S.F. v. S.F. Bay Reg'l Water Quality Control Bd.*,
No. RG19042575 (Alameda Cty. Super. Ct.)..............................24

*City & County of S.F. v. United States Citizenship & Immigration Services*,
981 F.3d 742 (9th Cir. 2020) .......................................................41

*Copeland v. Ryan*,
852 F.3d 900 (9th Cir. 2017) ........................................ 39, 49, 50

*Costle v. Pacific Legal Foundation*,
445 U.S. 198 (1980)........................................................................5

*Council for Urological Interests v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015).....................................................56

*El Comite Para el Bienestar de Earlimart v. EPA*,
786 F.3d 688 (9th Cir. 2015) .......................................................38

*EPA v. Cal. ex rel. State Water Res. Control Bd.*,
426 U.S. 200, 202 (1976) ..............................................................5

*Friends of Pinto Creek v. EPA*,
504 F.3d 1007, 17 (9th Cir. 2007) ......................................... 49, 58

*Greater Yellowstone Coalition, Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) .....................................................43

*Humane Soc. of United States v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ........................... 42, 43, 44, 47, 53

*In re City & County of S.F.*,
    4 E.A.D. 559 (EAB 1993) ...................................................... 14, 19

*In re United States Financial Securities Litigation*,
    729 F.2d 628 (9th Cir. 1984) .......................................................62

*In re Upper Blackstone Water Pollution Abatement Dist.*
    14 E.A.D. 577 (EAB 2010) ..........................................................35

*International Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)......................................................................5

*Klamath Water Users Protective Association v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999) .....................................................60

*League of United Latin Am. Citizens v. Regan*,
    996 F.3d 673 (9th Cir. 2021) .......................................................54

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)........................................................................38

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................54

*Montgomery Envt'l Coalition v. Costle*,
    646 F.2d 568 (DC. Cir. 1980)........................................................8

*Motor Vehicle Mfrs. Association of United States v. State Farm Mutual
    Auto. Insurance Co.*,
    463 U.S. 29 (1983)......................................................................55

*National Parks Conservation Association v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ............................................. 41, 44

*Native Village of Kivalina IRA Council v. EPA*,
    687 F.3d 1216 (9th Cir. 2012) .....................................................31

*Natural Resources Defense Council v. EPA*,
    526 F.3d 591 (9th Cir. 2008) .......................................................31

*Newton-Nations v. Betlach*,
    660 F.3d 370 (9th Cir. 2011) .......................................................31

*NRDC v. County of Los Angeles*,
    725 F.3d 1194 (9th Cir. 2013) ..................................... 33, 60, 62

*NRDC v. EPA*,
    16 F.3d 1395 (4th Cir. 1993) .........................................................7

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015) ........................................................ 33, 34, 36

*Nw. Environmental Advocates v. City of Portland*,
    56 F.3d 979 (9th Cir. 1995) ................................................................. 60, 62

*Pacific Legal Foundation v. Costle*,
    586 F.2d 650 (9th Cir. 1978) ......................................................................4, 5

*Perez-Guzman v. Lynch*,
    835 F.3d 1066 (9th Cir. 2016) .....................................................................37

*Planned Parenthood of Greater Wash. & N. Idaho v. Department of Health*
    *& Human Services*,
    946 F.3d 1100 (9th Cir. 2020) .....................................................................31

*Prairie Rivers Network v. Illinois Pollution Control Board*,
    50 N.E. 3d 680 (Ill. Ct. App. 2016) ............................................................34

*Puerto Rico Sun Oil Co. v. EPA*,
    8 F.3d 73 (1st Cir. 1993)..............................................................................58

*Rodriguez v. Holder*,
    619 F.3d 1077 (9th Cir. 2010) .....................................................................37

*Systech Envt'l Corp. v. EPA*,
    55 F.3d 1466 (9th Cir. 1995) .......................................................................55

*Texaco Inc. v. United States*,
    528 F.3d 703 (9th Cir. 2008) .......................................................................38

*United States v. Corrales-Vazquez*,
    931 F.3d 944 (9th Cir. 2019) .......................................................................38

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019)...................................................................42

*Watkins v. United States Bureau of Customs & Border Protection*,
    643 F.3d 1189 (9th Cir. 2011) .....................................................................36

*Yokeno v. Sekiguchi*,
    754 F.3d 649 (9th Cir. 2014) .......................................................................38

**Statutory Authorities**

5 U.S.C. § 706(2)(A) ........................................................................... 31, 48

33 U.S.C. § 301(b)(1)(C) ..............................................................................7

33 U.S.C. § 1311(a) ................................................................ 4

33 U.S.C. § 1311(b) ................................................................ 5

33 U.S.C. § 1311(b)(1)(C) ......................................................33

33 U.S.C. § 1313(c)(2)(A) ...................................................... 6

33 U.S.C. § 1313(d)(1)(A) ......................................................46

33 U.S.C. § 1315(b) ............................................................... 46

33 U.S.C. § 1319(a) ................................................................59

33 U.S.C. § 1342(a) ........................................................... 2, 4

33 U.S.C. § 1342(b) ................................................................ 4

33 U.S.C. § 1342(c)(1) ............................................................ 4

33 U.S.C. § 1342(q)(1) .........................................................9, 48

33 U.S.C. § 1362(11) .............................................................. 5

33 U.S.C. § 1369(b)(1) ............................................................ 3

33 U.S.C. § 1369(b)(1)(E) ....................................................... 2

Cal. Water Code § 13050 ........................................................21

Cal. Water Code § 13050(l)(1)(A) ...........................................21

**Federal Regulations**

40 C.F.R. § 23.2 ..................................................................2, 3

40 C.F.R. § 122.2 ................................................................6, 8

40 C.F.R. § 122.4(d) .......................................................... 33, 38

40 C.F.R. § 122.44(a)(1) .......................................................... 5

40 C.F.R. § 122.44(d)(1) .........................................................38

40 C.F.R. § 122.44(d)(1)(i) ................................... 7, 33, 35, 38

40 C.F.R. § 122.44(d)(1)(i)-(vii) ....................................... 37, 39

40 C.F.R. § 122.44(d)(1)(vii)(A) ........................................................ 8, 38, 40, 44

40 C.F.R. § 122.44(d)(vii)(A) ........................................................................36

40 C.F.R. § 122.44(k)(3)..................................................................................6

40 C.F.R. § 123.1(d)(1)....................................................................................4

40 C.F.R. § 124.16(a)(1) ................................................................................25

40 C.F.R. § 124.16(a)(2)(ii) ......................................................................... 25

40 C.F.R. § 124.19(m)(2)...........................................................................2, 26

**Federal Register Notices**

39 Fed. Reg. 26,061 (July 16, 1974)................................................................4

54 Fed. Reg. 40,664 (Oct. 3, 1989) ............................................................... 4

**Other Authorities**

EPA Region 9 and San Diego Reg'l Water Quality Control Bd.,
    E.W. Blom Point Loma Wastewater Treatment Plant Order/Permit, Order
    No. R9-2017-0007, NPDES No. CA0107409 (2017) ................................. 61

U.S. Environmental Protection Agency,
    Notice of Violation of Nat'l Pollutant Discharge Elimination Sys. Permits
    (Oct. 2, 2019) .............................................................................................. 59

U.S. Environmental Protection Agency,
    *NPDES Permit Writers' Manual* (Sep. 2010) ...................................... *passim*

State Water Resources Control Bd.,
    *California's Integrated Report* (last updated July 3, 2020) ........................ 46

## GLOSSARY

| | |
|---|---|
| CSD | Combined Sewer Discharge |
| CSO | Combined Sewer Overflow |
| CSS | Combined Sewer System |
| CWA | Clean Water Act |
| EAB | Environmental Appeals Board |
| EPA | Environmental Protection Agency |
| LTCP | Long-Term Control Plan |
| NPDES | National Pollutant Discharge Elimination System |
| PCMP | Post-Construction Monitoring Program |
| TBEL | Technology-Based Effluent Limitation |
| WQBEL | Water Quality-Based Effluent Limitation |
| WQS | Water Quality Standards |

## INTRODUCTION

The City and County of San Francisco (San Francisco or the City) seeks the vacatur of a Clean Water Act permit that threatens to undermine the City's investments in pollution controls. San Francisco spent billions in public money to develop and build infrastructure to protect water quality in the Pacific Ocean by controlling discharges from the City's sewer system. The City developed this control program under the oversight and with the approval of the U.S. Environmental Protection Agency (EPA or the Agency).

EPA's issuance of the City's most recent permit unlawfully creates confusion about what additional investments San Francisco must make, if any, to comply with the Clean Water Act. One of the permit's contested terms makes ambient water quality standards directly enforceable against the City, contrary to the Clean Water Act's requirement that EPA translate these standards into concrete, individualized permit terms.

The Agency also imposed a permit term that impermissibly requires the City to re-evaluate its successful, multibillion-dollar pollution control program and infrastructure. EPA imposed this requirement without making the findings that the Clean Water Act requires in order to demand that San Francisco revisit its pollution controls.

1

The Agency's attempt to undermine the City's pollution controls also rests on the false premise that San Francisco's current controls are inadequate. To the contrary, data in the record show San Francisco's program to be a success and EPA's actions to be arbitrary and capricious. These errors require that the Court vacate the permit and instruct EPA to comply with the Clean Water Act and its regulations on remand.

## JURISDICTIONAL STATEMENT

(a)  EPA has subject matter jurisdiction over the permitting action at issue here because Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a), empowers the Agency to issue National Pollutant Discharge Elimination System (NPDES) permits.

(b)  EPA's approval of San Francisco's NPDES permit is final and reviewable. The City challenged EPA's issuance of the permit before the Environmental Appeals Board (EAB); the EAB denied the City's request for review of EPA's permitting decision. 1-ER-3. EPA then issued a Notice of Final Permit Decision in response to the EAB's denial of review, which constitutes final agency action. 40 C.F.R. § 124.19(m)(2). This Court has jurisdiction to review EPA's action under 33 U.S.C. § 1369(b)(1)(E).

(c)  EPA issued its Notice of Final Permit Decision on December 22, 2020, 1-ER-2, which became a final agency action on January 5, 2021. *See* 40

2

C.F.R. § 23.2.  San Francisco filed its Petition for Review (Dkt. No. 1-6) on February 9, 2021, within the 120-day period specified by 33 U.S.C. § 1369(b)(1).

## ISSUES PRESENTED

(1)     Whether EPA acted arbitrarily and capriciously, as well as contrary to the Clean Water Act, when it approved NPDES permit provisions generically prohibiting discharges that cause or contribute to exceedances of water quality standards without following its own regulations and without record support.

(2)     Whether EPA's approval of a permit requirement to update San Francisco's combined sewer overflow long-term control plan was contrary to the Clean Water Act and otherwise arbitrary and capricious because EPA made no finding that San Francisco's existing long-term control plan was not protecting water quality standards.

(3)     Whether the Court's relief must reflect that San Francisco's NPDES permit is a single, indivisible permit that required authorization from both EPA and the State of California in order to be effective under the CWA.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in a separately-bound Addendum.

## STATEMENT OF THE CASE

### A.    The Clean Water Act

#### 1.    The Act's Permitting Program

San Francisco seeks relief from EPA's errors in issuing a National Pollutant

Discharge Elimination System (NPDES) permit for the City's sewers under the

Clean Water Act (CWA or Act), 33 U.S.C. § 1251 *et seq.* San Francisco requires

such a permit to discharge treated sanitary wastewater and stormwater, as well as

any "pollutant" contained therein, from its sewer system and wastewater treatment

plants into surface waters. *Id.* §§ 1311(a), 1342(a).

Both EPA and states issue NPDES permits. Most states, like California, are

authorized to issue permits for discharges into waters within the state's

jurisdiction.[1] *See* 33 U.S.C. § 1342(b); 40 C.F.R. 123.1(d)(1). Once a state

receives authorization, EPA's loses its authority to issue permits for discharges

within that state. 33 U.S.C. § 1342(c)(1). Authorized states, however, lack

authority to issue permits for discharges into the ocean more than three miles from

the shore. Only EPA may permit these discharges. *Pac. Legal Found.* v. *Costle*,

---

[1] California received authorization to issue NPDES permits through its State
Water Resources Control Board (State Water Board) and nine Regional Water
Quality Control Boards. 54 Fed. Reg. 40,664 (Oct. 3, 1989); 39 Fed. Reg. 26,061
(July 16, 1974).

586 F.2d 650, 655 (9th Cir. 1978), *rev'd on other grounds, Castle v. Pac. Legal Found.*, 445 U.S. 198 (1980).

Congress intended NPDES permits to specify numeric pollutant limits or operational requirements that a discharger must satisfy in order to comply with the Act. The CWA's permitting program replaced a prior regulatory scheme that relied only on states setting "ambient water quality standards specifying the acceptable levels of pollution in a State's interstate navigable waters" and enforcing those standards directly against polluters. *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202 (1976). This system proved unworkable because ambient water quality standards provided no specific "standards to govern the conduct of individual polluters." *Id.* at 203. Congress' creation of the NPDES program corrected this problem by requiring permits to establish "effluent limitations"—restrictions on how much pollutant one may discharge—to provide "'clear and identifiable' discharge standards." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496 (1987) (quoting S. Rep. No. 92-414, at 81 (1971)); 33 U.S.C. § 1362(11).

These effluent limitations come in two forms. First, technology-based effluent limitations (TBELs) establish discharge standards based on levels of effluent quality achievable by certain pollution treatment technologies. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 122.44(a)(1); EPA, *NPDES Permit Writers' Manual*

5

(*"NPDES Manual"*) Ch. 5 (Sep. 2010).  The next section addresses the second type of effluent limitation.

Effluent limitations are typically expressed numerically (*e.g.*, a maximum number of pounds of a pollutant that may be discharged).  Permit writers may, however, prescribe best management practices (BMPs)—specific operational requirements or prohibitions—rather than numeric limitations in certain circumstances, such as when developing a numeric limit is infeasible.  40 C.F.R. §§ 122.2, 122.44(k)(3).

## 2. Protecting Water Quality in Permits

The second set of effluent limitations protect water quality standards (WQS).  Subject to EPA's approval, states issue WQS, which consist of two primary features: (1) a water's **designated use** (known in California as a **beneficial use**), like "recreation" or "water supply"; and (2) **water quality criteria** (in California, **water quality objectives**)—numeric or narrative benchmarks to protect a designated use.  *See Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 350 (D.C. Cir. 1993) (citing 33 U.S.C. § 1313(c)(2)(A)).  The CWA, however, does not make these standards directly applicable to San Francisco and other dischargers.

Instead, "the state-created standards are used as the basis for specific effluent limitations in NPDES permits."[2]  EPA's regulations prescribe a two-step process for setting these limitations:

- **Step One**:  A permit writer determines whether a limit is needed to protect WQS by conducting a **reasonable potential analysis**:  an assessment of whether a discharge, taking into account existing permit limits and other sources of pollution, "will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard …."  40 C.F.R. § 122.44(d)(1)(i).  This analysis entails characterization of "both the effluent discharged by the facility … and the receiving water for that discharge," and often entails modeling or using other analytic methods that must be documented in the record.  *NPDES Manual* pp. 6-12, -30.

- **Step Two**:  If the permit writer finds there to be a reasonable potential to exceed WQS, they must develop one or more **water quality-based effluent limitations (WQBELs)** for the pollutants that may cause WQS excursions.  Each WQBEL must be set at a level that is "derived from,

---

[2] *Am. Paper Inst.*, 996 F.2d at 350; *NRDC v. EPA*, 16 F.3d 1395, 1399 (4th Cir. 1993) ("Water quality standards … serve as a guideline for setting applicable limitations in individual discharge permits."); 33 U.S.C. § 301(b)(1)(C) (permits must include limits "necessary to meet water quality standards.").

and complies with all applicable" WQS.  40 C.F.R.

§ 122.44(d)(1)(vii)(A).  EPA's guidance expects that deriving and setting

any WQBEL entails analysis of data and other information.  *See NPDES*

*Manual* p. 6-35.

### 3.    Regulating Discharges from Combined Sewer Systems

Congress and EPA have adapted the NPDES program—and its effluent

limitations—for cities that, like San Francisco, operate combined sewer systems

(CSSs).  A CSS is a wastewater collection system owned by a state or municipality

that conveys both sanitary wastewater and stormwater to a treatment plant through

one set of pipes.  *See* 40 C.F.R. § 122.2  When flow exceeds a CSS's conveyance

capacity during wet weather (*i.e.*, rain or snowmelt), combined sewer overflows

(CSOs)—discharges from a CSS into surface waters at a point prior to the

treatment plant—can occur.  CSOs, like other discharges, require NPDES permits.

*See, e.g., Montgomery Envt'l Coalition v. Costle*, 646 F.2d 568, 589-90 (D.C. Cir.

1980).

Built in older cities nationwide, CSSs posed unique water quality challenges,

which prompted EPA to take action specific to control CSOs.  In 1994, EPA issued

the *Combined Sewer Overflow Control Policy* (the CSO Policy or Policy) to

implement a "comprehensive national strategy" for CSO control to "meet

appropriate health and environmental objectives."  7-ER-1643.  Congress made the

CSO Policy binding in 2000, specifying that "[e]ach permit, order, or decree issued pursuant to this Act … for a discharge from a combined storm and sanitary sewer [system] shall conform to the" CSO Policy. 33 U.S.C. § 1342(q)(1). As a result, the Policy dictates how every NPDES permit for CSSs must be developed.

### a. Long-Term Control Plans

The CSO Policy created a framework for NPDES permit requirements that apply to CSOs occurring during wet weather.[3] CSOs have unique TBELs, consisting of control measures called the Nine Minimum Controls. 7-ER-1646 (§ II.B.). In order to make CSOs otherwise comply with the Act, particularly its water quality requirements, the Policy also required CSS communities to develop capital project planning and implementation programs called **long-term control plans (LTCPs)**.

Under the Policy, development of a community's LTCP consists of several elements:

- Characterization, monitoring, and modelling of the CSS, including an evaluation of rainfall records and CSO monitoring;

- Development of a process for public participation in LTCP development;

---

[3] The Policy flatly prohibited CSOs that occur during dry weather. 7-ER-1644.

9

- Special consideration and prioritization of the control of CSOs into waters deemed "sensitive areas";[4]

- An evaluation of control alternatives to reduce CSOs;

- An evaluation of the relationship between cost and the performance of control alternatives to assist in control selection;

- An operational plan for the selected CSO controls; and

- A requirement to maximize treatment of wet weather flows at treatment plants. *See generally* 7-ER-1646 to -1649 (§§ II.C.1.-7.).

A community's LTCP, the product of this planning process, must include:

- An **implementation schedule**: a timetable for construction of the selected CSO controls, 7-ER-1649 (§ II.C.8); and

- A **post-construction monitoring program (PCMP)** that entails monitoring CSO effluent and receiving water quality "to verify compliance with water quality standards … as well as to ascertain the effectiveness of CSO controls." *Id.* (§ II.C.9).

---

[4] The CSO Policy defines "sensitive areas" to include waters used for primary contact recreation (*e.g.,* swimming) and drinking water sources. 7-ER-1647 (§ II.C.3.)

### b.      Exemptions from LTCP Development

San Francisco was one of the few cities that made substantial progress on developing and implementing a CSO control plan prior to the Policy's adoption. The Policy acknowledged these efforts by allowing exemptions from portions of the CSO Policy for qualifying communities. 7-ER-1645 (§ I.C.).

One of these exemptions, in Section I.C.1, relieves a municipality from the Policy's "initial planning and construction provisions"—the requirements to develop and implement controls in an LTCP. *Id.* A municipality is exempt if it "completed or substantially completed construction of CSO control facilities that are designed to meet WQS and protect designated uses, and where it has been determined that WQS are being or will be attained . . . ." *Id.* Such a community is subject only to a portion of the Policy's requirements, including its post-construction monitoring provisions. *Id.* An exempted municipality might "be required to submit a revised [LTCP]," but only if post-construction monitoring data support a determination "that WQS are not being attained" by the community's CSO controls. *Id.*

### c.      Permits for CSS Communities

The Policy also created a two-phased permitting process for CSS communities. A "Phase I" permit is a discharger's first permit issued under the

Policy. This permit requires a permittee to (a) develop and implement the Nine

Minimum Controls, and (b) develop an LTCP. 7-ER-1651 (§ IV.B.1).

A "Phase II" permit carries a CSS community through the implementation of

its approved LTCP. In Phase II, a permittee builds the CSO controls described in

its LTCP over a period of years. *Id.* (§ IV.B.2.). These controls are typically

capital-intensive projects, such as the construction of transport and storage tunnels

designed to convey or capture surges in flow that occur during wet weather, that

cost into the tens and hundreds of millions of dollars. After completing

construction of these projects, a CSS community collects post-construction

monitoring data to assess whether its controls are achieving compliance with

applicable WQS and operates under a post-Phase II permit. 7-ER-1596 (EPA

guidance explaining that the post-Phase II period follows expected completion of

CSO control implementation).

## B.    Factual Background

### 1.    San Francisco's Oceanside Facilities

The NPDES permit at issue authorizes discharges from critical wastewater

infrastructure serving approximately 250,000 residents on the western side of San

Francisco. 1-ER-134. These assets consist of (a) the Oceanside Water Pollution

Control Plant (the Plant), (b) over 250 miles of combined sewers, and (c) the

12

Westside Recycled Water Project (collectively, the Oceanside Facilities). 1-ER-133, -134.

The Oceanside Facilities are authorized to discharge into the Pacific Ocean at several locations. The first is Discharge Point 001, a 4.5 mile outfall extending from the Plant into the Pacific Ocean and known as the Southwest Ocean Outfall (identified as the SWOO on the figure below). 1-ER-136. San Francisco may also discharge from seven combined sewer discharge (CSD) outfalls named CSD-001 through -007.[5] *Id.* The following figure depicts these discharge points:



---

[5] "Combined sewer discharge" is the term San Francisco uses to refer to CSOs.

1-ER-90.

San Francisco designed the Oceanside Facilities to minimize the potential for CSOs during wet weather. Flows up to 65 million gallons per day (MGD) receive at least primary treatment at the Plant before being discharged out the Southwest Ocean Outfall. 1-ER-135. When flows exceed 65 MGD, they receive equivalent-to-primary treatment within the sewer through solids settling, skimming of floatable solids, and, in some instances, screening. *Id.* The Westside Pump Station can then pump these additional flows—up to 133 MGD—out the Southwest Ocean Outfall. *Id.* The Oceanside Facilities also include three transport/storage structures with a combined capacity of 71 million gallons. *Id.* The Oceanside Facilities discharge from one or more of the seven CSD outfalls only when flows exceed the capacity of these assets. *Id.*

This configuration requires San Francisco to obtain a joint NPDES permit from both EPA and the San Francisco Bay Regional Water Quality Control Board (Regional Board). EPA must authorize discharges from the Southwest Ocean Outfall because it discharges more than three miles from shore. *In re City & Cty. of S.F.*, 4 E.A.D. 559, 560 n.1 (EAB 1993). The Regional Board must authorize the CSD outfalls because they discharge to near-shore waters. *See supra* at 4 (discussing limits on program authorization). The Oceanside Facilities— particularly the sewers—function as a single integrated system that serves both the

14

Southwest Ocean Outfall and the CSD outfalls; it cannot be readily divided into "federal" and "state" portions. As a result, EPA and the Regional Board have *jointly* issued NPDES permits for the Oceanside Facilities over several decades. *See* 5-ER-1029, -1190, -1229.

### 2. The City's CSO Control Efforts

The Oceanside Facilities reflect a multibillion dollar investment and decades of planning that began before passage of the CWA. San Francisco started work to reduce and control its CSOs in the late 1960s, undertaking activities that led to the development of a Master Plan in 1971. 4-ER-960 to -961. This effort included automated monitoring of rainfall and sewer levels, creating the City's first computational model of the sewer system, and conducting effluent studies and modeling to analyze water quality, currents, drift, and mass water movement. 4-ER-960. The 1971 Master Plan proposed a series of controls to reduce the Oceanside Facilities' CSO frequency by more than an order of magnitude—from 82 to eight. 4-ER-961.

After the CWA's passage, the City modified, with EPA's review and approval, the Master Plan to become eligible for construction grants available under the Act. This 1974 modification was accompanied by an Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) prepared by EPA and the San Francisco Department of Planning. *Id.* The City then undertook

15

monitoring, modeling, and extensive surveys of beach recreational use to evaluate the relationship between receiving waters and wet weather discharges from the City's CSD outfalls.  4-ER-962.

Prompted by the Regional Board's 1975 adoption of its first Comprehensive Basin Plan for the Bay Area, San Francisco conducted CSO control work under a series of orders and permits.  The orders included requirements for the City to perform field studies on the potential impacts of untreated overflows on the receiving waters to inform a cost-benefit analysis.  4-ER-962 to -963.  These studies formed the basis for the issuance of Regional Board Order No. 79-12.  This order established a long-term annual average criterion of eight CSOs per year as the basis for designing and constructing the City's CSO controls to protect receiving waters on the west side of San Francisco.  7-ER-1676.

Building on Order No. 79-12, the State Water Board issued Order No. 79-16.  This order set the parameters for San Francisco's construction of the Oceanside Facilities' CSO controls and defined how WQS apply to the Oceanside Facilities.  The State Water Board granted the Oceanside Facilities an exception to the Ocean Plan—the document that defines WQS for the Pacific Ocean—after finding "it was inappropriate to apply Ocean Plan standards strictly to combined waste and stormwater discharges."  7-ER-1662.  The State Water Board further found, based on San Francisco's data, that controls designed and operated to

16

achieve an average of eight CSOs per year would not compromise relevant beneficial uses.  7-ER-1666.

These findings formed the basis for exempting the Oceanside Facilities' wet weather CSOs from the obligation to comply with bacterial water quality objectives, while requiring San Francisco to design its controls to comply with other objectives "to the greatest extent practical."  7-ER-1670; 1-ER-141; 4-ER-870.  EPA approved the Order and its exemption in an August 17, 1979 letter.[6]  5-ER-1204.

San Francisco relied on this order to build the Oceanside Facilities' transport/storage structures and other CSO controls in the early 1980s.  4-ER-964.  The City completed construction of its CSO controls—covering both the Oceanside Facilities and the bayside of the peninsula—in 1997.  This city-wide CSO control effort cost San Franciscans more than $2 billion (in 2017 dollars).  *Id.*  The CSO controls have successfully reduced the City's annual average number of CSOs below the protective eight CSOs per year standard set by the State Water Board in Order No. 79-16.  4-ER-933.

---

[6] The State Water Board last revised the Ocean Plan in 2019 and retained the Oceanside Facilities' exemption under Order No. 79-16.  *See* 3-ER-614.

17

### 3. San Francisco's CSO Policy Exemption and Prior Permits

Due to this unique history, the City's LTCP consists of multiple documents (rather than a single plan) that EPA and the Regional Board have used for decades as the basis for issuing NPDES permits covering the Oceanside Facilities.[7]  In 1997, EPA and the Regional Board issued an NPDES permit for the Oceanside Facilities in which they concluded that San Francisco's fully-built CSO control program was exempt "from the planning and construction requirements" of the CSO Policy.  5-ER-1235.  Both agencies recognized that this finding was consistent with the broad exemption provided by Section I.C.1 of the Policy.  5-ER-1237.  EPA and the Regional Board affirmed these findings in subsequent permits.[8]  Under the Policy, these findings that San Francisco completed its construction obligations make each of the City's permits post-Phase II permits. *See supra at* 12.

Consistent with these findings, the Oceanside Facilities' prior permits have defined San Francisco's water quality-based compliance obligations during wet weather solely by reference to the City's LTCP.  The 1997, 2003, and 2009

---

[7] These documents are summarized and identified in San Francisco's 2018 *Wastewater Long Term Control Plan Synthesis*.  4-ER-951.

[8] 5-ER-1206 (San Francisco "demonstrated compliance with Section I.C.1 of the CSO Control Policy."); 5-ER-1038 (San Francisco's CSO control program is "consistent with the [CSO Control Policy]").

Oceanside Facilities NPDES permits contained a series of provisions (the LTCP WQBELs) requiring San Francisco to operate the controls specified in its LTCP to protect water quality during wet weather. *See* 5-ER-1249; 5-ER-1215 to -1216; 5-ER-1055 to -1056. This proceeding concerns EPA's attempt (in conjunction with the Regional Board) to deviate from this practice and alter San Francisco's water quality-based obligations.

### C. Proceedings Before the Agency

#### 1. The Draft Permit and San Francisco's Comments

EPA (through its Region 9 office) and the Regional Board jointly developed the permit at issue here. They conducted this process for developing a single, joint permit consistent with their practices dating back over 30 years.[9] In April 2019, the agencies published a draft permit and solicited public comments. The draft permit and accompanying notice both indicated that the agencies were issuing a single NPDES permit, not two separate permits. 3-ER-620; 4-ER-936 ("EPA and the [Regional] Board prepared a draft [NPDES] permit (CA0037681) for the above discharger ….").

---

[9] The Oceanside Facilities have been authorized via a single, jointly issued permit since 1988, when EPA issued a federal NPDES permit that the state cosigned and designated as State Order No. 88-106.18. *In re City & Cty. of S.F.*, 4 E.A.D. at 559.

San Francisco submitted detailed comments that raised a number of concerns about the draft permit's provisions addressing the City's water quality-based obligations and the Oceanside Facilities' LTCP. These comments questioned the draft's conformity with the Act, the CSO Policy, and the CWA's requirements for setting WQBELs. These comments also called to the agencies' attention monitoring data and a number of analyses that San Francisco performed to show how the City's LTCP protects applicable WQS. *See generally* 4-ER-888 to -932.

### 2. The Final Permit

The final permit issued by the agencies, NPDES Permit No. CA0037681 (designated Order No. R2-2019-0028 by the Regional Board) (the Permit), did not resolve the concerns raised in San Francisco's comments. It contains two sets of provisions that San Francisco challenges.

### a. The Generic Prohibitions

*First*, the City is challenging two provisions that impose a generic obligation to comply with water quality standards (collectively, the Generic Prohibitions). Rather than prescribe pollutant limits or ways in which San Francisco must operate

its CSO controls to protect water quality, these two provisions are broadly written and lack standards specifying how San Francisco can comply with the CWA:[10]

- Section V specifies that a discharge may "not cause or contribute to a violation of any applicable water quality standard," 1-ER-63; and

- Attachment G, § I.I.1 provides that no "discharge of pollutants shall create pollution … defined by California Water Code Section 13050."[11] 1-ER-171.

The Permit's Fact Sheet provides no factual basis and minimal justification for the Generic Prohibitions, explaining only that Section V is "necessary to ensure compliance with applicable water quality standards in accordance with the CWA …."[12] 1-ER-156.

---

[10] The Permit retained the LTCP WQBELs that the agencies prescribed in prior Oceanside Facilities permits. 1-ER-74 (§ IV.C.5.c.); 1-ER-155 ("the "Long-Term Control Plan required pursuant to the *Combined Sewer Overflow (CSO) Control Policy* and described in Provision VI.C.5.c. of the Order serves as narrative WQBELs.").

[11] California Water Code Section 13050(*l*)(1)(A) defines "pollution" to include "alteration of the quality of waters of the state … which unreasonably affects … the waters for beneficial uses.").

[12] The fact sheet is a document accompanying a NPDES permit "that briefly sets forth the principal facts and the significant factual, legal, methodological, and policy questions considered" by EPA. *NPDES Manual* p. 11-8.

21

#### b.    The LTCP Update

*Second*, San Francisco challenges Section VI.C.5.d.'s requirement for the City to "update" its LTCP, notwithstanding the City's multibillion dollar investment in CSO controls and exemption from further planning under Section I.C.1 of the CSO Policy.  1-ER-75.  Section VI.C.5.d (the LTCP Update) effectively requires San Francisco to develop a new LTCP by executing a series of tasks that may result in San Francisco having to invest in a new round of costly capital projects that are not justified by water quality needs

The LTCP Update requires San Francisco to conduct planning activities that the CSO Policy imposes on communities that have yet to develop an LTCP.  The City must prepare a System Characterization Report, which will require San Francisco to engage in sewer characterization, monitoring, and modeling activities that track the "Characterization, Monitoring and Modeling of the Combined Sewer System" required for *initial* LTCP development.  *Compare* 1-ER-75 (Permit § VI.C.5.d., Task 1), *with* 7-ER-1646 (Policy § II.C.1.).  It further demands that the City create a public participation plan, another requirement associated with initial LTCP development.  *Compare* 1-ER-75 (Permit § VI.C.5.d., Task 2), *with* 7-ER-1647 (Policy § II.C.2.).

The Permit also requires San Francisco to develop and propose additional CSO controls in a "Consideration of Sensitive Areas Report."  This requirement

demands that, for six of the City's CSD outfalls,[13] San Francisco "propose[] control alternatives needed to eliminate, relocate, or reduce the magnitude or frequency of discharges" from these locations.  1-ER-76 (§ IV.C.5.d, Task 3).  This report is not academic planning exercise; the report must include "an implementation schedule that includes interim milestones."  *Id.* (Task 3.g.).

The Fact Sheet provides only a cursory explanation for requiring San Francisco to revisit its multibillion dollar CSO control program.  The agencies refer generally to the LTCP Update's consistency with EPA guidance and how it "implements" State Water Board Order No. 79-16.  1-ER-160, 161.  The Fact Sheet's explanation otherwise only cites a string of provisions from the CSO Policy relating to permit requirements in Phase II NPDES permits and claims a general need "to document that the Discharger's LTCP is based on the most current information …."  1-ER-161.

### c.    The Permit's Approvals

The agencies' actual *approvals* of the final Permit came in fits and starts, and against the backdrop of threatened enforcement against the City.  The Regional Board signed the permit, indicating its approval, on September 12, 2019.  1-ER-57.

---

[13] These are outfalls CSD-001 to -003 and CSD-005 to -007.

EPA waited nearly three months after the Regional Board signed, approving the Permit on December 10, 2019.  1-ER-55.  During this delay, EPA took the unusual step of transferring the Permit's approval to EPA headquarters, away from the Region 9 office.  3-ER-766.  The Agency also sent a letter to California's governor during this period, threatening enforcement against the City based on claims that discharges from San Francisco's CSS are impairing water quality.  3-ER-767 to -770.

### 3.  San Francisco's Appeal to the Environmental Appeals Board

On January 13, 2020, San Francisco filed a petition with the Environmental Appeals Board (EAB) to challenge the Generic Prohibitions and LTCP Update (collectively, the Contested Provisions),[14] as well as a third provision that the City is not challenging here.[15]  Because the Regional Board's approval of the Permit is a distinct agency action, San Francisco separately challenged the Regional Board's decision in a state court action.  *City & Cty. of S.F. v. S.F. Bay Reg'l Water Quality Control Bd.*, No. RG19042575 (Alameda Cty. Super. Ct.).  This state court litigation is stayed pending resolution of proceedings in this Court.

---

[14] San Francisco challenged both sets of provisions as being inconsistent with the CWA, its implementing regulations, and the facts in the record.  2-ER-462 to -481; 2-ER-361 to -372.

[15] That provision, Section IV.c.5.a.ii.b., requires San Francisco to report certain overflows from its CSS.  1-ER-71.

24

At the outset of the EAB proceeding, EPA argued for the first time that it and the Regional Board had not jointly approved a single NPDES permit. Contrary to the Oceanside Facilities' permitting history and the record, EPA claimed in its Notice of Stay of Contested Conditions that the Permit was two separate permits: one state, one federal.[16]  *See* 2-ER-437.  In EPA's view, this framing of the Permit made the Contested Provisions in a putative "federal" permit unenforceable, while leaving EPA free to enforce identical requirements in the "state" permit.  *Id.*

The City objected to EPA's re-characterization of the Permit and filed a supplemental petition for review contesting EPA's novel position.  The supplemental petition highlighted how EPA's claim that the agencies issued two separate permits was inconsistent with, among other things (1) the Permit's text, which recognizes only one permit; and (2) the administrative process employed by the agencies, which resulted in issuance of one Permit and one Response to Comments authored jointly by EPA and the Regional Board.  2-ER-326 to -31.

The EAB issued an order on December 1, 2020 that denied San Francisco's original and supplemental petitions on all grounds.  1-ER-3.  The EAB based its

---

[16] Contested permit provisions are stayed pending review before the EAB.  40 C.F.R. § 124.16(a)(1).  After the EAB receives a petition for review, EPA must file a notice identifying the contested provisions covered by such a stay.  *Id.* § 124.16(a)(2)(ii).

denial on its highly deferential standard of review, under which it only disturbs a permit decision that "is based on a clearly erroneous finding of fact or conclusion of law." 1-ER-6 (citing 40 C.F.R. § 124.19(a)(4)(i)). In response to the EAB order, EPA issued a Notice of Final Permit Decision, 1-ER-2, which constitutes final agency action. 40 C.F.R. § 124.19(m)(2). San Francisco then filed its Petition for Review in this Court.

## SUMMARY OF THE ARGUMENT

The Contested Provisions threaten San Francisco's substantial investments in its CSO control program and fail to provide the City with clear direction on how to continue investing to ensure compliance with the CWA. Both the Generic Prohibitions and the LTCP Update reflect EPA's failures to heed the CWA's limitations on its authority and the Act's implementing regulations. The record also contradicts EPA's flawed justifications for the Contested Provisions. The facts before the Agency show that San Francisco's CSO controls protect water quality in the Pacific Ocean. EPA had no legitimate reason to burden the City with the Contested Provisions. These arbitrary and capricious actions demand vacatur of the Permit and a remand to EPA.

By imposing the Generic Prohibitions, EPA abdicated its duty to set concrete permit terms prescribing pollution levels or operational requirements that achieve compliance with WQS. Without clear benchmarks for how to discharge consistent with WQS, the City will be forced to invest in pollution controls without any assurance these investments will actually result in compliance. Worse yet, EPA took this action despite a court of appeals decision that struck down similar permit terms because they failed to inform dischargers what they must do or cannot do in order to comply with WQS.

The Generic Prohibitions' lack of specific pollutant limits or operational practices results from EPA flouting its permitting regulations. These rules prescribe a process for setting discharger-specific WQBELs to protect WQS. EPA's contentions, made repeatedly below, that it had discretion not to follow this process, would absolve the Agency from ever again having to set discharger-specific limits to protect water quality. The Act and EPA's regulations afford the Agency no discretion to leave San Francisco in the dark about how to comply with the Act and WQS.

EPA's justifications for imposing terms that fail to specify how to comply with the Act are threadbare and at odds with the record. The Agency justified the Generic Prohibitions by making conclusory statements that these terms were somehow necessary to protect WQS. EPA mustered no record support for these assertions because it could not have done so. Data before the Agency show that San Francisco's WQBELs are sufficient to protect receiving water quality, contradicting EPA's claimed need to impose the Generic Prohibitions.

Likewise, EPA's imposition of the LTCP Update would force San Francisco to re-evaluate its multibillion dollar CSO control program without any demonstrated need to do so. The Act and CSO Policy provide that communities like San Francisco can be required to revisit their costly LTCPs in only narrow circumstances: when these plans are not resulting in attainment of WQS. These

circumstances do not exist here; San Francisco's data indicate that its CSO controls protect receiving water quality.

Unable to justify the LTCP Update on water quality grounds, EPA attempted to save this permit term by relying on factors that the Act and CSO Policy do not allow it to consider. The Agency's demand that San Francisco re-do its LTCP and develop new controls rests on EPA's apparent discomfort with the age of the City's plan, which dates back to the 1970s. The CWA does not allow EPA to upset San Francisco's compliance and capital planning efforts by invoking vague concerns that an LTCP *might* be outdated. The Act only allows the Agency to send San Francisco back to the drawing board when an LTCP's *performance* is shown to be inadequate by post-construction monitoring data. EPA has not found San Francisco's plan to be insufficient based on the City's water quality data, and the Agency cannot use its concerns about the age of the City's LTCP to force the City to spend public money on additional, unnecessary CSO controls.

In imposing the LTCP Update, EPA also ignored the limits on its authority to require San Francisco to reassess discharges into sensitive areas. Having exempted the City from the CSO Policy's planning requirements, EPA could not require San Francisco to perform any sensitive areas analysis. Even if the City had no exemption, the Agency lacked authority to require a sensitive areas analysis that, like the one required by the LTCP Update, entails the assessment of controls

29

to reduce or treat CSOs. The Act empowers the agency to require only that a discharger reevaluate whether it could move or eliminate discharges into sensitive areas. Against the backdrop of San Francisco's protection of WQS, EPA had no authority to require San Francisco to further control its already compliant discharges.

These errors require that the Court vacate the Permit and take steps to ensure that the Agency does not attempt to circumvent a vacatur order. Before the EAB, the Agency argued—to preserve its ability to enforce the Contested Provisions even if they were invalidated—that the Permit is actually two separate NPDES permits: one state and one federal. This fiction cannot be squared with the Permit's text or its administrative record. The Court must fashion its relief to prevent EPA from undermining the Permit's vacatur.

## STANDARD OF REVIEW

The Administrative Procedure Act governs judicial review of EPA's approval of the Permit. *Native Village of Kivalina IRA Council v. EPA*, 687 F.3d 1216, 1219 (9th Cir. 2012). EPA's decision must be reversed if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). EPA has acted impermissibly if

> the agency has relied on factors which Congress has not intended it consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Natural Resources Defense Council v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Under this standard, "the court needs to ensure a 'rational connection between the facts the agency found and the choice the agency made.'" *Planned Parenthood of Greater Wash. & N. Idaho v. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1114 (9th Cir. 2020) (quoting *State Farm*, 463 U.S. at 43)). The "administrative record must be sufficient to support the agency action … and enable the court to review the agency's decision." *Newton-Nations v. Betlach*, 660 F.3d 370, 381 (9th Cir. 2011) (internal quotations and citations omitted).

31

## ARGUMENT

### I. The Generic Prohibitions cannot be reconciled with the Act, EPA's regulations, or the record.

The Generic Prohibitions contravene EPA's obligation under the CWA to specify pollutant limits or operational requirements that will achieve compliance with WQS. San Francisco is prepared to invest in additional pollution controls, if needed, in order to comply with the Act. The Generic Prohibitions, however, provide the City no direction on how it must operate its sewer system or what pollution benchmarks its discharges must achieve. Under these provisions, San Francisco must make its best guess about how to comply with WQS, while remaining exposed to an after-the-fact enforcement action if EPA disagrees with the City's understanding of what constitutes compliance.[17] The Act does not allow the Agency to put San Francisco in this bind.

The record also shows the Generic Prohibitions to be a solution in search of a problem. EPA justified these provisions with only conclusory assertions that the record contradicts and that appear to reflect the Agency's threats of enforcement made during the prior administration. *See* 3-ER-768.

---

[17] Based on EPA's 2019 threat of enforcement based on unspecified claims of water quality exceedances, such an action is not a theoretical concern. *See* 3-ER-768.

32

### A. EPA violated its duty to define San Francisco's water quality-based obligations in the Permit.

The Generic Prohibitions' vague requirements result from EPA's disregard for the CWA's directive that the Agency write permit terms that actually tell San Francisco *how* to discharge consistent with WQS by specifying pollutant limits or specific operational requirements. The Act required EPA to ensure that the Permit complied with all of the CWA's requirements, including its command that each permit ensure protection of WQS.[18]

The Generic Prohibitions do not satisfy this directive. In *NRDC v. EPA*, the Second Circuit invalidated a provision in a general NPDES permit for vessel discharges that—like the Generic Prohibitions—imposed a general, open-ended duty to comply with applicable WQS.[19] 808 F.3d 556, 568 (2d Cir. 2015) (permit required control of discharges "as necessary to meet applicable water quality

---

[18] *See* 33 U.S.C. § 1311(b)(1)(C) (requiring limitations necessary to meet water quality standards); 40 C.F.R. § 122.4(d) (permits must "ensure compliance with the applicable water quality requirements of all affected States"); *id.* § 122.44(d)(1)(i) (permits must contain limits "necessary to … [a]chieve water quality standards").

[19] The Second Circuit's decision contradicts EPA's contention that "federal courts have recognized the authority of permit issuers to include narrative prohibitions against violations of water quality standards …." 1-ER-22; 4-ER-865. This claim both ignores *NRDC v. EPA* and misreads the cases on which EPA relies. The latter concerned generic prohibitions' *enforceability* rather than their *validity* or EPA's authority to issue them. *E.g.*, *NRDC v. Cty. of Los Angeles*, 725 F.3d 1194, 1250 (9th Cir. 2013) (enforcing general requirement to comply with water quality standards because "each permit term is simply enforced as written").

33

standards in the receiving water body").  The court found that a general

requirement not to violate WQS "is insufficient to give [dischargers] guidance as

to what is expected or to allow any permitting authority to determine whether a

[discharger] is violating [WQS]."  *Id.*at 578.  This lack of guidance—a failure to

specify pollutants limits or operational practices—led the court to conclude that the

generic prohibition failed to meet the Act's "requirement that NPDES permits

ensure compliance with the CWA."  *Id.* at 580; *see also Prairie Rivers Network v.*

*Ill. Pollution Control Bd.*, 50 N.E. 3d 680, 688 (Ill. Ct. App. 2016) (invalidating a

NPDES permit provision specifying that "effluent cannot cause or contribute to

water quality violations" because it did not specify requirements for ensuring

protection of water quality).

    The Generic Prohibitions afford San Francisco the same dearth of direction

that doomed the permit reviewed by the Second Circuit.  Unlike the Permit's

WQBELs, which specify levels of effluent quality and how to operate the City's

CSO controls in order to protect WQS, neither of the Generic Prohibitions

specifies what, if anything the City must or cannot do to avoid violating WQS.  *Cf.*

1-ER-62 (dry weather chronic toxicity WQBEL); 1-ER-74 (narrative, operational

requirements for implementing the controls in San Francisco's LTCP).  Instead,

they simply declare that San Francisco cannot "cause or contribute" to a violation

of *any* WQS.  As San Francisco explained in its comments, such an open-ended

command "create[s] uncertainty for [the City] associated with its permit obligations and how the agency can ensure that it is maintaining compliance with those obligations." 4-ER-921.

This uncertainty leaves San Francisco to invest public money in pollution controls without any assurance that this investment will result in compliance with the Permit and protection of WQS. Assessing whether a discharge might "cause or contribute" to a WQS exceedance is not straightforward. It involves the use of scientific and technical judgment to resolve uncertainties regarding the relationship between effluent quality and its impact on receiving waters. Resolving this uncertainty is the province and obligation of permit writers, who are tasked with performing this precise set of evaluations and providing discharger-specific guidance by setting WQBELs.[20]

EPA even acknowledged that its imposition of the Generic Prohibitions fails to provide San Francisco the direction it needs and the Act requires. The Agency admitted below that the Generic Prohibitions made it "harder to assess the levels of pollutant discharges that would comply" with the Act than if the Agency had

---

[20] *See In re Upper Blackstone Water Pollution Abatement Dist.*, 14 E.A.D. 577, 599 & n.27 (EAB 2010) (discussing permit writers' role in resolving uncertainty in conducting a reasonable potential analysis required by 40 C.F.R. § 122.44(d)(1)(i)); *see also supra* at 7-8 (discussing analysis involved in setting WQBELs).

35

established WQBELs.  2-ER-417.  This difficulty in being able to assess

compliance renders the Generic Prohibitions "too imprecise to guarantee

compliance with water quality standards," such that EPA's action was arbitrary

and capricious.  *NRDC*, 808 F.3d at 570.

### B.    EPA's imposition of the Generic Prohibitions disregarded the Agency's permitting procedures.

The Generic Prohibitions' lack of direction for how to comply results from

EPA's failure to follow its own rules for setting WQBELs.  The record is devoid of

any "reasonable potential analysis" to determine whether including the Generic

Prohibitions was merited.  *See* 40 C.F.R. § 122.44(d)(1)(i); *supra at* 7-8

(describing the CWA's processes for setting WQBELs).  EPA also made no

attempt to "derive" the Generic Prohibitions from applicable WQS. 40 C.F.R.

§ 122.44(d)(vii)(A) (WQBELs must be "derived from" applicable water quality

standards).  The Agency has long understood deriving a limitation to entail a

documented analysis that is absent from all portions of the record that discuss the

Generic Prohibitions.  *See NPDES Manual* pp. 6-31 to -40.

EPA is not free to disregard this regulatory process designed to provide San

Francisco with concrete, individualized requirements.[21]  In justifying its failure to

---

[21] *See, e.g.*, *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189,
1199 (9th Cir. 2011) ("'It is a familiar rule of administrative law that an agency

conduct a reasonable potential analysis or derive the Generic Prohibitions from applicable WQS, EPA posited that it was *not bound* by the process for setting WQBELs in 40 C.F.R. § 122.44(d)(1)(i)-(vii).  The Agency believed it had discretion to jettison this process and directly apply WQS through the Generic Prohibitions.  See 1-ER-21 ("the regulations do not require all permit conditions necessary to meet water quality standards to be" issued consistent with the process in § 122.44(d)(1)(i)-(vii)).  This reading cannot be reconciled with how the Agency's regulations unambiguously make the WQBEL-setting process the exclusive mechanism for setting permit limits to protect water quality.[22]

Read as a whole, the NPDES regulations afford EPA no discretion to jettison the WQBEL-setting process and impose the Generic Prohibitions.[23]  Below, EPA

---

must abide by its own regulations.'" (quoting *Ft. Stewart Schools v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990)).

[22] For this reason, EPA cannot resort to *Auer* deference to defend its misreading of its regulation.  *See, e.g.*, *Attias v. Crandall*, 968 F.3d 931, 937 (9th Cir. 2020) (agency interpretations of their regulations are eligible for deference only when the regulations at issue are "genuinely ambiguous" (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)).

[23] *See, e.g.*, *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1074 (9th Cir. 2016) (goal of statutory interpretation is to "understand the statute as a symmetrical and coherent regulatory scheme and to fit, if possible, all parts into a harmonious whole." (quoting *Gila River Indian Community v. United States*, 729 F.3d 1139, 1145 (9th Cir. 2013)) (internal quotation marks omitted); *Rodriguez v. Holder*, 619 F.3d 1077, 1079 (9th Cir. 2010) ("We interpret each provision to fit harmoniously as part of a 'symmetrical and coherent' statutory scheme." (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))); *see also Texaco Inc. v.*

defended the Generic WQBELs by citing its obligation to impose "*any requirements* … necessary to … [a]chieve water quality standards," 40 C.F.R. § 122.44(d)(1), and a general mandate that NPDES permit ensure compliance with WQS, 40 C.F.R. § 122.4(d).  1-ER-21; 4-ER-864.  EPA, however, cannot rely on these provisions in isolation.[24]  They must read in the context of the seven sub-paragraphs in 40 C.F.R. § 122.44(d)(1).[25]  Those subparagraphs specify only one mechanism for determining the "requirements" referenced in § 122.44(d)(1): the WQBEL-setting process, with its demands to conduct a reasonable potential analysis and set limits that are "derived from" and found to "compl[y] with applicable water quality standards."  *See id.* § 122.44(d)(1)(i), (vii)(A).

---

*United States*, 528 F.3d 703, 710 (9th Cir. 2008) ("Determining a regulation's meaning requires application of the same principles that imbue exercises in statutory construction." (internal quotation marks and citation omitted)).

[24] *See, e.g.*, *E.g.*, *Yokeno v. Sekiguchi*, 754 F.3d 649, 653 (9th Cir. 2014) ("We do not look at statutory language in isolation, but consider 'the specific context in which [statutory language] is used, and the broader context of the statute as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))); *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 949 (9th Cir. 2019) ("'statutes are not read as a collection of isolated phrases'" (quoting *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009))).

[25] *See, e.g.*, *El Comite Para el Bienestar de Earlimart v. EPA*, 786 F.3d 688, 696 (9th Cir. 2015) ("[O]ur task is to interpret the regulation as a whole…not to give force to one phrase in isolation." (internal quotation marks and citation omitted)); *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("we construe language in its context and in light of the terms surrounding it.").

The regulations' specification of this sole process makes it the only means at EPA's disposal for setting "any requirements" to protect WQS in the Permit. *E.g.*, *Copeland v. Ryan*, 852 F.3d 900, 907 (9th Cir. 2017) ("there is a presumption 'that when a statute designates certain … manners of operation, all omissions should be understood as exclusions.'" (quoting *Boudette v. Barnette*, 923 F.3d 754, 756-57 (9th Cir. 1991)). The regulations' use of the term "any" merely recognizes that EPA may establish a range of possible limits when its exercises its discretion within the confines of the WQBEL-setting process.[26]

By contrast, EPA's position would absolve the Agency of any obligation to set discharger-specific WQBELs. In the Agency's view, it need not follow the WQBEL-setting process and can simply demand compliance with WQS writ large. If the Court adopts the Agency's views, a permit writer would never again have to conduct a reasonable potential analysis or assure themselves that a WQBEL is sufficiently protective to "comply with applicable water quality standards." 40

---

[26] EPA's guidance confirms this reading of the regulations. EPA's *Permit Writers' Manual*, used nationwide for developing NPDES permits, acknowledges how permits must "include *any* effluent limitations necessary to meet water quality standards." *NPDES Manual* p. 6-1. The *Manual* further specifies how, "to satisfy this requirement," permit writers employ "a process"—singular—to assess the need for and "where necessary, develop WQBELs": a description of the WQBEL-setting process laid out in § 122.44(d)(1)(i)-(vii). *Id.* The *Manual* nowhere contemplates that EPA has at its disposal any mechanism other than this process to "determine[] final effluent limitations" or otherwise "ensure that all applicable CWA standards are met." *Id.* at pp. 6-2, 7-1.

C.F.R. §122.44(d)(1)(vii)(A). Instead, they would be able to do what EPA has attempted here: push this procedural requirement aside and impose a general requirement to comply with WQS. The Court cannot countenance nullification of the regulations' WQBEL-setting procedures. *See, e.g.*, *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 966 (9th Cir. 2013) ("courts should not interpret statutes in a way that renders a provision superfluous.").

### C. EPA arbitrarily imposed the Generic Prohibitions.

#### 1. EPA marshalled no record support for these terms.

EPA's decision to impose the Generic Prohibitions and leave San Francisco without direction on how to comply with WQS rests on a pair of unsupported assertions. *First*, EPA maintained that the limits "are necessary to ensure compliance with applicable water quality standards …." 1-ER-156. *Second*, EPA justified these limits as necessary because compliance with the Permit's WQBELs will not necessarily achieve water quality standards. 4-ER-867; 4-ER-785 (the Generic Prohibitions "serve as backstops in the event that the effluent limitations … prove to be inadequate.").

EPA asserted these justifications as conclusions, unsupported by facts in the record. EPA nowhere explained why or how the Generic Prohibitions are "necessary" for any reason, let alone "to ensure compliance with" WQS. 1-ER-156. EPA similarly mustered no facts and conducted no analysis to show why the

Permit's WQBELs "will not necessarily achieve water quality standards." 4-ER-867. EPA supported these critical justifications with no assessment of receiving water or effluent quality achieved by the Permit's WQBELs.

EPA cannot impose the Generic Prohibitions based on these "bald declaration[s]" of its reasons, divorced from facts in the record. *City & Cty. of S.F. v. U.S. Citizenship & Immigration Servs.*, 981 F. 3d 742, 760 (9th Cir. 2020). By doing so, it failed to discharge "its duty to engage in 'reasoned decisionmaking' and 'explain the evidence which is available.'" *Id.*[27]

The EAB's attempt to resuscitate these conclusory justifications by identifying facts that *might* have been relevant to the Agency's conclusions only underscores how EPA acted arbitrarily. The EAB cherry-picked data relating to (a) gallons of combined stormwater and wastewater discharged between 2011 and 2014; (b) recreational use of receiving waters after CSO events; and (c) a limited

---

[27] *See also Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (EPA's reliance on rationale that is "unsupported by any explained reasoning" is arbitrary and capricious); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (holding agency's decision arbitrary and capricious because its rationale "is not a statement of reasoning, but of conclusion" and "conclusory statements will not do"); *Chem. Mfrs' Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994) (agency rationale that was "unsupported and conclusory" was arbitrary and capricious).

number of exceedances of a WQS that does not even apply to the Oceanside

Facilities' discharges.[28]  1-ER-27 to -28.

The EAB, however, provided no explanation for how these data justified the

Generic Prohibitions.  It claimed that the data only generally "support … the need

to protect beneficial uses." 1-ER-27.  The record, including the EAB's decision,

contains no analysis of what this information shows about EPA's claimed "need"

for the Generic Prohibitions.  Having failed to make any such assessment, the

Court cannot credit the EAB's post hoc statements and must conclude that EPA's

threadbare justifications render the Generic Prohibitions arbitrary and capricious.

*See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1052-54 (9th Cir. 2010) (agency

decision was arbitrary and capricious where its "explanation is incomplete and

inadequate to permit meaningful judicial review"); *United Steel v. Mine Safety &*

*Health Admin.*, 925 F.3d 1279, 1285 (D.C. Cir. 2019) (rule found to be arbitrary

and capricious because "the record lacks a reasonable justification…").

---

[28] Specifically, the EAB referenced the single sample maximum water quality
objective for enterococcus.  1-ER-28.  The Oceanside Facilities are exempt from
this and other bacteriological water quality objectives.  *See supra* at 16-17
(discussion of Order No. 79-16).

### 2. The record contradicts EPA's claim that the Generic Prohibitions are necessary.

EPA mustered only conclusory justifications for the Generic Prohibitions because the record provides no support for the Agency's claim that the City's WQBELs will not necessarily protect WQS. To the contrary, the record contains findings and analysis reflecting how the Permit's WQBELs are sufficient to protect receiving water quality. This contradiction between EPA's reasons and the record exposes the imposition of the General Prohibitions to be an arbitrary act that must be vacated. *See Humane Soc. of U.S.*, 626 F.3d at 1050-51 (invalidating agency action where "findings are in apparent conflict" with the agency's decision and the agency "has not offered a rationale to explain the disparate findings"); *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1024-30 (9th Cir. 2011) (agency action found arbitrary and capricious where it "did not articulate a rational connection between the data before it and its conclusion").

### a. EPA's claim that the Generic Prohibitions are necessary contradicts the Agency's decision to set WQBELs.

The Agency's rationale for the Generic Prohibitions cannot be reconciled with the Permit's WQBELs and the findings that support them. These WQBELs consist of a chronic toxicity limitation that applies to the Southwest Ocean Outfall during dry weather and the Permit's LTCP WQBELs—requirements to implement the City's LTCP controls—during wet weather. 1-ER-62. EPA's implicit and

43

explicit findings made in setting these WQBELs contradict the Agency's justifications for the Generic Prohibitions. Such an "internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141 (citing *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987)); *Humane Soc. of U.S.*, 626 F.3d at 1055 (faulting agency's failure to "confront…inconsistencies" and "explain cogently the bases of its decision[]").

The Agency's decision to set WQBELs necessarily included determinations that these Permit limits are sufficient to protect WQS on their own. EPA's regulations demand that all WQBELs "ensure" that "[t]he level of water quality to be achieved by limits on point sources established under this paragraph [*i.e.*, WQBELs] … complies with all applicable water quality standards. 40 C.F.R. § 122.44(d)(1)(vii)(A). Setting the Permit's WQBELs thus encompassed a determination that these limitations actually ensure compliance with applicable WQS.

The Fact Sheet confirms that EPA understood the Permit's WQBELs to be sufficient to protect WQS. EPA recognized that the WQBEL-setting process is "intended to achieve applicable water quality objectives and criteria …." 1-ER-147. The Agency then found that the Permit's WQBELs met this goal, concluding that they "have been derived to implement water quality objectives that protect

beneficial uses."  1-ER-156; *see also id.* (describing the WQBELs as "more stringent effluent limitations … necessary to meet" WQS).

EPA's reasons for imposing the Generic Prohibitions cannot be squared with these findings.  The Agency's claim that the WQBELs may not achieve WQS, such that they must be supplemented by the Generic Prohibitions, contradicts its WQBEL regulations and the record's findings about the stringency of San Francisco's WQBELs.  4-ER-785, -867.  Under its regulations, the Agency cannot do what it has attempted here: set WQBELs that the Agency claims are insufficient to protect WQS.

> **b.** **System performance and receiving water conditions refute EPA's justifications for the Generic Prohibitions.**

Performance and water quality data also subvert EPA's vague contentions that the Permit's WQBELs are insufficient.  In issuing Order No. 79-16 and defining how WQS apply to the Oceanside Facilities, the State Water Board found that an average of eight CSOs per year would not compromise beneficial uses in the Oceanside Facilities' receiving waters.  7-ER-1666.  The Permit's LTCP WQBELs, based on the City's LTCP, are designed to achieve this beneficial use-protecting rate of CSOs.  *See supra* at 18-19.

Performance and modeling data show that implementation of San Francisco's LTCP has achieved this protective target.  Between 1997 and 2018,

none of the Oceanside Facilities' seven outfalls averaged more than 5.6 CSOs per year, well below the level at which the State Water Board determined beneficial uses would be protected.  4-ER-933.  San Francisco's hydrologic and hydraulic modeling data further demonstrated to EPA that operation consistent with the LTCP WQBELs will continue to result in CSOs occurring below the protective eight per year threshold.  *See* 4-ER-934.

Receiving water assessments further belie EPA's contention that the Permit's WQBELs are not sufficient to protect WQS.  As part of the development of California's 2014 and 2016 Integrated Report,[29] the Regional Board found that the receiving waters for CSD-001 through -003 (the Pacific Ocean offshore Fort Funston and Ocean Beach) were not impaired for bacteria.  These determinations reflected numerous lines of evidence, including bacterial data collected during or just after storm events when CSOs were known to occur, as well as information on recreational use of these waters.  4-ER-927, -987, -994.  The Regional Board also found, based on sixteen lines of evidence, that water quality at Baker Beach

---

[29] The CWA requires California and other states to prepare, every two years, an integrated report that, among other things, specifies whether water quality meets applicable WQS.  *See* 33 U.S.C. § 1313(d)(1)(A) (requiring states to identify impaired waters); *id.* § 1315(b) (requiring states to submit biennial reports on water quality); *see generally* State Water Resources Control Bd., *California Integrated Report* (last updated July 3, 2020), https://www.waterboards.ca.gov/water_issues/ programs/water_quality_assessment/integrated_report.html (describing California's Integrated Report process).

(receiving waters for CSD-004 through -007) improved to such an extent that it was no longer impaired. 4-ER-1018. Against this backdrop, EPA expressly found that *none* of the Oceanside Facilities' receiving waters are impaired for *any* pollutant. 4-ER-868.

These data contradict EPA's vague claim that the Generic Prohibitions were needed to comply with WQS. The Oceanside Facilities' performance shows that the LTCP WQBELs are protecting beneficial uses. Conditions in the receiving waters further show that existing permit limits achieve water quality in attainment with WQS. For EPA to claim the contrary to justify Generic Prohibitions demands that the Permit be set aside. *E.g.*, *Humane Soc. of U.S.*, 626 F.3d at 1050-51.

## II. The Permit's requirement to revise San Francisco's Long-Term Control Plan is inconsistent with the CSO Policy.

The Permit exceeds that Act's limits on EPA's authority by requiring San Francisco to revisit its multibillion dollar investment in CSO control infrastructure. Its LTCP Update requires San Francisco to go through the CSO Policy's long-term planning process anew, culminating in the proposal of an implementation schedule for a new set of CSO control projects. *See supra* at 22-23. EPA may only impose this burden on San Francisco's residents under narrow circumstances not found in the record. Lacking this record support, EPA has instead justified the LTCP Update by reference to factors untethered from the Policy and the CWA.

47

EPA's demand that San Francisco revisit its CSO controls also outstrips the Agency's authority to require evaluations of discharges to sensitive areas. Under the guise of a preparing a "Consideration of Sensitive Areas Report," the LTCP Update demands that San Francisco conduct extensive technical evaluations in the service of proposing alternatives to achieve further reductions in CSOs from six of the Oceanside Facilities' CSD outfalls. 1-ER-76 (§ IV.C.5.d, Task 3). This onerous planning exercise distorts beyond recognition the CSO Policy's requirements and EPA's authority.

### A. EPA did not make the finding necessary to require San Francisco to update its LTCP.

#### 1. EPA may require an update to a fully-implemented LTCP only if the Agency finds that the plan is not protecting water quality standards.

EPA made no findings that could have justified sending San Francisco's CSO control program back to square one. Because Congress codified the CSO Policy, EPA had a duty to comply with its requirements and limitations when it issued the Permit. *See* 33 U.S.C. § 1342(q)(1). Recognizing that CSO controls require major investments of public funds, the Policy's text and structure recognize only one circumstance when EPA can order an LTCP update: when the plan is not attaining compliance with WQS. EPA made no such finding to support the LTCP Update, rendering this provision unlawful. *See* 5 U.S.C. § 706(2)(A); *Friends of*

*Pinto Creek v. EPA*, 504 F.3d 1007, 1011-15, 17 (9th Cir. 2007) (vacating NPDES permit "based on errors of law under the Clean Water Act").

EPA's determinations that San Francisco was exempted under Section I.C.1 of the Policy limited the Agency's discretion to require a revision of the City's LTCP.[30] *See supra* at 18-19. Having exempted the City under this provision, EPA may send San Francisco back to the drawing board only when "after [post-construction] monitoring, it is determined that WQS *are not being attained*." 7-ER-1645 (§ I.C.1) (emphasis added). The Policy's identification of just one basis for requiring revisions to an exempted LTCP—to the exclusion of any other—necessarily cabin's EPA's authority. *See Copeland* 852 F.3d at 907 (a statute's specification of a manner of operation should be construed as excluding all other methods).

Even if San Francisco were not exempt under Section I.C.1, EPA only could have imposed the LTCP Update if it had found that the City's LTCP was not

---

[30] That EPA was able to grant San Francisco an exemption under Section I.C.1 in 1997 and affirm it in subsequent permits subverts the Agency's argument in support of the LTCP Update that it is too difficult to understand what documents comprise San Francisco's LTCP. *See* 4-ER-869 ("determining which [documents] constitute its current long-term control plan and which are outdated is difficult"; 4-ER-941 (San Francisco's LTCP is "a number of documents and supplements, whose relationship is not entirely clear."). The Agency offered no explanation for how it could ascertain the contents of the LTCP in 1997 but could no longer do so in 2019.

protecting WQS.  The Policy does not obligate a community with an approved LTCP to cycle continuously through its planning requirements as time passes. Instead, the CSO Policy specifies that such a community is in "compliance with the elements of this Policy concerning planning and implementation of a long term CSO remedy" so long as it remains in "compliance with the schedule for implementing the controls recommended in" its LTCP.  7-ER-1651 (§ IV.B.2.g.). Having fully implemented its controls by 1997, San Francisco is manifestly in compliance with these requirements.  *See supra* at 17.

The Policy expects no further planning or revisions to an approved LTCP, except "upon determination that the CSO controls fail to meet water quality standards …."  7-ER-1651 (§ IV.B.2.g.).  Such a finding is to be based on monitoring data collected by a community's post-construction monitoring program.  7-ER-1649 (§ II.C.9) (monitoring program must be "adequate to verify compliance with water quality standards"); 7-ER-1651 (§ IV.B.2.d.) (Phase II permits must require collection of "sufficient information to demonstrate compliance with WQS").  The Policy's—and thus the Act's—specification of this one mechanism for EPA to require an LTCP update necessarily limited EPA's discretion.  *See Copeland*, 852 F.3d at 907; *see also* 7-ER-1646 (§ II.C.) (recognizing the potential for modification of controls only "if additional controls

are *subsequently determined to be necessary to meet WQS*" (emphasis added)); 7-ER-1648 (§ II.C.4.b.iv.) (same).[31]

### 2. The Agency has made no such finding.

The LTCP Update's requirement for San Francisco to revisit its CSO controls rests on no finding that the City's existing LTCP is inadequate to protect WQS. The record contains no reasoned analysis of the City's compliance with WQS, despite San Francisco's collection of post-construction monitoring data.

In lieu of this necessary analysis, EPA made a series of observations that *might* relate to water quality but are unaccompanied by reasoning to connect these observations to a conclusion that WQS are not being met. For instance, the Agency's justification for the LTCP Update noted the volume discharged from the Oceanside Facilities' CSD outfalls between 2011 and 2014 but did not explain the relationship between these data and any water quality standard. 4-ER-872. The Agency similarly highlighted recreational use surveys without explaining their significance for assessing compliance. *Id.*

---

[31] EPA's guidance issued contemporaneously with the Policy confirms this limit on the Agency's authority to require LTCP revisions. In it, EPA recognized that LTCPs may need to be updated "to identify additional CSO controls." 6-ER-1468. The guidance identifies only situation when such an update would be needed: where "post-construction compliance monitoring indicates that existing WQS are not being met …." *Id.*

The record also includes a discussion of bacteria samples that omits analysis that would support finding that San Francisco's CSO controls are not complying with WQS. The Agency noted how, over one 12-month period, San Francisco collected receiving water samples that exceeded the single sample maximum objective for one or more bacteria indicators. *Id.* This observation does not support a finding that WQS are not being protected; discharges from the Oceanside Facilities' CSD outfalls are exempt from the Ocean Plan's bacterial objectives. 7-ER-1670; 1-ER-141; 4-ER-866. EPA also referred to the number of days beaches were posted with "no swimming signs" over that same year-long stretch but without explaining this fact's significance or relevance to WQS attainment. 4-ER-872.

Finally, EPA's discussion of metals data in connection with the LTCP Update concedes that the Agency did not assess compliance with relevant WQS. This portion of the record compared concentrations of zinc and copper in San Francisco's *effluent* to water quality objectives, albeit with the caveat that "the applicable water quality standards *apply in the receiving waters*" rather than to the effluent itself. *Id.* (emphasis added). This analysis also fails to account for how the Oceanside Facilities' CSD outfalls were exempted by State Water Board Order No. 79-16 from strict compliance with metals and other non-bacterial water quality objectives. 7-ER-1670; 4-ER-873 *see supra* at 16-17.

52

In total, EPA made no finding that San Francisco's existing CSO controls fail to protect WQS, nor did it provide analysis that would support such a finding. EPA's failure to make this required finding or even show its work renders the LTCP Update's requirement for San Francisco to reinvent its CSO control program arbitrary and capricious. *See, e.g.*, *Humane Soc. of U.S.*, 626 F.3d at 1052-54.

## B. EPA's rationales for imposing the LTCP Update are divorced from the CSO Policy.

Having failed to justify the LTCP Update on water quality grounds, EPA compiled a grab-bag of alternative reasons that converge on the Agency's vague discomfort with the age of the City's LTCP. *See, e.g.*, 4-ER-870 ("since decades have passed since San Francisco constructed most of its wet weather facilities, we find it unlikely that no improvement can be made."). For instance, EPA argued that unspecified changes to San Francisco's sewer system and to the city itself— but not to the controls in the City's LTCP—justified the update. *See* 4-ER-942 to -944. EPA further argued that San Francisco's mere creation of planning documents (including the City's Sewer System Improvement Program) after completion of the City's CSO controls necessitated the LTCP Update. 4-ER-941.

The CWA does not allow EPA to force San Francisco to reassess its CSO control program by simply invoking the passage of time or changes accompanying it. As explained above, implementation of an approved LTCP—which San

Francisco completed in 1997—supplants a community's planning obligations under the CSO Policy. *See supra* at 49-50. In drafting the Policy and incorporating it into the Act, EPA and Congress could have specified a variety of considerations relating to the passage of time to justify updating an LTCP, but they did not do so. Instead, they provided only one trigger for requiring a reevaluation of CSO controls: data showing that the LTCP is not achieving compliance with WQS. *See id.* EPA's invocation of the passage of time and San Francisco's planning efforts introduces considerations that Congress did not specify, rendering its action arbitrary and capricious. *E.g.*, *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 696-97 (9th Cir. 2021) (EPA could not justify denial of petition based on extra-statutory factors); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (EPA's action found arbitrary and capricious due to "reasoning divorced from the statutory text.").

Similarly, the record and CSO Policy afford no support for EPA's argument that it can require the LTCP update so that the Agency possesses "the most current information to assess whether water quality standards are being met …." 1-ER-161. This explanation is irrational when one accounts for how the CSO Policy makes post-construction monitoring data, not the contents of a community's LTCP, the basis for assessing compliance with WQS. *See, e.g.*, 7-ER-1649 (§ II.C.9). EPA, moreover, makes no claim that San Francisco's post-construction

54

monitoring data are inadequate. The record's discussion of updating the City's post-construction monitoring plan references only the need to account for the "new control alternatives" that EPA seeks to impose through the LTCP update. EPA cannot rely on this irrational, baseless explanation to require the City to assess and potentially develop additional costly CSO control projects. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (an action is arbitrary is capricious when "the agency offer[s] an explanation that runs counter to the evidence before the agency . . ." (internal quotation marks omitted)); *see also Systech Envt'l Corp. v. EPA*, 55 F.3d 1466, 1470-71 (9th Cir. 1995) (invalidating as arbitrary EPA's interpretation of a RCRA requirement that effectively forced permit applicants to make a false certification, while advancing none of the agency's stated policy objectives).

### C. The LTCP Update's provisions addressing sensitive areas exceed the Agency's authority.

Although the entire LTCP Update is unlawful for the reasons stated above, its Task 3 is uniquely inconsistent with San Francisco's exemption under Section I.C.1 of the Policy and EPA's authority more generally. This Task requires San Francisco to evaluate and propose additional CSO control alternatives for six CSD outfalls. EPA, however, has attempted to downplay the magnitude of this undertaking by re-casting it as a mere sensitive areas analysis, titling it a

"Consideration of Sensitive Areas Report."  1-ER-76.  EPA cannot, in the name of assessing discharges to sensitive areas, contort the Policy to require San Francisco to propose a new suite of CSO controls.

### 1. San Francisco's CSO Policy exemption precludes EPA from requiring any sensitive areas analysis.

Having exempted San Francisco under Section I.C.1 of the Policy, EPA cannot require the City to undertake *any* sensitive areas analysis.  Section I.C.1 makes no allowance for continued sensitive areas analysis, and EPA's decision to exempt San Francisco under Section I.C.1 included a finding that the City had discharged its sensitive areas-related obligations in full.  *See* 5-ER-1237 (1997 permit finding that the City "appropriately considered sensitive areas as required in the CSO Control Policy.").  Only Section I.C.2 of the Policy, which does not apply to the City, allows for CSO control programs to be "modified to be consistent with the sensitive areas … provisions of this Policy."  7-ER-1645 (CSO Policy § I.C.2).  The Policy's inclusion of this language in Section I.C.2—but not I.C.1—must be construed to mean that EPA lacked the authority to require San Francisco to conduct *any* sensitive areas analysis.  *See, e.g.*, *Council for Urological Interests v. Burwell*, 790 F.3d 212, 221 (D.C. Cir. 2015) (Congress's inclusion of language in one statutory provision and omission of the same language in another "suggest[s] that the omission in this particular context was deliberate").

## 2.    The Permit's sensitive areas requirements are overly broad.

Even if EPA could require San Francisco to undertake a sensitive areas analysis, Task 3 sweeps more broadly than what the CSO Policy allows. The Policy envisions sensitive areas analyses to be limited assessments of "new or improved techniques to eliminate or relocate overflows or changed circumstances that influence economic achievability" of elimination or relocation. 7-ER-1647 (§ II.C.3.c.), -1651 (§ IV.B.2.e.). Thus, the Act would allow Task 3, at most, to require San Francisco to examine relocation or elimination of its CSD outfalls.

Task 3 outstrips this limitation by requiring the City to identify and evaluate additional costly CSO controls. The Task requires the City to conduct activities that have no relationship to CSO elimination and relocation, such as updating recreational use surveys and evaluating control alternatives that include treatment and disinfection of discharges. 1-ER-76 (Task 3.a.-e.). These activities culminate in San Francisco proposing alternatives to eliminate or relocate its CSD outfalls, as well as controls "for reducing the magnitude and frequency" of CSOs. *Id.* (Task 3.f.). EPA's memorandum describing the LTCP Update anticipated that San Francisco would be unable to identify ways to move or eliminate its CSD outfalls. 4-ER-946 The Agency expected that the LTCP Update would result in San Francisco proposing only "control alternatives … to reduce the magnitude or frequency of" its CSOs. *Id.* These admissions confirm that EPA intended Task 3

57

to require San Francisco to develop the precise type of controls that the Agency lacked the authority to require: those intended to reduce, rather than relocate or eliminate, the City's CSOs.

## III. The Court's relief must reflect that EPA and the State jointly approved a single Permit.

San Francisco requests that the Court grant complete relief from EPA's errors. The Agency's errors of law and failures to engage in reasoned decision-making mandate vacatur of EPA's approval of the Permit and a remand to the Agency. Doing so here is consistent with the established practice for granting relief from NPDES permitting decisions when EPA has acted contrary to its regulations and otherwise taken action that is arbitrary and capricious. *See Friends of Pinto Creek v. EPA*, 504 F.3d at 1014-15 (vacating permit where EPA did not meet the requirements of 40 C.F.R. § 122.4(i)); *Puerto Rico Sun Oil Co. v. EPA*, 8 F.3d 73, 81 (1st Cir. 1993) (vacating and remanding adoption of NPDES permit).

This relief must be structured so EPA cannot attempt an end-run around the Permit's vacatur in an enforcement action. EPA argued below—and the EAB agreed—that the Permit is somehow two separate NPDES permits, each of which is independently enforceable under the Act. 1-ER-17 ("the authorizations are distinct for the purposes of … enforcement as a matter of law."). Under this construct, a vacatur limited to only a "federal" permit would leave EPA free to

58

enforce an identical "state" permit that EPA claimed to be nested within the

Permit. *See* 33 U.S.C. § 1319(a) (granting EPA authority to enforce permits issued

by the State); *see also* 2-ER-437 (EPA arguing that it may enforce a separate

"California-issued NPDES Oceanside Permit"). EPA's position that there are two

permits, a stance that it adopted only after San Francisco appealed to the EAB,

appears to be informed by its desire to bring an enforcement action against the

City.[32]

The Court's relief must ignore this fiction and protect San Francisco against

EPA attempting to enforce an otherwise-vacated permit. The Permit itself, its

record, and even the representations of EPA's own counsel show that EPA and the

Regional Board issued a single, indivisible permit that *required both regulators'*

*approval to become effective*. The Court's order should make clear that there is a

single unified Permit, such that vacatur of EPA's approval renders it unenforceable

for purposes of 33 U.S.C. § 1319(a).[33]

---

[32] *See supra* at 24; EPA, Notice of Violation of Nat'l Pollutant Discharge Elimination Sys. Permits (Oct. 2, 2019), https://www.epa.gov/sites/production/files/2019-10/documents/sfpuc-npdes-violation-notice-2019-10-02.pdf.

[33] San Francisco is not requesting that the Court make any determination regarding the Permit's validity under state law or the Regional Board's approval of the Permit. The City is asking only that the Court fashion relief that properly interprets the permit for purposes of the CWA.

**A.      The Permit's text shows it to be a single, jointly-approved NPDES permit.**

The Permit itself shows that a vacatur order would apply to EPA's approval

of a single, unified permit.  NPDES permits must be interpreted in the same

manner as contracts.  *See, e.g.*, *NRDC v. Cty. of Los Angeles*, 725 F.3d 1194, 1204-

1205 (9th Cir. 2013) ("NPDES permits are treated like any other contract."); *Nw.*

*Envtl. Advocates v. City of Portland*, 56 F.3d 979, 982 (9th Cir. 1995) ("We review

the district court's interpretation of the 1984 permit as we would the interpretation

of a contract or other legal document.").  In interpreting the Permit, "[i]f the

language of the permit, considered in light of the structure of the permit as a whole,

'is plain and capable of legal construction, the language alone must determine the

permit's meaning.'" *Cty. of Los Angeles*, 725 F.3d at 1204-05 (quoting *Piney Run*

*Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 266-69 (4th Cir.

2001)).  It is well-settled that "[c]ontract terms are to be given their ordinary

meaning, and when the terms of a contract are clear, the intent of the parties must

be ascertained from the contract itself." *Klamath Water Users Protective Ass'n v.*

*Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).

The Permit's language and structure show that EPA and the Regional Board

understood it to be a single, indivisible NPDES permit.  The Permit refers to itself

only in the singular and as a unitary document issued by both EPA and the

Regional Board rather than two distinct permits.[34]

Unlike other California permitting actions that involve both EPA and the

state, the Permit makes no distinction between federal and state terms that would

support a conclusion that the agencies issued separate permits. The Permit

contains no terms that would apply only to "state waters" or in federal ones, a

practice used when EPA and California seek to distinguish between federal and

state permits, and their respective requirements.[35]

EPA and the Regional Board also affirmatively removed the potential for the

Permit to be construed as separate state and federal permits. The Permit makes

clear that San Francisco, in complying with the permit's Standard Provisions,

---

[34] *See* 1-ER-53 ("Discharger is authorized to discharge ... in accordance with the waste discharge requirements (WDRs) and federal National Pollutant Discharge Elimination System (NPDES) permit requirements set forth in this Order"); 1-ER-59 (referring to "the Order"—singular—as "as WDRs pursuant to California Water Code article 4, chapter 4, division 7 (commencing with § 13260)" and "as a National Pollutant Discharge Elimination System (NPDES) permit authorizing the Discharger to discharge into waters of the United States as listed in Table 2"); *id.* ("The Regional Water Board intends that joint issuance of this Order with U.S. EPA ....").

[35] *Cf.* EPA Region 9 and San Diego Regional Water Quality Control Board, E.W. Blom Point Loma Wastewater Treatment Plant Order/Permit, Order No. R9-2017-0007, NPDES No. CA0107409 (2017) § II.C. (identifying state-only provisions), available at https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2017/R9-2017-0007.pdf.

61

should make no distinction between EPA and the Regional Board. 1-ER-63

("references to 'Regional Water Board' shall be interpreted as 'Regional Water

Board and U.S. EPA,' and references to 'Regional Water Board Executive Officer'

shall be interpreted as 'Regional Water Board Executive Officer and U.S. EPA.'").

On its face, the Permit is a single, indivisible NPDES permit.

### B.     The record confirms that EPA's decision concerned a single, joint permit.

Even if the Permit were not on its face a single, joint permit, EPA's

characterizations of it foreclose a conclusion to the contrary. Courts may, when

confronted with ambiguity in a NPDES permit, "turn to extrinsic evidence to

interpret its terms." *Cty. of Los Angeles*, 725 F.3d at 1205. A court will, in

particular, "give significant weight to any extrinsic evidence that evinces the

permitting authority's interpretation of the relevant permit." *Id.* (internal quotation

marks and citation omitted). This extrinsic evidence can include "written

representations of counsel…and oral representations made to the court during

argument," *In re U.S. Financial Securities Litig.*, 729 F.2d 628, 631 (9th Cir.

1984), as well as "affidavits and other documentary evidence." *Nw. Envt'l

Advocates*, 56 F.3d at 983.

The statements of EPA's own lawyers show that the Permit is a single

NPDES permit that required approval from both regulators. Under questioning

from the EAB, EPA's counsel explained how the Permit "requires signature by both agencies to be effective," in effect conceding that there is a single permit that became effective only when EPA approved it. 2-ER-263. When pressed about this admission, EPA's counsel did not back away from this characterization and instead agreed that "the permit required all signatures" from the agencies to go into effect. 2-ER-264.

Counsel's statements should come as no surprise, as they are consistent with EPA's actions prior to the Permit's issuance. On April 20, 2019, the agencies noticed a joint draft permit, referring to the permit singularly. 4-ER-936 ("EPA and the [RWQCB] Board prepared *a draft National Pollutant Discharge Elimination System permit (CA0037681) for the above discharger* in accordance with the Clean Water Act (CWA) and Porter-Cologne Water Quality Control Act." (emphasis added)); *id.* ("The Board intends that issuance of *this NPDES permit* will serve as certification of the permit under CWA section 401 (emphasis added)). On August 30, 2019, the agencies issued a single Response to Comments. 4-ER-853. The Response refers to the "permit" in the singular throughout and makes no distinction between "federal-only," "State-only," and "joint" terms or responses. The document uses the term "we" to refer jointly to Region 9 and the RWQCB. *See, e.g.*, *id.* ("*[W]e* summarized the comments ... *we* responded in the same tabular format ..." (emphasis added)).

63

On September 11, 2019, the agencies conducted a single hearing to receive oral comments and consider Permit approval. 4-ER-772. EPA representatives made public statements during the adoption hearing expressing support for the jointly issued Permit and referring to it only in the singular. *See* 4-ER-818 (statement by EPA representative explaining, "EPA is here because *the permit* would authorize discharges to federal and state waters. Therefore, *the permit is jointly issued* by the [Regional Water] Board and EPA." (emphasis added)). Similarly, the Regional Board made multiple statements about joint issuance of a single ("this") permit. *See, e.g.*, 4-ER-777 ( "we issue this permit jointly with EPA because the plant discharges to federal waters that are beyond State jurisdiction."); 4-ER-786 ("We have worked very closely with USCPA [sic] on this . . . and USCPA [sic] prepared to approve the revised tentative Order when and if the Board approves it.").

This record and the Permit itself evince EPA's and the Regional Board's intention to promulgate a single permit that required both agencies' approval. As a matter of law, neither EPA nor the Court can conclude that the agencies issued two separate permits. San Francisco asks that the Court's relief conform to this reality by vacating EPA's approval of the single, indivisible NPDES permit. In so doing, the Court will ensure that the Agency cannot circumvent the Court's vacatur by enforcing a fictional "state" permit.

64

## CONCLUSION

The Contested Provisions improperly require San Francisco to revisit its successful CSO control program and fail to provide the City with concrete permit terms specifying how to protect receiving water quality. The Agency's approval of these Permit terms exceeded the Agency's authority under the Act and CSO Policy and cannot be reconciled with EPA's regulations. EPA's actions, moreover, are contradicted by a record that shows San Francisco's CSO controls to be a water quality success story. These errors render the Contested Provisions contrary to law, as well as arbitrary and capricious. For these reasons, San Francisco requests that the Court grant the Petition for Review, vacate the Permit, and remand it to the Agency.

Respectfully submitted,

August 25, 2021

s/Andrew C. Silton

| | |
|---|---|
| John Roddy | Andrew C. Silton |
| Estie Kus | Richard S. Davis |
| *Deputy City Attorneys* | BEVERIDGE & DIAMOND, P.C. |
| Office of City Attorney Dennis Herrera | 1900 N Street NW, Suite 100 |
| City and County of San Francisco | Washington, DC 20036 |
| City Hall, Room 234 | Telephone No.: (202) 789-6000 |
| 1 Dr. Carlton B. Goodlett Pl. | asilton@bdlaw.com |
| San Francisco, CA 94102 | rdavis@bdlaw.com |
| Telephone No.: (415) 554-3986 | |
| John.S.Roddy@sfcityatty.org | |
| Estie.Kus@sfcityatty.org | |

*Attorneys for Petitioner City and County of San Francisco*

65

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**        21-70282

I am the attorney or self-represented party.

**This brief contains 13,986 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
(*select only one*):

   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Andrew C. Silton                    **Date** August 25, 2021

66