No. 21-70282

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CITY AND COUNTY OF SAN FRANCISCO,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

Petition for Review of Action of the U.S. Environmental Protection Agency

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

Of Counsel:

MARCELA VON VACANO
POOJA PARIKH
PETER Z. FORD
*Attorneys*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
ELISABETH CARTER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-3141
Elisabeth.carter@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iv

GLOSSARY..........................................................................................ix

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.......................................................2

STATEMENT OF THE ISSUES.............................................................3

PERTINENT STATUTES AND REGULATIONS ..................................4

STATEMENT OF THE CASE................................................................4

    A.   The Clean Water Act ......................................................................4

        1.  National Pollutant Discharge Elimination System...............................4

        2.  The Combined Sewer Overflow Control Policy ...................................7

            a.  Overview..................................................................7

            b.  Long Term Control Plans .......................................8

            c.  Flexibility Between Phases I and II .....................10

        3.  Applicable Water Quality Standards.................................................12

            a.  The California Ocean Plan....................................12

            b.  The 1979 Exception ...........................................12

    B.   Factual background........................................................................14

        1.  The Oceanside Combined Sewer System ...........................................14

        2.  Planning and Permitting History ......................................................18

C.  Agency Proceedings ........................................22

SUMMARY OF ARGUMENT .............................................23

STANDARD OF REVIEW ..............................................25

ARGUMENT ........................................................28

I.  EPA Appropriately Required San Francisco to Update its LTCP ...............28

   A. EPA's Requirement that San Francisco Update its LTCP is
      Consistent with the CSO Policy and Supported by the Record ..........28

     1. The CSO Policy Affords EPA Discretion to
       Require LTCP Updates .......................................29

     2. EPA's Decision to Require the LTCP
       Update Is Supported by the Record ...................................32

   B. San Francisco's Arguments Against the LTCP
      Update Requirement Are Unavailing................................35

     1. San Francisco's Claim that Violations of
       Water Quality Standards are the Exclusive
       Basis for Requiring an LTCP Update Is Incorrect ..............35

     2. EPA Included Appropriate Requirements
       Pertaining to San Francisco's Sensitive Areas Analysis .....38

II. EPA's Inclusion of the Narrative Prohibition
    Against Violating Water Quality Standards Is Legally
    Permissible and Supported by the Record.....................................42

   A. The Narrative Prohibition Is Lawful.............................42

     1. Courts Have Recognized the Validity of a Narrative
       Prohibition Against Violating Water Quality Standards ....44

     2. EPA Satisfied the CWA's Requirements in
       Including the Narrative Prohibition ....................................51

  B. The Record Supports EPA's Decision to
   Include the Narrative Prohibition ........................................................ 55

III. EPA and California Independently Authorized San Francisco's
  Discharges through the Oceanside Permit ................................................... 60

CONCLUSION ........................................................................................................ 64

# TABLE OF AUTHORITIES

**CASES**                                                                       **PAGE**

*Alaska Eskimo Whaling Comm'n v. EPA*,
  791 F.3d 1088 (9th Cir. 2015) ........................................................ 25-26

*Alden Mgmt. Servs. v. Chao*,
  532 F.3d 578 (7th Cir. 2008) ...............................................................37

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................27

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ............................................................................26

*Carver v. Lehman*,
  558 F.3d 869 (9th Cir. 2009) ......................................................... 36-37

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................... 28

*City & Cty. of S.F. v. S.F. Bay Reg'l Water Quality Control Bd.*,
  No. RG19042575 (Alameda Cty. Super. Ct.) .....................................22

*Dep't of Treasury, I.R.S. v. Fed. Lab. Rels. Auth.*,
  494 U.S. 922 (1990) ..................................................................... 26-27

*Gen. Elec. Co. v. U.S. E.P.A.*,
  53 F.3d 1324 (D.C. Cir. 1995) .............................................................27

*Indergard v. Ga.-Pacific Corp.*,
  582 F.3d 1049 (9th Cir. 2009) ............................................................27

*In re City of Lowell*,
  18 E.A.D. 115 (EAB 2020) .......................................................... 43-44

*Kern County Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) .............................................................25

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ..............................................................27, 53, 54

*Los Angeles Cnty. Flood Control Dist. v. NRDC, Inc.*,
    568 U.S. 78 (2013) ...............................................................................49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ...............................................................................26

*Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*,
    551 U.S. 644 (2007) ....................................................................... 60-61

*NRDC, Inc. v. EPA*,
    863 F.2d 1420 (9th Cir. 1988) .............................................................27

*NRDC, Inc. v. Cnty. of Los Angeles*,
    673 F.3d 880 (9th Cir. 2011) ......................................................... 48-49

*NRDC v. Cnty. of Los Angeles*,
    725 F.3d 1194 (9th Cir. 2013) .......................................................44, 47

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015)........................................................ 49-50, 51

*Nw. Envtl. Advocates v. City of Portland*,
    56 F.3d 979 (9th Cir. 1995) .................................. 24, 44, 46-48, 53, 54

*Nw. Coal. for Alternatives to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008) .............................................................25

*Ohio Valley Envtl. Coal. v. Fola Coal Co.*,
    845 F.3d 133 (4th Cir. 2017) ..............................................43, 44, 45, 47

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*,
    511 U.S. 700 (1994)........................................................................45, 46

*Rust v. Sullivan*,
    500 U.S. 173 (1991)..............................................................................26

*Sims v. Apfel,*
    530 U.S. 103 (2000) ........................................................39

*S. Cal. All. of Publicly Owned Treatment Works v. U.S. EPA,*
    853 F.3d 1076 (9th Cir. 2017) ...................................... 61-62

*Twp. of Tinicum v. United States DOT,*
    582 F.3d 482 (3d Cir. 2009)............................................37

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999) ........................................................26

*Upper Blackstone Water Pollution Abatement Dist. v. EPA,*
    690 F.3d 9 (1st Cir. 2012)...............................................27

**STATUTES**

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ............................................25

Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1388:

    Section 101(a), 33 U.S.C. § 1251(a)............................................4, 23

    Section 301, 33 U.S.C. § 1311 ................................................4, 5

    Section 301(a), 33 U.S.C. § 1311(a)..........................................4

    Section 301(b)(1)(C), 33 U.S.C. § 1311(b)(1)(C) ........................3, 5, 24, 52, 55

    Section 301(h)(9), 33 U.S.C. § 1311(h)(9) ................................ 15-16

    Section 303, 33 U.S.C. § 1313 ..............................................4

    Section 303(a), 33 U.S.C. § 1313(a) ........................................5

    Section 303(c), 33 U.S.C. § 1313(c) ........................................5

    Section 304(b), 33 U.S.C. § 1314(b) ......................................4, 5

    Section 401(a)(1), 33 U.S.C. § 1341(a)(1)..................................5

Section 401(a)(2), 33 U.S.C. § 1341(a)(2).............................................5

Section 402, 33 U.S.C. § 1342 ......................................................4

Section 402(a)(1), 33 U.S.C. § 1342(a)(1).................................. 5-6

Section 402(a)(2), 33 U.S.C. § 1342(a)(2).................................. 5-6

Section 402(b), 33 U.S.C. § 1342(b) ........................................6, 60, 64

Section 402(c), 33 U.S.C. § 1342(c) ...........................................6

Section 402(c)(1), 33 U.S.C. § 1342(c)(1)...................................60

Section 402(d)(2), 33 U.S.C. § 1342(d)(2)...............................61, 62

Section 402(q)(1), 33 U.S.C. § 1342(q)(1) ...............................7, 28

Section 502(8), 33 U.S.C. § 1362(8) .........................................12

Section 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E)..............................61

## CODE OF FEDERAL REGULATIONS

40 C.F.R. pt. 122 .............................................................4

40 C.F.R. § 122.4(d) ......................................................5, 42

40 C.F.R. § 122.41 ........................................................ 5-6

40 C.F.R. § 122.44(d) .....................................................5, 42

40 C.F.R. § 122.44(d)(1)....................................................5

40 C.F.R. § 122.44(d)(1)(i)...............................................53, 54

40 C.F.R. § 122.44(k)(3)....................................................42

40 C.F.R. § 122.44(k)(4)....................................................42

40 C.F.R. § 122.45 ................................................................... 5-6

40 C.F.R. pt. 124 .......................................................................4

40 C.F.R. § 124.4 ...................................................6, 19, 60, 63

40 C.F.R. § 124.4(a)(1) ...........................................................6

40 C.F.R. § 124.4(a)(2) ..................................................... 6-7, 63, 64

40 C.F.R. § 124.19(a)(4)(i) ...................................................39

40 C.F.R. pt. 125 .......................................................................4

40 C.F.R. pt. 131 .......................................................................4

40 C.F.R. § 131.3(b) ...............................................................5

40 C.F.R. § 131.10 ...................................................................5

40 C.F.R. § 131.11 ...................................................................5

40 C.F.R. § 131.11(b) ..............................................................5

40 C.F.R. § 131.12 ...................................................................5

40 C.F.R. § 133.102 ...............................................................16

## FEDERAL REGISTER

54 Fed. Reg. 40,664 (Oct. 3, 1989)...........................................6

   54 Fed. Reg. 40,665 ..............................................................6

39 Fed. Reg. 26,061 (July 16, 1974)..........................................6

## GLOSSARY

| | |
|---|---|
| CSD | Combined Sewer Discharge |
| CSO | Combined Sewer Overflow |
| CSO Policy | Combined Sewer Overflow Control Policy |
| CWA | Clean Water Act |
| EAB | Environmental Appeals Board |
| EPA | Environmental Protection Agency |
| LTCP | Long Term Control Plan |
| NPDES | National Pollution Discharge Elimination System |

**INTRODUCTION**

Petitioner City and County of San Francisco ("San Francisco" or "Petitioner") manages its sewage and wastewater for the western portion of the city through the Oceanside Water Pollution Control Plant and its stormwater and wastewater collection system ("the Oceanside system"). By San Francisco's own estimation, the Oceanside system discharges millions of gallons of combined sewage, industrial and commercial wastewater, and stormwater onto San Francisco's beaches and into the Pacific Ocean every year. The Environmental Protection Agency ("EPA") and California are tasked with issuing Clean Water Act ("CWA") permits, known as NPDES permits, to ensure that San Francisco's discharges to federal and state waters do not violate water quality standards, including protection of sensitive areas such as beaches that support recreation.

In 2019, EPA and California issued through a joint proceeding a consolidated NPDES permit ("the Oceanside Permit" or "the Permit") for San Francisco's discharges from the Oceanside system into federal and state waters. To ensure that the permitting authorities have accurate information to protect water quality, and to comply with EPA's Combined Sewer Overflow Control Policy ("the CSO Policy"), the Permit requires San Francisco to compile an assessment of the overall functioning of the system and opportunities for improving performance in an updated Long Term Control Plan ("LTCP"). San Francisco has already

independently conducted many of these studies but has not used that information to update its plan to control overflows. Consistent with the CWA's requirement that permits ensure compliance with water quality standards, the Permit also contains a narrative prohibition against causing or contributing to a violation of applicable water quality standards, in addition to limitations on discharges of specific pollutants.

San Francisco filed a petition with EPA's Environmental Appeals Board ("EAB") in which it challenged both of these requirements in the Oceanside Permit. After full briefing and a hearing on the merits, the EAB denied the petition in its entirety, holding that EPA's inclusion of these provisions was both lawful and supported by evidence in the record. Because San Francisco's arguments before this Court are equally meritless, the Court should deny San Francisco's petition for review.

## STATEMENT OF JURISDICTION

San Francisco challenges a NPDES permit for discharges into federal waters from San Francisco's Oceanside combined sewer system, issued by EPA Region 9 and upheld by the EPA's Environmental Appeals Board ("EAB"). EPA's action was final on January 5, 2021, and jurisdiction exists under 33 U.S.C. § 1369(b)(1)(F). However, this Court does not have jurisdiction to review the

concurrently issued state permit for discharges into state waters issued by the State of California. *See infra* at 60-62.

## STATEMENT OF THE ISSUES

1.     Whether EPA had discretion under the Clean Water Act, including the CSO Policy, to require San Francisco to update its Long Term Control Plan in order to have the accurate information necessary to protect water quality, when San Francisco's existing Long Term Control Plan is an amalgam of documents ranging from 1971 to 1990 that do not reflect the current operation of the City's combined sewer system.

2.     Whether EPA had discretion under the Clean Water Act to include a narrative prohibition preventing San Francisco from having any discharges that "cause or contribute to a violation of any applicable water quality standard," where EPA found that the narrative prohibition was necessary to ensure compliance with the CSO Policy, 33 U.S.C. § 1342(q), and the Clean Water Act's requirement that NPDES permits include any limitation "necessary to meet water quality standards," 33 U.S.C. § 1311(b)(1)(C).

3.     Whether EPA and California's consolidation of their NPDES permitting processes for the Oceanside Permit transformed their separate authorizations into a single permit, reviewable by the Ninth Circuit, where EPA

has authorized the State of California to administer the NPDES permitting program for discharges to waters under California jurisdiction.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A. The Clean Water Act

Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve these goals, the CWA prohibits the discharge of any pollutant from a "point source" to waters of the United States unless authorized by another provision of the Act. 33 U.S.C. § 1311(a).

### 1. National Pollutant Discharge Elimination System

Under section 402 of the CWA, EPA and qualifying states may issue NPDES permits authorizing the discharge of pollutants to our Nation's waters. 33 U.S.C. § 1342. The Act protects water quality through two primary mechanisms: (1) water quality standards, and (2) effluent limitations. 33 U.S.C. §§ 1311, 1313, 1314(b); 40 C.F.R. pts. 122, 124, 125, 131.

Water quality standards protect the integrity of bodies of water. Generally, they are adopted by states and subject to review and approval or disapproval by

EPA. 33 U.S.C. § 1313(a), (c). Water quality standards include three components: (1) the "designated uses" of the water body, such as public drinking supply, recreation, or wildlife habitat[1]; (2) water quality criteria, which specify the amounts of pollutants that may be present in the water body without impairing its designated uses; and (3) an antidegradation provision, which protects existing uses and high quality waters. 40 C.F.R. §§ 131.10-12. States may establish either numeric (quantitative) or narrative (qualitative) water quality criteria, or both. 40 C.F.R. §§ 131.3(b), 131.11(b). Once EPA has approved a state's water quality standards, they become the applicable standards under the CWA for that state's waters. The CWA requires permitting authorities to ensure that every NPDES permit complies with the CWA and the applicable water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1341(a)(1)-(2); 40 C.F.R. §§ 122.4(d), 122.44(d)(1).

Effluent limitations regulate pollution levels in discharges. Effluent limitations are either technology-based, which are generally established on an industry-wide basis, or water quality-based, which are established where more stringent requirements are necessary to meet state water quality standards. 33 U.S.C. §§ 1311, 1314(b); 40 C.F.R. §§ 122.4(d), 122.44(d). NPDES permits generally include other provisions in addition to effluent limitations, such as

---

[1] California refers to designated uses as "beneficial uses" and water quality criteria as "objectives" in its water quality standards. 2-ER-513–14.

5

monitoring and reporting requirements, compliance schedules, and management practices. 33 U.S.C. § 1342(a)(1), (2); 40 C.F.R. § 122.41, 40 C.F.R. § 122.45.

Under CWA section 402(b), a state may seek to administer the NPDES permit program. 33 U.S.C. § 1342(b). If EPA approves the state's program, the state gains authority to administer its own NPDES permit program, and EPA's authority to issue NPDES permits for waters under that state's jurisdiction ceases. 33 U.S.C. § 1342(b) and (c).

EPA has approved California's program to issue NPDES permits. *See* 54 Fed. Reg. 40,664, 40,664-65 (Oct. 3, 1989); 39 Fed. Reg. 26,061 (July 16, 1974). Waters within three miles of the shoreline are under state jurisdiction, while waters beyond three miles from the shore are under federal jurisdiction. 1-ER-136. Here, California administers the NPDES permitting program for San Francisco's discharges within three miles of the shoreline, and EPA administers the NPDES program for discharges that are further than three miles from the shore. 1-ER-136; 1-ER-141.

When more than one permit is needed for a particular facility, CWA regulations allow for consolidation of the permitting processes. 40 C.F.R. § 124.4. The regulations instruct that for consolidated permits, "[t]he first step . . . is to prepare each draft permit at the same time." 40 C.F.R. § 124.4(a)(1). "The final permits may be issued together," or they may be issued separately if "joint

processing would result in unreasonable delay in the issuance of one or more permits." *Id.* at (a)(2).

## 2. The Combined Sewer Overflow Control Policy

### a. Overview

In 1994, EPA published the CSO Policy to establish a national approach for controlling combined sewer discharges and overflows. 7-ER-1643. While the CSO Policy was guidance when first issued, Congress amended the CWA in 2000 to incorporate the Policy into law. It added section 402(q), which specifies that permits for combined sewer systems "shall conform" to the CSO Policy. 33 U.S.C. § 1342(q)(1).

A combined sewer system conveys sewage, industrial and commercial wastewaters, and stormwater through a single pipe system to a wastewater treatment facility. 7-ER-1643. During heavy rainfall, total flows can exceed the capacity of a combined sewer system's treatment facilities. 7-ER-1489. When this occurs, the combined sewer system is designed to overflow directly into surface water bodies, such as lakes, rivers, or the ocean. *Id.* This type of discharge is called a combined sewer overflow ("CSO"). 7-ER-1644. CSOs are point source discharges that are subject to the NPDES permitting requirements of the CWA. 7-ER-1643.

Because CSOs contain a mix of domestic sewage, industrial and commercial wastewaters, and stormwater, they often contain high levels of solid materials, pathogenic microorganisms, toxic pollutants, "floatables" (i.e., fecal matter and other floating substances), oxygen-demanding organic compounds, oil and grease, and other pollutants. *Id*. CSOs can cause exceedances of water quality standards. Such exceedances may pose risks to human health, threaten aquatic life and its habitat, and impair the use and enjoyment of the Nation's waters. *Id*.

The CSO Policy is designed to ensure that CSOs meet the requirements of the CWA, including protection of water quality standards. 7-ER-1643. The Policy prohibits dry weather overflows altogether. 7-ER-1644. In addition, the CSO Policy establishes nine minimum controls and requires municipalities to develop and implement a Long Term Control Plan containing measures to protect water quality. 7-ER-1643, 1646.

### b.    Long Term Control Plans

The CSO Policy sets forth a phased approach to permitting overflows from combined sewer systems. "Phase I" permits require the permittee to implement the nine minimum controls and develop a Long Term Control Plan. 7-ER-1651. An LTCP is the foundational planning document that is created to ensure that a combined sewer system complies with the Clean Water Act. 7-ER-1646. It assesses the specific combined sewer system and evaluates a range of control

options to arrive at the most cost-effective CSO control strategies for that system. *Id.* An LTCP should include nine elements: (1) characterization, monitoring, and modeling of the combined sewer system; (2) public participation; (3) consideration of sensitive areas;[2] (4) evaluation of alternatives; (5) cost/performance considerations; (6) an operational plan; (7) a plan to maximize treatment capacity at the existing treatment plant; (8) an implementation schedule; and (9) a plan for post-construction compliance monitoring to verify compliance with water quality standards and ascertain the effectiveness of CSO controls. 7-ER-1646–49.

A primary objective of the LTCP is "to meet [water quality standards], including the designated uses[,] through reducing risks to human health and the environment by eliminating, relocating or controlling CSOs to the affected waters." 7-ER-1649. The LTCP should aim to allow cost-effective expansion or retrofitting if additional controls are subsequently determined to be necessary to meet water quality standards, including designated uses. 7-ER-1648.

After a permittee has created its Long Term Control Plan and implemented the nine minimum controls, it enters "Phase II." 7-ER-1651. Phase II permits require the permittee to implement the controls selected in its LTCP. 7-ER-1651.

---

[2] Sensitive areas include waters designated Outstanding National Resource Waters, National Marine Sanctuaries, waters with threatened or endangered species and their habitat, waters with primary contact recreation (such as beaches), public drinking water intakes, and shellfish beds. 7-ER-1647.

Phase II permits are based on the LTCP and include: (1) requirements to implement technology-based controls, including the nine minimum controls; (2) narrative requirements to ensure that the selected CSO controls are implemented, operated and maintained in compliance with the LTCP; (3) water quality-based effluent limitations requiring compliance with the numeric performance standards for the selected CSO controls; (4) a requirement to implement the post-construction water quality monitoring program in order to assess compliance with water quality standards and protection of designated uses; (5) a requirement to reassess overflows to sensitive areas, where elimination or relocation of those overflows is not possible; (6) requirements for maximizing the treatment of wet weather flows at the treatment plant; and (7) a reopener clause allowing modification of the permit if water quality standards, including protection of designated uses, are not being met.  7-ER-1651.

### c.     Flexibility Between Phases I and II

The elements of Phase I and II permits are not set in stone.  Rather, the CSO Policy explains that "the entire process . . . must be coordinated to control CSOs effectively."  7-ER-1645; *see also* 7-ER-1497 (explaining that "in many instances, the separation between permit phases may not be distinct and permits may contain both Phase I and Phase II elements").

In addition, the CSO Policy calls for ongoing assessment of combined sewer systems and of potential needs for improvement. For example, as described above, Phase II permits should "include a post-construction water quality monitoring program adequate to verify compliance with water quality standards and protection of designated uses as well as to ascertain the effectiveness of CSO controls." 7-ER-1649. Phase II permits must also include "[a] requirement to reassess overflows to sensitive areas in those cases where elimination or relocation of the overflows is not physically possible and economically achievable." 7-ER-1651. "If, after monitoring, it is determined that [water quality standards] are not being met," "the permittee should be required to submit a revised" LTCP "that will attain water quality standards after implementation." 7-ER-1645.

Recognizing that some municipalities had already made progress in abating CSOs, the CSO Policy exempts certain permittees from the initial planning and construction provisions of Phase I of the Policy. 7-ER-1645. The Policy exempts from initial planning requirements permittees who, by 1994, had "substantially completed construction of CSO control facilities that are designed to meet [water quality standards] and protect designated uses" (section I.C.1), as well as those who had "substantially developed or [were] implementing a CSO control program pursuant to an existing permit or enforcement order" (section I.C.2). *Id.*

### 3. Applicable Water Quality Standards

#### a. The California Ocean Plan

California adopted the Water Quality Control Plan for Ocean Waters of California ("Ocean Plan") in 1972 and has amended it several times, most recently in 2019. 3-ER-503. The Ocean Plan establishes water quality standards and a program to protect beneficial uses of the Pacific Ocean within California's territorial waters. *See* 33 U.S.C. § 1362(8). Upon EPA's approval, the water quality standards in the most recent Ocean Plan became the applicable water quality standards for ocean waters in California under the CWA.[3] 1-ER-140. The Ocean Plan establishes water quality standards in the form of beneficial uses and water quality objectives. 3-ER-513–22. These water quality standards take the form of both narrative (*e.g.*, "[f]loating particulates and grease and oil shall not be visible") and numeric criteria. *Id.*

#### b. The 1979 Exception

In 1979, California granted San Francisco a limited exception to the Ocean Plan during wet weather. 7-ER-1670 ("1979 Exception"). The 1979 Exception exempts San Francisco from compliance with bacteriological objectives in the Ocean Plan during wet weather. *Id.* The 1979 Exception also instructs San

---

[3] Relevant to this Permit, these standards apply to federal waters more than three miles from California's shores, as well as state waters within three miles of California's shores. 1-ER-144.

Francisco to limit combined sewer overflows to an average of eight per year. *Id.*
It provides, in relevant part:

- Except for the bacteriological standards, to the greatest extent
  practical, San Francisco is to design, construct, and operate facilities
  to conform to the remaining standards in the 1978 Ocean Plan.

- San Francisco is to design and construct facilities to contain all
  stormwater runoff beyond that associated with an average of eight
  combined sewer discharges per year.

- Beaches affected by combined sewer discharges are to be posted with
  warning signs beginning when the discharge commences until
  analysis indicates that water quality meets Ocean Plan bacteriological
  standards for recreation.

7-ER-1670–71. The 1979 Exception also states that construction of additional
facilities or modification of existing facility operations may be required based on
changes in the location, intensity, or importance of affected beneficial uses, or
demonstrated unacceptable adverse impacts resulting from facility operations. 7-
ER-1672.

## B. Factual background

### 1. The Oceanside Combined Sewer System

San Francisco's Oceanside combined sewer system collects wastewater from approximately 250,000 residents in western San Francisco. 1-ER-134. The Oceanside system discharges into the Pacific Ocean through eight discharge points, or outfalls. 1-ER-136. Discharge Point No. 001, known as the "Southwest Ocean Outfall," is a deepwater outfall that discharges 4.5 miles offshore into the Pacific Ocean. *Id.* The remaining seven discharge points, known as combined sewer discharges ("CSDs") 1-7, are nearshore outfalls that discharge directly onto San Francisco's western beaches, which are sensitive areas, and into the Pacific Ocean. 1-ER-53–54.

The following figure illustrates the Oceanside system, with the black arrow representing the Southwest Ocean Outfall and the red arrows representing CSDs 1-7:



1-ER-90.

During dry weather, all wastewater in the Oceanside system is required to go through both primary and secondary treatment before being discharged into the Pacific Ocean through the Southwest Ocean Outfall. 1-ER-135. Primary treatment uses physical processes such as screening, sedimentation, and skimming to remove at least 30% of the biological oxygen demanding material and suspended solids

from the waters entering a treatment plant. 33 U.S.C. § 1311(h)(9). Secondary

treatment typically uses biological processes to remove at least 85% of biological

oxygen demand and total suspended solids. 40 C.F.R. § 133.102.

During wet weather, the amount of wastewater flowing through the

Oceanside system may exceed its primary and secondary treatment capacities. The

Oceanside treatment plant has a total wet weather capacity of 65 million gallons

per day. 1-ER-135. The system provides both primary and secondary treatment

for 43 million gallons per day, and primary treatment alone for an additional 22

million gallons per day. *Id.* These waters are mixed at the treatment facility before

being discharged into the ocean through the Southwest Ocean Outfall. *Id.*

In heavy rain, wastewater flowing through the Oceanside system can exceed

65 million gallons per day. In that case, any wastewater above 65 million gallons

per day does not receive primary or secondary treatment at the Oceanside

treatment plant. 1-ER-135. Instead, it undergoes what is labeled "equivalent to

primary" treatment. *Id.* For equivalent to primary treatment, wastewater

exceeding 65 million gallons a day flows into enormous concrete boxes known as

"transport/storage structures," before overflowing either through the Southwest

Ocean Outfall or through CSDs 1-7 onto beaches. *Id.* The goal of sending

untreated wastewater into the boxes before discharging it is to allow certain

materials in the wastewater, such as sediments and solids, to sink to the bottom of

the boxes before the wastewater overflows. *Id.* Some of the boxes also contain baffles that are intended to retain "floatables" instead of sending them through the outfalls. 1-ER-171. This overflow wastewater is either mixed with the treated water from the Oceanside treatment plant and pumped out through the Southwest Ocean Outfall or, once the Southwest Ocean Outfall's capacity of approximately 165 million gallons per day is reached, discharged through the CSD outfalls onto beaches and into the ocean. *Id.*

Based on its modeling, San Francisco estimates that over 196 million gallons of combined sewage and wastewater are discharged from CSDs 1-7 in a typical year. 5-ER-958. This combined sewage and wastewater is discharged to popular beaches and is only treated in the "equivalent to primary" process. 1-ER-135. Data from 2004 to 2014 show that pollutant concentrations in combined sewer discharges exceeded water quality objectives. For example, the average copper and zinc concentrations were 29 µg/L and 118 µg/L, with maximum concentrations of 59 µg/L and 274 µg/L. 4-ER-872. These exceed the applicable water quality objectives of 6-month median concentrations of 3 µg/L of copper and 20 µg/L of zinc, and instantaneous maximum concentrations of 30 µg/L of copper and 200 µg/L of zinc. 3-ER-519. Samples collected from receiving water monitoring locations along the shoreline between July 2012 and June 2013 also contained elevated levels of *E. coli*, total coliform, and *Enterococcus*. 5-ER-872. Seventy

percent of the elevated samples correlated with combined sewer discharges from the CSD outfalls and resulted in the posting of warning or "no swimming" signs at beaches for seventeen days between July 2012 and June 2013. *Id.*

These sewer discharges occur at popular beaches in San Francisco, including Ocean Beach, China Beach, and Baker Beach. 5-ER-871–72. Surveys conducted after combined sewer overflows between 2008 and 2014 showed that 20% of users at the beaches were in physical contact with the waters that had just received the overflow sewage. 5-ER-872.

## 2. Planning and Permitting History

San Francisco began planning CSO controls in the 1970s. 5-ER-941. Construction began on the Oceanside system in the early 1980s, and it was substantially complete by the late 1990s. 4-SER-792. As a result, when EPA and California issued San Francisco's NPDES permit in 1997, they determined that San Francisco did not need to comply with the initial planning and construction requirements of the CSO Policy. 5-ER-1235; *see also* 7-ER-1645. Therefore, San Francisco receives Phase II permits for its combined sewer systems, and it never created an LTCP in the form of a single, unified planning document. 4-ER-941. Instead, San Francisco refers to a collection of documents ranging from 1971 to 1990 as its LTCP. *Id.* In the 2009 permit renewal, EPA and California determined

that San Francisco's planning documents were consistent with the CSO Policy.  5-ER-1038.

In 2011, San Francisco began the Sewer System Improvement Program ("Improvement Program"), a 20-year investment to enhance the reliability and performance of its wastewater system.  4-ER-941.  The Improvement Program generated information about how the combined sewer system, the area covered by the Oceanside system, and the system's management approach have changed since 1997, including various studies that analyze collection system improvements and that identify collection system opportunities within the drainage basin.  4-ER-941, 946–47.  These studies include a memorandum designed to help San Francisco reduce combined sewer discharges while minimizing flooding and backups.  4-ER-947; *see also* 2-SER-270, 288, 391.

Because the Oceanside system discharges into both federal and state waters, EPA and California consolidated their NPDES permitting processes pursuant to 40 C.F.R. § 124.4, as in previous permits.  1-ER-53.  EPA worked with California and San Francisco for more than six years before reissuing the Oceanside NPDES permit in 2019.  3-SER-466; 1-SER-10.  EPA and California shared an early draft consolidated NPDES permit with San Francisco in 2014 and received comments from San Francisco in January 2015.  3-SER-465.  In 2016, EPA requested additional information from San Francisco after receiving reports of "raw sewage

mixed with stormwater . . . overflowing from [San Francisco's combined sewer system] into streets, sidewalks, residences and businesses." 1-SER-210. In 2017, California sent San Francisco a request for additional monitoring data to better understand the quality of the wet weather overflows. 1-SER-206.

In 2018, pursuant to the requirements of the permit for San Francisco's Bayside combined sewer system, San Francisco submitted the *San Francisco Wastewater Long Term Control Plan Synthesis*.[4] 4-ER-951. Among other things, the Synthesis identifies various documents that San Francisco alleges comprise the LTCP for both the Bayside and Oceanside combined sewer systems. 4-ER-974–75. The Synthesis explains that "no single report describes the analyses and assumptions underlying the construction of the City's current facilities." 4-ER-954.

In response to the submittal, California found that the Synthesis did not adequately address the minimum required elements of an LTCP under the CSO Policy. 1-SER-204. For example, California explained that Appendix A of the Synthesis "summarizes documents that comprise [San Francisco's] Long-Term Control Plan through March 1994, but this does not reflect current circumstances." *Id*. at 1. San Francisco did not submit a revised Synthesis addressing California's

---

[4] San Francisco operates two combined sewer systems, the Oceanside system and the Bayside system. 4-ER-955. All discharges from the Bayside system are into state waters, so California solely issues that permit. 1-ER-13.

comments.  1-SER-199.  EPA thus determined that, notwithstanding the limited

prior CSO exemption relieving San Francisco from the CSO Policy's initial

planning requirements, it was necessary to include a requirement in the 2019

Oceanside Permit that San Francisco update its LTCP.  4-ER-868–69.

EPA also concluded that the draft permit's effluent limitations based on San

Francisco's outdated planning documents would "not necessarily achieve water

quality standards."  4-ER-866–67.  As a result, EPA determined that it was

necessary to include as a backstop a narrative prohibition stating that San

Francisco "shall not cause or contribute to a violation of any applicable water

quality standard (with the exception set forth in [the 1979 Exception]) for receiving

waters."  1-ER-63; *see also* 1-ER-171.

In October 2018, EPA and California shared another draft permit with San

Francisco.  1-SER-42.  Between October 2018 and December 2019, EPA and

California met with San Francisco nine times for in-depth discussions about draft

permit conditions.  4-ER-818.  In addition to San Francisco's voluminous

comments on the draft permit, EPA and California also received comments from

numerous members of the public asking the permitting authorities to prevent San

Francisco from allowing sewage to overflow into people's homes and businesses.

4-ER-853–61.

California signed the final consolidated NPDES permit on September 12, 2019, and it became effective as to discharges to state waters on November 1, 2019.  1-ER-54; 1-SER-4.  The director of EPA's Water Division signed the final consolidated permit on December 10, 2019, with an effective date as to discharges to federal waters of February 1, 2020.  1-ER-55; 1-SER-2.

## C.    Agency Proceedings

San Francisco petitioned EPA's Environmental Appeals Board for review of EPA's permit decision in January 2020.[5]  2-ER-442.  San Francisco challenged both the requirement that it update its LTCP and the narrative prohibition on violating water quality standards.[6]  2-ER-462–81.  After EPA stayed the contested provisions of the federal Permit, San Francisco also filed a supplemental motion arguing that the Oceanside Permit is a single permit, rather than a federal and a state permit, concurrently issued.  2-ER-311.  On December 1, 2020, the EAB denied San Francisco's petition on all counts.  1-ER-3.  Following the EAB order, EPA issued the final permit, which included the unsuccessfully contested

[5] San Francisco challenged the state permit in state court, but that lawsuit has been stayed pending the resolution of the federal challenge.  *City & Cty. of S.F. v. S.F. Bay Reg'l Water Quality Control Bd.*, No. RG19042575 (Alameda Cty. Super. Ct.).

[6] San Francisco also challenged a permit provision requiring San Francisco to report isolated sewer overflows, such as sewage backups into basements or onto streets through manhole covers, to EPA.  2-ER-481–93.  San Francisco has not challenged that provision before this Court.

conditions, on December 22, 2020.  Notice of Final Permit Decision.  1-ER-2.  San Francisco then filed a Petition for Review before this Court.  Petition, Docket No. 1.

## SUMMARY OF ARGUMENT

1.  The Oceanside Permit's requirement that San Francisco update its LTCP is lawful and supported by the record.  The CSO Policy calls for continued assessment of a combined sewer system's functioning to ensure discharges meet applicable water quality standards and protect sensitive areas.  This includes Phase II permits such as San Francisco's.  7-ER-1645.  Therefore, EPA may require San Francisco, which was exempted from the initial planning requirements of the CSO Policy, to update its LTCP when the record shows that such an update is necessary. San Francisco incorrectly argues that one condition that is *sufficient* to allow EPA to require an LTCP update—a demonstration that water quality standards are being violated—is one that is *necessary* for EPA to do so.  The CSO Policy is not as inflexible as San Francisco suggests, and EPA reasonably does not interpret it in a manner that would thwart Congress' fundamental objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Further, EPA reasonably explained in the record that the LTCP update was needed to assess the program's effectiveness because San

Francisco's existing LTCP is a collection of outdated documents and does not reflect current operation of the Oceanside system.

2. The Oceanside Permit's requirement that San Francisco not cause or contribute to a violation of water quality standards is lawful and supported by the record. The CWA requires that NPDES permits ensure that authorized discharges meet water quality standards. 33 U.S.C. § 1311(b)(1)(C). The CWA, including the CSO Policy, enables EPA to accomplish that mandate by including in permits narrative prohibitions such as the one at issue here, in addition to effluent limitations for specific pollutants. 7-ER-1651. Ninth Circuit precedent recognizes that NPDES permits may include such narrative limitations, and establishes that EPA does not have to "translate" such limitations into numeric standards for them to be enforceable. *See, e.g.*, *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 987 (9th Cir. 1995). Further, the narrative prohibition was not subject to the regulatory requirements for imposing pollutant-specific effluent limitations. The record supports EPA's inclusion of the narrative prohibition as a backstop in the Oceanside Permit, because EPA reasonably found that the other effluent limits in the Permit may not in themselves ensure compliance with the applicable water quality standards. 4-ER-863, 866–68.

3. The consolidated NPDES Oceanside Permit issued by EPA and California is, legally speaking, two permits, one state and one federal. The

applicable regulations allow EPA and California to merge their permitting processes, but the resulting consolidated permit-document contains two separate federal and state authorizations, no matter whether that document is referred to as a joint permit, one permit or two permits. Because California is authorized to issue NPDES permits for California waters, EPA lacks permit issuance authority outside of specific circumstances not present here. California authorized discharges to state waters, and EPA authorized discharges to federal waters. This Court lacks jurisdiction to review the state-issued permit, which San Francisco has appealed in state court, and it should deny San Francisco's request for declaratory relief pertaining to that state-issued permit.

## STANDARD OF REVIEW

Review of NPDES permits is governed by the Administrative Procedure Act's ("APA") standard of review, which authorizes courts to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008). The scope of review under this standard is "highly deferential, presuming the agency action to be valid," and requires "affirming the agency action if a reasonable basis exists for its decision." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006), *see also Alaska Eskimo*

*Whaling Comm'n v. EPA*, 791 F.3d 1088, 1095-96 (9th Cir. 2015).  A court will not set aside agency action unless the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  Further, a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

EPA's reasonable interpretation of the CWA is entitled to deference.  *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Where statutory language is susceptible to an agency's reading, a court need not determine that the agency's construction is "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999) (quoting *Atlantic Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 389 (1998)), or that it is "the only [construction the agency] permissibly could have adopted," *Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (quoting *Chevron*, 467 U.S. at 843 n.11).  Courts defer to an agency's construction as long as it "is a reasonable one," even if "it is not the [construction the court] would arrive at."  *Dep't of Treasury, I.R.S. v. Fed. Lab.*

*Rels. Auth.*, 494 U.S. 922, 928 (1990). Courts also defer to an agency's reasonable reading of genuinely ambiguous regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997). Additionally, "[a]lthough agency guidance documents are 'not controlling upon courts by reason of their authority, [they] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Indergard v. Ga.-Pacific Corp.*, 582 F.3d 1049, 1053 (9th Cir. 2009) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

Deference is especially appropriate here, where "a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations." *Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1327 (D.C. Cir. 1995) (under such circumstances, "the arguments for deference to administrative expertise are at their strongest"). Similarly, regarding scientific or technical findings, courts "must defer to a great extent to the expertise of the EPA." *Natural Resources Defense Council, Inc. v. EPA*, 863 F.2d 1420, 1430 (9th Cir. 1988). Deference "goes to the entire agency action," which here includes "both EPA's permitting decision and the EAB's review and affirmance of that decision." *See Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 20 (1st Cir. 2012).

Congress incorporated the CSO Policy directly into the CWA by requiring that any NPDES permit for a combined sewer system "shall conform to the Combined Sewer Overflow Control Policy." 33 U.S.C. § 1342(q)(1). Therefore, EPA's reasonable interpretation of the CSO Policy is entitled to deference. *See Chevron*, 467 U.S. at 844.

## ARGUMENT

### I. EPA Appropriately Required San Francisco to Update its LTCP.

The Oceanside Permit's requirement that San Francisco update its LTCP is lawful and supported by the record. San Francisco's argument to the contrary is based on an incorrect reading of the CSO Policy and should be rejected.

#### A. EPA's Requirement that San Francisco Update its LTCP is Consistent with the CSO Policy and Supported by the Record.

EPA interprets the CSO Policy as authorizing EPA to require municipalities to prepare updated LTCPs when necessary. Viewing the CSO Policy in context, EPA's interpretation is reasonable, best furthers the objectives of the CWA, and is entitled to deference. Here, the record supports EPA's decision: San Francisco's existing planning documents for the Oceanside system are outdated and do not reflect current conditions, which hinders EPA's ability to issue NPDES permits ensuring that the Oceanside system complies with the CWA.

### 1. The CSO Policy Affords EPA Discretion to Require LTCP Updates.

EPA has flexibility under the CSO Policy to require a permittee to update its LTCP. The CSO Policy contemplates ongoing assessment of a system's overall functioning to ensure compliance with the requirements of the CWA, including protection of water quality standards. If this assessment reveals that an LTCP update is necessary, then the CSO Policy accounts for that possibility. 7-ER-1651.

EPA is not prohibited from requiring San Francisco to conduct such an update simply because San Francisco was exempted from the CSO Policy's initial planning requirements. As the EAB explained, nothing in the CSO Policy "supports the notion that a determination that a permittee is excused from having to conduct initial planning or construction requirements under the CSO Control Policy remains in perpetuity." 1-ER-43. Combined sewer systems that have been issued Phase II permits, such as San Francisco, do not subsequently graduate from the CSO Policy or the potential need to prepare an LTCP update, as San Francisco suggests. Pet. Br. 48–51. Instead, the CSO Policy requires that "[i]n the case of *any* ongoing or substantially completed CSO control effort, the NPDES permit . . . should be revised to include all appropriate permit requirements consistent with Section IV.B of this Policy." 7-ER-1645 (emphasis added). Section IV.B of the CSO Policy establishes the major elements of NPDES permits, including requirements to develop and implement LTCPs. *Id.* This very general language

reasonably anticipates the potential need to reevaluate completed control efforts, such as a previously completed LTCP, where circumstances warrant. In short, EPA has wide discretion to include appropriate permit requirements under the CSO Policy, and requiring an LTCP update where the circumstances warrant one fits comfortably within that discretion.

Other provisions of the CSO Policy further emphasize the need for ongoing evaluation. Programs exempted from initial planning requirements under section I.C.2 "should be reviewed and modified to be consistent with the sensitive area, financial capability, and post-construction monitoring provisions" of the CSO Policy. 7-ER-1645. Each permit is required to include a "reopener clause authorizing the NPDES authority to reopen and modify the permit upon determination that the CSO controls fail to meet [water quality standards] or protect designated uses." 7-ER-1651; 1-ER-64 (reopener clause in 2019 permit). And where elimination or relocation of CSOs to sensitive areas such as beaches has been deemed impossible, the CSO Policy instructs permitting authorities to "require for each subsequent permit term a reassessment" of those discharges "based on new or improved techniques to eliminate or relocate, or on changed circumstances that influence economic achievability." 7-ER-1647. This is exactly what EPA's LTCP update requirement does. Among other requirements, the LTCP update provision in the 2019 Permit instructs San Francisco to submit a

"System Characterization Report" comprehensively describing the Oceanside

system.  1-ER-76.  Based on the findings of that report, San Francisco must create

and submit a "Consideration of Sensitive Areas Report that evaluates, prioritizes,

and proposes control alternatives needed to eliminate, relocate, or reduce the

magnitude or frequency of discharges to sensitive areas."[7]  *Id.*

EPA's construction of the CSO Policy as enabling EPA to require an LTCP

update in appropriate circumstances is also fully consistent with an LTCP's

purpose.  That purpose is to "consider the site-specific nature of CSOs and

evaluate the cost effectiveness of a range of control options/strategies."  7-ER-

1646.  In other words, an LTCP tells the permitting authority how the system

should function and what can be improved, and the permitting authority uses that

information to determine appropriate requirements of an NPDES permit.[8]  It is

important for a municipality's LTCP to reflect current conditions, so that the

---

[7] The 2009 Oceanside permit also required San Francisco to submit a
"consideration of sensitive areas" report, and San Francisco did not challenge that
reporting requirement.  5-ER-1056.

[8] San Francisco complains of the "burden on San Francisco's residents" imposed
by the fact that the LTCP update will require San Francisco to "assess and
potentially develop additional costly CSO control projects." Pet. Br. 47, 55.  As the
CSO Policy explains, the assessments a municipality conducts in its LTCP are in
fact designed to "ensure that CSO controls are cost effective" by "[p]roviding
sufficient flexibility to municipalities, especially financially disadvantaged
communities, to consider the site-specific nature of CSOs and to determine the
most cost-effective means of reducing pollutants and meeting CWA objectives and
requirements."  7-ER-1644.

permitting authority can compare the information in the LTCP to post-construction monitoring data to accurately evaluate whether the system is functioning appropriately and adjust future permits if needed.  7-ER-1651.  A permitting authority cannot assess whether a system is functioning properly if it does not know how the system *should* function, and an outdated or unclear LTCP fails to accurately convey how the system should function.  Here, an updated LTCP will ensure that future permit requirements for the Oceanside system are based on the most recent and appropriate information.  4-ER-942.

For example, San Francisco's Oceanside system is subject to the 1979 Exception's requirement that the system conform to applicable water quality standards "to the greatest extent practical."  7-ER-1670.  But EPA cannot ensure that water quality standards are being met "to the greatest extent practical" if the information in San Francisco's LTCP is outdated and unclear.  Therefore, under the CSO Policy, an LTCP update is "an appropriate permit requirement," because San Francisco's existing outdated LTCP does not allow EPA to evaluate whether and how the Oceanside system can meet applicable water quality standards to the greatest extent practical.

> ### 2. EPA's Decision to Require the LTCP Update Is Supported by the Record.

EPA amply supported its decision to require San Francisco to update its LTCP.  As EPA reasonably explained, the LTCP update is necessary because the

current LTCP is no longer adequate in light of changes to the Oceanside system and the need for accurate assessment of operations to ensure compliance with the CSO Policy and the CWA. 4-ER-941–44.

As EPA noted, the existing LTCP "is a collection of documents, developed over the course of two decades, dating from 1971 . . . whose relationship is not entirely clear. Furthermore, the Oceanside facilities have changed since they were constructed in 1997, and additional changes are underway and planned for the near future." 4-ER-941; *see also* 4-ER-869. San Francisco has conducted extensive planning efforts through the Improvement Program since the last permit reissuance in 2009. 4-ER-941. These new programs and planning efforts contain relevant information about existing and potential permit requirements: they include, for example, long-term capital plans and projects that affect system performance and protect water quality. 4-ER-941, 4-SER-896, 2-SER-214, 4-SER-638, 5-SER-937, 5-SER-1027, 5-SER-974, 5-SER-965. Yet, San Francisco has *not* submitted these documents to EPA as part of an LTCP. 4-ER-941. This failure hinders EPA's ability to issue a permit that protects water quality and accurately reflects conditions in the Oceanside system, because EPA does not know what authority the Improvement Program plans carry or how they relate to the documents that

comprise San Francisco's existing LTCP.[9] *Id.*; 1-SER-230. In fact, when San Francisco submitted an LTCP "Synthesis" to California, the State found that San Francisco's submission "[did] not adequately address the minimum required elements" of an LTCP. 1-SER-204. The most recent planning document that San Francisco pointed to in its LTCP Synthesis is a 1990 revision of a 1988 document. 4-ER-975. California noted that the collection of documents San Francisco submitted as its LTCP Synthesis "does not reflect current circumstances" and failed to include recent assessments of San Francisco's combined sewer systems. 1-SER-204.

Regarding changes to the Oceanside system that were not reflected in the existing LTCP, EPA explained that "the combined sewer system, the sewershed, and the Discharger's management approach have changed, most notably as documented by the Sewer System Improvement Program." 4-ER-941. For instance, EPA noted that San Francisco now discharges out of seven combined sewer discharge outfalls in addition to the Southwest Ocean Outfall, rather than eight as originally planned. 4-ER-869. EPA also pointed to examples of planned

---

[9] Recognizing that San Francisco has already completed much of the analysis necessary for the updated LTCP through its Improvement Program process, EPA specified in the permit that San Francisco "may use previously completed studies to the extent that they accurately provide the required information." 1-ER-75. As a result, contrary to San Francisco's claim, the LTCP update should not be unduly burdensome on San Francisco. Pet. Br. 48.

projects in the Oceanside system that can affect wet weather operations and effluent quality, including the Westside Recycled Water Project. 4-ER-941–42. Additionally, EPA explained that the Oceanside system has experienced condition-related maintenance and operational problems. 4-ER-942. For example, the Southwest Ocean Outfall has been impacted by sediment deposition, reducing its capacity. *Id.* Further, multiple planning documents have concluded that the current level of funding is not adequate to meet the sewer replacement needs of San Francisco's aging system. 4-ER-942 n.10.

EPA's goal in requiring the LTCP update to reflect updated information regarding the Oceanside system is consistent with the CSO Policy's directive to require permittees to "accurately characterize" sewer systems and to submit "appropriate documentation" of those systems. 7-ER-1646. The record supports EPA's conclusion that requiring an updated LTCP is appropriate, and the Permit provision requiring the update should be upheld.

**B.** **San Francisco's Arguments Against the LTCP Update Requirement Are Unavailing.**

**1.** **San Francisco's Claim that Violations of Water Quality Standards are the Exclusive Basis for Requiring an LTCP Update Is Incorrect.**

The CSO Policy provides that EPA should require an LTCP update when monitoring data show that water quality standards are not being met. Section I.C.1 of the CSO Policy instructs that in that situation, permittees who were excluded

from initial planning obligations should be required "to submit a revised CSO control plan that, once implemented, will attain [water quality standards]." 7-ER-1645.

San Francisco misreads this provision as providing the exclusive basis on which EPA can require that an LTCP be updated, arguing that EPA is prohibited from requiring an LTCP update in any other circumstance. San Francisco incorrectly attempts to transform noncompliance with water quality standards from being a *sufficient* basis for requiring an LTCP update into a precondition that is *necessary* for EPA to require such an update. This is a mistaken and illogical construction of the CSO Policy. Properly understood, section I.C.1 simply provides one circumstance in which an LTCP update should be required, not a condition precedent for any LTCP update requirement. 7-ER-1645.

This Court addressed a similar argument in *Carver v. Lehman*, 558 F.3d 869 (9th Cir. 2009). In that case, a statute allowed the Department of Corrections to deny early release to an eligible prisoner "if" one of four conditions was met. *Id.* at 873-74. After the Department of Corrections denied a prisoner's release without finding that one of the four conditions was met, the prisoner sued, arguing that the statute "requires the [Department of Corrections] to transfer an inmate to community custody in lieu of earned release unless any one of the . . . specifically designated reasons are found." *Id.* at 874 (internal citations omitted). The Ninth

Circuit disagreed.  The fact that the statute specified four grounds for denying transfer did not mean that the Department of Corrections could not deny transfer unless one of the four grounds existed.  *Id.* at 874-75.  The Court explained: "[i]f the . . . criteria for denying transfer constituted an exhaustive list of reasons for denial, the language would be effectively mandatory, giving rise to a presumption of transfer.  Nothing in the statute, however, indicates that those four criteria are the sole reasons for which the DOC may deny transfer."  *Id.* at 875-76.  The Ninth Circuit's explanation applies equally here:

> If, for example, the statute stated that DOC "may" deny transfer "only if" certain criteria are met or "unless" they are not, that might sufficiently limit the discretion of the DOC to the point it creates an expectation of release.  The distinction between "if" and "only if," however, is not a mere quibble over vocabulary—it goes right to the heart of whether the criteria . . . are necessary or sufficient conditions for transfer, and therefore whether transfer is mandatory or entirely discretionary.

*Id.* at 876 n.12.  *Cf. Alden Mgmt. Servs. v. Chao* , 532 F.3d 578, 581 (7th Cir. 2008) (rejecting argument that statute providing that "[c]omplaints may be filed by any aggrieved person or organization" foreclosed complaints filed by any other party, because "'[i]f A then B' . . . differs from '*only* if A, then B'" (emphasis original)); *Twp. of Tinicum v. United States DOT* , 582 F.3d 482, 488 (3d Cir. 2009) (explaining the difference between "only if," which describes a necessary condition, and "if," which describes a sufficient condition).

San Francisco's argument here suffers the same logical flaw. Section I.C.1 of the CSO Policy allows a permitting authority to require an LTCP update *if* water quality standards are not being met, but just as in *Carver*, it does not state that a permitting authority may require an LTCP update *only if* water quality standards are not being met. 7-ER-1645. As a result, EPA reasonably construes the CSO Policy as allowing a permitting authority to require an LTCP update for other reasons that are consistent with the Policy. EAB Decision, 1-ER-44. And for the reasons described above, the CSO Policy's requirement that a permit "should be revised to include all appropriate permit requirements consistent with Section IV.B of this Policy" allows EPA to require an LTCP update when necessary to ensure that the system is functioning properly. 7-ER-1645. EPA's interpretation of its CSO Policy is reasonable and entitled to deference.

### 2. EPA Included Appropriate Requirements Pertaining to San Francisco's Sensitive Areas Analysis.

San Francisco's argument that EPA lacked authority to require a sensitive areas analysis as part of the LTCP update also lacks merit. Pet Br. 55-58. San Francisco contends that it was exempted from the CSO Policy's initial planning requirements under section I.C.1 of the Policy but not under section I.C.2. *Id.* Section I.C.1 exempted from the CSO Policy's initial planning requirements permittees that had substantially completed construction of CSO facilities when the Policy was published, and it provides that a permittee should be required to submit

a revised LTCP if water quality standards are not being attained.  7-ER-1645.

Section I.C.2 exempted from initial planning requirements certain permittees that

had substantially developed a CSO control program pursuant to a permit, and it

provides that such programs should be modified as necessary to be consistent with

the sensitive area provisions of the Policy.  *Id.*  San Francisco incorrectly claims

that as a result, "EPA cannot require the City to undertake *any* sensitive areas

analysis."  Pet Br. 56 (emphasis original).  The Court should reject this argument

for multiple reasons.

As an initial matter, San Francisco failed to preserve this argument for

judicial review by raising it before the EAB.  *See* 40 C.F.R. § 124.19(a)(4)(i)

(requiring challenged permit conditions to be identified in appeal to EAB); *Sims v.

Apfel*, 530 U.S. 103, 108-09 (2000) (noting it is common for agency regulations to

require issue exhaustion in administrative appeals, and where they do, courts

reviewing agency action regularly ensure against the bypassing of that

requirement).  In fact, before the EAB, San Francisco repeatedly argued that it *is*

covered by section I.C.2.  2-ER-460, 474, 479.  As a result, the EAB had no

opportunity to consider San Francisco's new argument that it is not subject to

section I.C.2's requirement for ongoing assessment of discharges to sensitive areas.

Regardless, if San Francisco's argument is considered, it lacks merit.  Even

if section I.C.2 does not apply, other pertinent provisions in the CSO Policy

beyond that section require ongoing analyses of sensitive areas.  The Policy

contains separate provisions requiring both LTCPs and Phase II permits to include

"[a] requirement to reassess overflows to sensitive areas in those cases where

elimination or relocation of the overflows is not physically possible and

economically achievable.  The reassessment should be based on consideration of

new or improved techniques to eliminate or relocate overflows or changed

circumstances that influence economic achievability."  7-ER-1651; *see also id.* at

1647.  Thus, EPA had an adequate basis under the CSO Policy to require an

ongoing reassessment of discharges to sensitive areas, whether or not San

Francisco is subject to section I.C.2.

Moreover, San Francisco errs in claiming that the CSO Policy somehow

prohibits permitting authorities from requiring a permittee, as part of sensitive area

analyses, from considering the impacts of discharges on recreational uses and

evaluating control alternatives and ways to reduce or eliminate its outfalls and

CSOs.  The sensitive areas provisions of the CSO Policy require an assessment of

certain specific considerations, but nothing in them prevents EPA from requiring

San Francisco to assess *other* pertinent factors impacting sensitive areas as part of

its LTCP update.  7-ER-1645.  Indeed, such a restriction would be incompatible

with the CSO Policy's stated goal of "minimiz[ing] water quality, aquatic biota,

and human health impacts from CSOs," 7-ER-1644, as well as its instruction that

"EPA expects a permittee's long-term CSO control plan to give the highest priority to controlling overflow to sensitive areas," 7-ER-1647. The sensitive areas considerations that EPA required San Francisco to include in its LTCP update are appropriate under the CSO Policy, particularly because the Oceanside system's seven CSDs discharge to sensitive areas.

Further, the record supports EPA's decision to require San Francisco to conduct a sensitive areas analysis in the LTCP. EPA began gathering information regarding the Oceanside system's performance upon receiving reports that San Francisco's sewers were overflowing and dumping raw sewage into people's basements and into the streets. *See* 4-ER-853–61. EPA found that: (1) San Francisco discharged approximately 100 million gallons of combined wastewater and stormwater from the CSD outfalls between 2011 and 2014;[10] (2) recreational use surveys after combined sewer discharges from 2008 to 2014 showed that 20 percent of users came into contact with the discharge-receiving waters; (3) samples collected from July 2012 through June 2013 showed bacteria levels exceeding water quality objectives, resulting in the posting of warnings or no swimming signs at beaches for 17 days; and (4) pollutant concentrations in San Francisco's combined sewer discharges exceeded certain water quality objectives for receiving

---

[10] In fact, in 2018 San Francisco's own models estimated that discharge levels through the CSD outfalls in a typical year are much higher, at 196 million gallons per year. 4-ER-958.

waters, such as copper and zinc. 4-ER-872. Given these facts, EPA reasonably found it appropriate to require San Francisco to assess, through an LTCP update, ways to reduce impacts to sensitive areas such as public beaches, to better protect designated uses.

## II. EPA's Inclusion of the Narrative Prohibition Against Violating Water Quality Standards Is Legally Permissible and Supported by the Record.

EPA appropriately included a narrative prohibition against violating water quality standards in the Permit. The CWA and EPA's regulations do not preclude the inclusion of a narrative prohibition, and EPA's decision to include one in the Oceanside Permit is supported by the record and reasonable.

### A. The Narrative Prohibition Is Lawful.

As the EAB explained, the CWA requires every NPDES permit to include conditions that ensure the discharges will comply with the CWA, including "*any*" (emphasis added) limitation "necessary to meet water quality standards." 1-ER-21 (discussing 33 U.S.C. § 1311(b)(1)(C)). Similarly, NPDES regulations implementing the CWA require permits to include "*any* requirements in addition to or more stringent than promulgated effluent limitations" necessary to achieve water quality standards. 40 C.F.R. § 122.44(d) (emphasis added); *see also* 40 C.F.R. §§ 122.44(k)(3), 122.44(k)(4) (authorizing best management practices as an alternative to numeric effluent limitations). The CSO Policy echoes these

requirements, providing that permits should contain "[w]ater quality-based effluent limits . . . requiring, at a minimum, compliance with . . . the numeric performance standards for the selected CSO controls." 7-ER-1651. The CSO Policy expressly *requires* Phase I permits to "at least" contain provisions requiring permittees to "[c]omply with applicable [water quality standards] . . . expressed in the form of a narrative limitation." *Id.* Consistent with those statutory and regulatory requirements, EPA appropriately included in the Permit a narrative provision prohibiting San Francisco from "caus[ing] or contribut[ing] to a violation of any applicable water quality standard (with the exception set forth in State Water Board Order No. WQ 79-16) for receiving waters." 1-ER-63.

EPA's inclusion of a narrative prohibition in the Permit comports with EPA's longstanding interpretation of the statutory and regulatory requirements cited above. EPA has consistently interpreted the CWA and its implementing regulations to authorize narrative language in permits requiring compliance with water quality standards. *See, e.g.*, *Ohio Valley Envtl. Coal. v. Fola Coal Co.*, 845 F.3d 133, 141 (4th Cir. 2017) (recognizing that "EPA's view as to the reach of [narrative permit provisions prohibiting violations of water quality standards] has been consistent, as has the acceptance by courts of EPA's view when interpreting similar water quality provisions"); CSO Guidance for Permit Writers, 7-ER-1578 (providing that, "in addition to" performance standards designed to meet water

quality standards, "the permit writer should include narrative permit language providing for the attainment of applicable" water quality standards); *In re City of Lowell*, 18 E.A.D. 115, 175-88 (EAB 2020) (determining that EPA did not clearly err in including a permit provision that a facility's discharge "shall not cause a violation of the water quality standards of the receiving water"); Response to Comments, 4-ER-863 (explaining that "broad permit requirements implementing water quality standards, not stated as effluent limitations, may be included in permits and are enforceable").

EPA's longstanding reasonable interpretation of the statute it administers is entitled to deference and should be upheld.

> ### 1. Courts Have Recognized the Validity of a Narrative Prohibition Against Violating Water Quality Standards.

This Court and many others have recognized the validity of EPA's interpretation. Numerous decisions have upheld the application of narrative permit provisions requiring dischargers to comply with water quality standards. *See Nw. Envtl. Advocates*, 56 F.3d at 990; *Fola Coal*, 845 F.3d at 144; *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1199 (9th Cir. 2013). These decisions make clear that EPA is not required to "translate" water quality standards into numeric end-of-pipe limitations. Rather, narrative prohibitions on violating water quality standards are enforceable as written. Such narrative requirements are simply another tool in

EPA's toolbox to protect water quality, in addition to numeric technology-based and water quality-based limitations.

The Supreme Court has recognized the enforceability of broad, narrative water quality standards. *See PUD No. 1 of Jefferson Cnty. v. Washington Dep't of Ecology*, 511 U.S. 700, 715–16 (1994) ("*Jefferson County*") (acknowledging that water quality criteria are often expressed in general, narrative terms, such as "there shall be no discharge of toxic pollutants in toxic amounts," and holding that the CWA allows States to enforce broad narrative criteria). Although the specific question presented in *Jefferson County* is distinguishable from this case[11], the Supreme Court's analysis of narrative criteria is instructive. The Supreme Court recognized:

> [C]riteria are often expressed in broad, narrative terms. . . . In fact, under the Clean Water Act, only one class of criteria, those governing "toxic pollutants listed pursuant to section 1317(a)(1)" need be rendered in numerical form. . . . [The petitioners'] attempt to distinguish between uses and criteria loses much of its force in light of the fact that the Act permits enforcement of broad, narrative criteria based on, for example, "aesthetics."

*Id.*; *see also Fola Coal*, 845 F.3d at 144 (explaining that permittee "could not" "argue that narrative water quality standards cannot be enforced . . . given that the

---

[11] In *Jefferson County*, the dispute turned on whether a permit for a dam project could impose a minimum stream flow requirement in order to enforce a broad narrative antidegradation provision in a state's water quality standards. *See* 511 U.S. at 710.

Supreme Court has held to the contrary" (citing *Jefferson County*, 511 U.S. at 716)).  San Francisco's argument that the narrative prohibition on violating water quality standards in the Oceanside permit is too "vague" fails for the same reasons.  Pet. Br. 33.

This Court reached the same conclusion in the context of CSO permit prohibitions on violating water quality standards.  *Nw. Envtl. Advocates*, 56 F.3d at 990.  In *Nw. Envtl. Advocates*, the Ninth Circuit considered the enforceability of a narrative provision in a NPDES permit for a combined sewer system.  That permit, similar to the one at issue here, provided that "notwithstanding the effluent limitations established by this permit, no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards . . . ."  *Id.* at 985.  The defendant City of Portland argued in that case that the plaintiff environmental group could not bring a citizen suit enforcing the narrative prohibition on violating water quality standards.  *Id.*  This Court disagreed, and held that the narrative prohibition was enforceable, explaining, "the Supreme Court recognized that the numerical criteria components of state water quality standards cannot reasonably be expected to address all the water quality issues arising from every activity which can affect the State's . . . water bodies."  *Id.* at 989–90 (citing *Jefferson County*, 511 U.S. at 717).  The Court recognized that, due to the nature of CSOs, "it is impossible [for regulators] to determine the level at which to set a

numeric concentration-based permit limit in order to ensure that the gross amount of pollution discharged will not violate water quality standards." *Id.* at 989. As a result, narrative prohibitions on violating water quality standards offer "an important enforcement tool" for regulators, in addition to numeric limitations. *Id.*

Other decisions by this Court and other Courts of Appeal have recognized that narrative prohibitions against violating water quality standards are enforceable as written and do not need to be "translated" into numeric effluent limitations to be valid. In *NRDC v. Cnty. of Los Angeles*, 725 F.3d at 1199, this Court again considered enforcement of a permit condition prohibiting "discharges from [the facility] that cause or contribute to the violation of the Water Quality Standards or water quality objectives." The Court concluded that such narrative prohibitions are enforceable. *Id.* at 1206–07; *see also Fola Coal*, 845 F.3d at 137–38 (where a permit required the permittee's discharges to "be of such quality so as not to cause violation of applicable water quality standards," upholding the district court's finding that the permittee violated the provision by discharging ions and sulfates in sufficient quantities to cause increased conductivity, which resulted in a violation of the state's narrative water quality standards). These decisions directly refute San Francisco's argument that the narrative prohibition on violating water quality standards in the Permit is too vague: San Francisco can comply with the provision by not violating applicable water quality standards. *See* 1-ER-139–42; 4-ER-864.

In contending that EPA was required to "translate" the narrative prohibition into numeric effluent limitations, San Francisco does not even attempt to address the bulk of these cases. Pet. Br. 33-36. Its sole attempt to distinguish them is to claim that they are inapplicable because they related to the enforceability of such provisions. *Id.* n.19. That argument misses the point. The fact that these cases were decided in the context of assessing whether narrative prohibitions are enforceable does not detract from the central force of their holdings—narrative prohibitions on violating water quality standards are valid and enforceable.

In the cases discussed above, the permittee challenged the enforceability of narrative prohibitions on the very same grounds that San Francisco now challenges their validity. In *Nw. Envtl. Advocates*, for example, the permittee challenged enforceability of the narrative prohibition precisely *because* it was a narrative prohibition, and not a numeric effluent limitation. *See* 56 F.3d at 989 (rejecting argument "exclud[ing] citizen suit enforcement of water quality standards that are not translated into quantitative limitations," and explaining that "[s]uch a result would be especially troubling in this case, because no effluent limitations cover the discharges from Portland's combined sewer overflows"). In discussing that case, this Court has explained:

> [W]e recognized that Congress had authorized enforcement of state
> water-quality standards, lest municipalities be immunized on the
> technicality that not all water standards can be expressed as effluent
> limitations. . . . Because the total amount of water entering and

> leaving the sewer system was unknown, it was impossible to articulate
> effluent standards which would ensure that the gross amount of
> pollution discharged [would] not violate water quality standards.
> Only by enforcing the water-quality standards themselves as the limits
> could the purpose of the CWA and the NPDES system be effectuated.

*NRDC, Inc. v. Cnty. of Los Angeles*, 673 F.3d 880, 895-96 (9th Cir. 2011) (internal

quotations and citations omitted; alteration in original) (reversed on other grounds

by *Los Angeles Cnty. Flood Control Dist. v. NRDC, Inc.*, 568 U.S. 78 (2013)).  The

Court's logic upholding enforceability of the narrative condition in that case

applies with equal force here.

No matter that the cases discussing the validity of narrative permit

provisions occurred in the enforcement context, their holdings are clear: NPDES

permits may include narrative prohibitions on violating water quality standards.  In

fact, the enforcement context of those cases only serves to make them more

instructive, demonstrating that in practice, the narrative prohibitions are not too

vague to enforce.  That courts have been able to determine whether permittees

have violated broad narrative conditions demonstrates they are not too vague and

undercuts San Francisco's argument that it will not be able to determine whether it

is in compliance.

The sole case San Francisco relies on to argue that the narrative prohibition

is invalid, *NRDC v. EPA*, 808 F.3d 556 (2d Cir. 2015), is distinguishable for a

number of reasons and also cannot be reconciled with the controlling Ninth Circuit

precedent discussed above.  First, the narrative requirement to comply with water quality standards in *NRDC v. EPA* was the *only* water quality-based effluent limitation applicable to all the dischargers covered by the permit because EPA concluded that numeric limitations were "infeasible" to calculate.  *Id.* at 578.  Because the narrative limitation was the only water quality based effluent limitation applicable to all dischargers, the Second Circuit concluded that the narrative limitation was too vague to ensure compliance with water quality standards.  *Id.*  In contrast, the Permit at issue here does include discharge limits in the form of numeric effluent limitations.  *See* 1-ER-61–62; 4-ER-864.  Therefore, the narrative prohibition does not take the place of numeric effluent limitations; it serves as a backstop protection *in addition to* numeric effluent limitations and other permit provisions.  As a result, *NRDC v. EPA*'s reasoning that the narrative limitation in that case did not do *enough* to ensure compliance with water quality standards under CWA section 301(b)(1)(C) simply does not apply here.

In addition, the permit in *NRDC v. EPA* was a general permit regulating discharges of ballast water from ships, which would be travelling through different water bodies subject to different water quality standards.  *See* 808 F.3d at 562.  The frequent changes in applicable water quality standards depending on a vessel's location made it difficult for an operator to know what water quality standards applied at any given time, therefore failing to provide shipowners with adequate

guidance as to what was required under the permit. *Id.* at 577-78. In contrast, this case involves discharges from a single, stationary source, and the discharges are specifically subject to the standards in California's Ocean Plan, as applied to the Oceanside system in the 1979 Exception, and the Permit specifically lists the sections of the Ocean Plan containing the applicable standards. 4-ER-864; 1-ER-139–42. Moreover, *NRDC* involved a permit for discharges from a vessel ballast tank, not a combined sewer system. 808 F.3d at 567. Therefore, the CSO Policy, which specifically recommends narrative permit conditions requiring compliance with water quality standards, did not apply there. *Id.*

Finally, in any event, an out of Circuit decision such as *NRDC* cannot overcome consistent and controlling precedent from this Circuit.

In short, EPA reasonably exercised its discretion when it imposed a narrative prohibition on violating water quality standards in addition to the numeric effluent limitations contained in the Permit. EPA's inclusion of that provision should be upheld.

### 2. EPA Satisfied the CWA's Requirements in Including the Narrative Prohibition.

San Francisco additionally argues that the narrative prohibition is invalid because EPA purportedly did not follow the proper procedures under its regulations at 40 C.F.R. § 122.44(d) in applying it. Pet. Br. 36-39. This argument is incorrect. The regulations that San Francisco relies on create a framework for

51

EPA to follow upon setting pollutant-specific effluent limitations, but they do not apply to narrative prohibitions on violating water quality standards like the one at issue here.  As the EAB explained:

> Although 40 C.F.R. § 122.44(d) sets forth a process for deriving pollutant-specific effluent limits when the permitting authority determines that a particular pollutant has the reasonable potential to cause or contribute to an exceedance of water quality standards, the regulations do not require all permit conditions necessary to meet water quality standards to be expressed in terms of specific pollutant-by-pollutant limitations.

1-ER-21.  Accordingly, the EAB properly held that "the regulations… setting forth the standards-to-permit process are inapposite to the narrative prohibition at issue here."  1-ER-25.

Pursuant to the statute, EPA may include a narrative prohibition so long as it determines it is "necessary" to meet water quality standards under CWA section 301(b)(1)(C).  33 U.S.C. § 1311(b)(1)(C).  As described above, courts have recognized—consistent with this broad grant of statutory authority—EPA's ability to include in permits broad narrative prohibitions on violating water quality standards.  And EPA reasonably does not interpret its implementing regulations at 40 C.F.R. § 122.44(d)(1)(i)-(vi) as precluding the utilization of narrative prohibitions.  The provisions in 40 C.F.R. § 122.44(d)(1)(i)-(vi) simply do not address narrative prohibitions; they address the process for establishing pollutant-specific effluent limits.  Nothing in these regulations precludes a permitting

authority from determining that a narrative prohibition against violating water quality standards is also appropriate and necessary for ensuring compliance with water quality standards. *See Nw. Envtl. Advocates*, 56 F.3d at 986 (rejecting a permittee's argument that "only those water quality standards that are translated into effluent limitations" may be enforced).

Specifically, 40 C.F.R. § 122.44(d)(1)(i) states that "[l]imitations must control all pollutants or pollutant parameters . . . which the Director determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." In other words, EPA conducts a "reasonable potential analysis" and follows the framework laid out in the regulations when establishing specific controls on "pollutants or pollutant parameters." But that framework does not apply when EPA establishes narrative prohibitions, which are not based on specific "pollutants or pollutant parameters." For the same reason, the framework San Francisco relies on from the permit writers' manual applies to pollutant-specific effluent limitations, and not the narrative prohibition at issue here.

EPA's interpretation of 40 C.F.R. §§ 122.44(d)(1)(i)-(iv) as applying only to limitations for specific "pollutants or pollutant parameters" comports with the plain meaning of the regulations. But even if the Court finds the regulations to be

ambiguous, EPA's interpretation is entitled to deference. *See Kisor*, 139 S. Ct. at 2408 (affording deference to agencies' reasonable interpretations of genuinely ambiguous regulations). Here, EPA's reading is reasonable in light of the fact that, while the regulation sets a framework for establishing standards for specific "pollutants or pollutant parameters," 40 C.F.R. § 122.44(d)(1)(i), the CWA, including the CSO Policy, expressly anticipates that the permitting authority will also apply broad narrative conditions requiring permittees to comply with applicable water quality standards where necessary, *see* 7-ER-1651 (instructing that Phase I permits require permittees to "[c]omply with applicable [water quality standards] . . . expressed in the form of a narrative limitation"); *Nw. Envtl. Advocates*, 56 F.3d at 990. Therefore, the "character and context of [EPA's] interpretation entitle it to controlling weight," *see Kisor*, 139 S. Ct. at 2416, and EPA's interpretation should be affirmed.

San Francisco's claim that EPA's interpretation "would absolve the Agency of any obligation to set discharger-specific [water quality-based effluent limitations]" is simply not correct. Pet. Br. 39. This line of reasoning is divorced from the CSO Policy, which is incorporated into the CWA under section 402(q). For example, the CSO Policy instructs that Phase II permits must include water quality-based effluent limitations "under 40 C.F.R. 122.44(d)(1) and 122.44(k) requiring, at a minimum, compliance with . . . the numeric performance standards

for the selected CSO controls." 7-ER-1651, 1643 ("Contained in the Policy are provisions for developing appropriate, site-specific NPDES permit requirements for all combined sewer systems . . . that overflow as a result of wet weather events."). Further, EPA did not seek to avoid its obligation to include effluent limitations for specific pollutants or pollutant parameters in addition to the narrative prohibition at issue here: the permit appropriately contains both. 1-ER-62, 74–75.

**B.    The Record Supports EPA's Decision to Include the Narrative Prohibition.**

CWA section 301(b)(1)(C) requires NPDES permits to include limitations "necessary to meet water quality standards." 33 U.S.C. § 1311(b)(1)(C). Here, the record establishes that the narrative prohibition on violating water quality standards was necessary and serves an important backstop function. Therefore, this Court should uphold EPA's inclusion of the narrative prohibition.

EPA included the narrative prohibition as a backstop "to ensure compliance with applicable water quality standards in accordance with the CWA and [its implementing regulations]." 1-ER-156; 4-ER-863. The existence of separate numeric effluent limitations in the permit did not foreclose EPA from reasonably including the narrative prohibition. As EPA explained in its response to comments, the narrative prohibition was "necessary to ensure compliance with applicable water quality standards" because the effluent limits elsewhere in the

permit may not "necessarily achieve water quality standards." 4-ER-863, 866–68.

EPA thus included the narrative prohibition to ensure that San Francisco satisfies

its statutory obligation to ensure water quality standards are met.

The record supports EPA's determination that compliance with end-of-pipe

numeric effluent limitations in the permit might not ensure compliance with water

quality standards, including protection of beneficial uses. 1-ER-25–26. As the

EAB noted, "[t]he aim of the CWA, by virtue of the CSO Control Policy, is to

bring combined sewer discharges into compliance with the CWA, including

compliance with water quality standards *and* protection of designated uses." 1-

ER-26 (emphasis original) (internal quotations omitted). To that end, the CSO

Policy requires permits to include provisions providing for post-construction

monitoring, in order to verify compliance with water quality standards and

protection of designated uses and to ascertain the effectiveness of CSO controls.

7-ER-1643, 1649; 4-ER-867. Similarly, the CSO Policy requires permittees to

submit a revised LTCP if post-construction monitoring data reveal that water

quality standards are being violated. 7-ER-1645. If compliance with pollutant-

specific numeric effluent limitations were sufficient to ensure that a permittee

would not violate water quality standards, then these provisions of the CSO Policy

would not be necessary. The CSO Policy thus supports EPA's decision to include

the narrative prohibition as a backstop given the possibility that the numeric

effluent limitations in the permit might not sufficiently ensure compliance with water quality standards, including beneficial uses, on their own.

EPA's determination is also consistent with the 1979 Exception, which requires San Francisco to comply with the water quality standards laid out in California's Ocean Plan, including beneficial uses, to the "greatest extent practical," with a limited exception for bacteriological standards. 7-ER-1671. The 1979 Exception requires San Francisco to capture and contain all stormwater runoff, "[e]xcepting an average of eight overflows per year." 7-ER-1671. Despite this allowance, the 1979 Exception expressly recognized that changes might be necessary to protect water quality standards; it did not constitute a determination that its terms would adequately protect water quality standards, including beneficial uses, forever. 7-ER-1672 ("[I]f [California] finds that changes in location, intensity or importance of affected beneficial uses or demonstrated unacceptable adverse impacts as a result of operation of the constructed facilities have occurred, it may require the construction of additional facilities or modification of the operation of existing facilities."); 1-ER-142. Therefore, it was reasonable for EPA to conclude that the existing water quality-based effluent limitations in the Permit, which were derived from the LTCP and designed to comply with the 1979 Exception, might not be adequate to protect beneficial uses, and that a backstop in the form of the narrative prohibition was necessary.

Indeed, because conditions have changed over the decades and because of water quality concerns about the sewer overflows, EPA denied San Francisco's request for EPA to make an affirmative statement that the Oceanside system's current operations ensure protection of beneficial uses. 4-ER-867–68. EPA explained that the assumptions made by the State Water Board about the frequency of combined sewer discharges in 1979 "may not ensure protection of beneficial uses today." 4-ER-867. That is why the permit includes post-construction compliance monitoring, consistent with the CSO Policy, to verify compliance with water quality standards, including beneficial uses. *Id.*

Additional record evidence supports the need for the narrative prohibition in order to protect water quality standards, including beneficial uses such as recreation. EPA noted that combined sewer overflows resulted in the discharge of sewage-laden wastewater onto Ocean Beach, China Beach, and Baker Beach, which are popular recreational areas. 4-ER-871–72. Further, between 2011 and 2014, the combined sewer discharge outfalls discharged approximately 100 million gallons of wastewater onto San Francisco beaches. 4-ER-872. Between 2008 and 2014, surveys conducted after combined sewer discharges showed that 20% of users at the beaches were in physical contact with water that had just received the discharge of sewage. *Id.*

Additionally, EPA cited monitoring data supporting its decision to include the narrative prohibition. EPA pointed to data from 2004 through 2014 showing that pollutant concentrations in combined sewer discharges exceeded water quality objectives. For example, the average copper and zinc concentrations in combined sewer discharges were 29 µg/L and 118 µg/L, and maximum concentrations reached 59 µg/L and 274 µg/L. 4-ER-872. These concentrations are far higher than the applicable water quality objectives in California, which set 6-month median concentrations of 3 µg/L of copper and 20 µg/L of zinc; instantaneous maximum concentrations are not to exceed 30 µg/L of copper and 200 µg/L of zinc. 3-ER-519.

EPA also considered data showing elevated levels of bacteria (specifically, *E. coli*, total coliform, or *Enterococcus*) in samples collected at receiving water monitoring locations along the shoreline. 4-ER-872. 70% of the elevated samples were associated with combined sewer overflows and resulted in the posting of warnings or no swimming signs at beaches for seventeen days between July 2012 and June 2013. *Id.* Although San Francisco is exempt from complying with bacteriological objectives under the 1979 Exception, the data support EPA's determination that the narrative prohibition was necessary because the sampling results indicated negative impacts to beneficial uses such as water contact recreation. This is consistent with the 1979 Exception, which specifically

envisioned the potential for modification based on changes in the affected

beneficial use or demonstrated unacceptable adverse impacts. 7-ER-1672; *see also*

EAB Decision, 1-ER-29 (explaining that the 1979 Exception "does not provide a

determination that operation of the Oceanside [system] would be protective of

beneficial uses in perpetuity."). Because the law and the record support EPA's

decision, the Permit's narrative prohibition should be upheld.

## III. EPA and California Independently Authorized San Francisco's Discharges through the Oceanside Permit.

EPA and California consolidated their permitting processes pursuant to 40

C.F.R. § 124.4. San Francisco asks this Court to declare that this consolidation

transformed the resulting authorizations into one indivisible permit. Pet Br. 58-64.

San Francisco's argument conflicts with the plain text of the CWA and its

implementing regulations, and this Court should reject it.

EPA does not have the authority to issue the NPDES permit for the

Oceanside system's discharges into waters within state jurisdiction. California is

authorized under CWA section 402(b) to issue NPDES permits for waters within

its borders. 33 U.S.C. § 1342(b). When a state is authorized to issue NPDES

permits under section 402(b), EPA's permitting program in that state is suspended.

33 U.S.C. § 1342(c)(1); *see also Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*,

551 U.S. 644, 650 (2007) ("If [NPDES permitting] authority is transferred, then

state officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight.").

Once a state gains NPDES permitting authority and EPA suspends its permitting program, EPA only retains authority to issue a NPDES permit for an authorized state if it goes through the permit objection process laid out in CWA section 402(d)(2). 33 U.S.C. § 1342(d)(2). That process did not occur for the 2019 Oceanside Permit. EPA is only involved in the Oceanside system permitting process because the Oceanside system discharges into federal waters in addition to state waters. 1-ER-136. EPA and California issued their permits jointly as a result, but EPA's involvement and the resulting consolidation of permit proceedings does not—and cannot, under the CWA—erase California's continued authority to issue the NPDES permit for discharges into waters within its jurisdiction. San Francisco's desire to invalidate the two permits in one sweep cannot overcome this principle.

If San Francisco wishes to have the state permit invalidated, it must bring that challenge in state court. 33 U.S.C. § 1369(b)(1)(E); *see S. Cal. All. of Publicly Owned Treatment Works v. U.S. EPA*, 853 F.3d 1076, 1081 (9th Cir. 2017) ("*SCAP*") ("permits issued by the state are subject to administrative and judicial review in accordance with state law."). The Ninth Circuit does not have jurisdiction to hear a challenge to the state permit. *Id.* In *SCAP*, the petitioner

challenged revised state permits issued after EPA objected to the original permits pursuant to 33 U.S.C. § 1342(d)(2). *Id.* The petitioner argued that the Ninth Circuit had jurisdiction to review the permits because EPA had effectively promulgated new limitations through its objection letter, and because the objection letter was the "functional equivalent" of a denial of the state-proposed permits. *Id.* at 1081. This Court disagreed, making clear that state-issued NPDES permits are challenged exclusively in state courts, and federally issued NPDES permits are challenged exclusively in federal courts. It explained that it lacked jurisdiction to review the state-issued permits under either 33 U.S.C. § 1369(b)(1)(E) or 1369(b)(1)(F). *Id.* at 1078-79.

The same is true here. This Court may review EPA's NPDES permit for the Oceanside system, but it cannot review California's permit. The consolidation of the two permitting processes pursuant to 40 C.F.R. § 124.4(a)(2) does not change the statutory scheme, in which EPA has jurisdiction to issue an NPDES permit for discharges into federal waters and California has jurisdiction to issue an NPDES permit for discharges into state waters. To accept San Francisco's argument would be to impliedly hold that the consolidation of the two permit processes somehow took away California's permitting authority and enabled EPA to issue the NPDES permit for discharges into state waters despite the suspension of EPA's program. That result cannot be squared with the CWA, and this Court should reject it.

Further, the regulation at issue here, 40 C.F.R. § 124.4, allows for consolidation of permit processing, but it does not transform two jointly issued permits into one.  As the EAB explained, "[t]he purpose of consolidation is to make the permitting process more efficient but, once the permitting process is complete and the consolidated permit is issued, the authorizations are distinct for the purposes of appeal, stay, and enforcement as a matter of law."  1-ER-17.  The language of the regulation is clear: in describing consolidated permits, it consistently uses the plural "permits" to refer to the end result.  40 C.F.R. § 124.4.  The regulation explains:

> Whenever draft *permits* are prepared at the same time, the statements of basis (required under § 124.7 for EPA-issued permits only) or fact sheets (§ 124.8), administrative records (required under § 124.9 for EPA-issued permits only), public comment periods (§ 124.10), and any public hearings (§ 124.12) on those *permits* should also be consolidated. The final *permits* may be issued together. *They* need not be issued together if in the judgment of the Regional Administrator or State Director(s), joint processing would result in unreasonable delay in the issuance of one or more *permits*.

40 C.F.R. § 124.4(a)(2) (emphasis added).  According to the plain language of the regulation, consolidated permits are still two separate permits, even when issued together.

It also does not matter whether EPA loosely referred to the permits issued in the consolidated proceeding as one permit.  1-ER-17–18.  The text of the statute and regulations are controlling, and San Francisco fails entirely to engage with that

63

text.  Instead, San Francisco attempts to rely on principles of contract law to argue that there is only one permit because of EPA's use of the term "permit" rather than "permits."  Pet. Br. 60-62.  But EPA's use of the singular "permit" cannot supersede the language in the CWA and EPA's regulations providing that consolidated permits processed in a single proceeding are still multiple "permits." 33 U.S.C. § 1342(b); 40 C.F.R. § 124.4(a)(2).  EPA and California each independently authorized San Francisco's discharges through separate federal and state permits, and this Court should reject San Francisco's attempt to improperly obtain federal review of the state-issued permit in this proceeding.

## CONCLUSION

For the foregoing reasons, this Court should deny San Francisco's petition.


Respectfully submitted,

Of Counsel:                          /s/ *Elisabeth Carter*
                                     TODD KIM
MARCELA VON VACANO                   *Assistant Attorney General*
POOJA PARIKH                         ELISABETH H. CARTER
PETER Z. FORD                        *Attorney*
*Attorneys*                          Environment and Natural Resources Division
U.S. Environmental Protection Agency  U.S. Department of Justice

November 24, 2021

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**          21-70282

I am the attorney or self-represented party.

**This brief contains 13,963 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ *Elisabeth Carter*

**Date**          November 24, 2021