No. 21-70282

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

CITY AND COUNTY OF SAN FRANCISCO,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

_____

Petition for Review of Action of the U.S. Environmental Protection Agency

_____

**STATUTORY AND REGULATORY ADDENDUM TO RESPONDENT'S
BRIEF**

_____

Of Counsel:

MARCELA VON VACANO
POOJA PARIKH
PETER Z. FORD
*Attorneys*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
ELISABETH CARTER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-3141
Elisabeth.carter@usdoj.gov

# TABLE OF CONTENTS

**STATUTES**

5 U.S.C. § 706 ................................................................................ADD1

33 U.S.C. § 1251 ............................................................................ADD2

33 U.S.C. § 1311 ............................................................................ADD4

33 U.S.C. § 1313 ..........................................................................ADD18

33 U.S.C. § 1314 ..........................................................................ADD20

33 U.S.C. § 1342 ..........................................................................ADD22

33 U.S.C. § 1362 ..........................................................................ADD36

33 U.S.C. § 1369 ..........................................................................ADD41

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 122.4 .........................................................................ADD43

40 C.F.R. § 122.41 .......................................................................ADD45

40 C.F.R. § 122.44 .......................................................................ADD53

40 C.F.R. § 122.45 .......................................................................ADD63

40 C.F.R. § 124.4 .........................................................................ADD67

40 C.F.R. § 124.19 .......................................................................ADD69

40 C.F.R. § 131.3 .........................................................................ADD77

40 C.F.R. § 131.10 .......................................................................ADD79

40 C.F.R. § 131.11 .......................................................................ADD82

40 C.F.R. § 131.12 ........................................................................ ADD84

40 C.F.R. § 133.102 ...................................................................... ADD86

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,   6th Cir.(Tenn.),   Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 5. Government Organization and Employees (Refs & Annos)
      Part I. The Agencies Generally
         Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

🟨 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Research and Related Programs (Refs & Annos)

33 U.S.C.A. § 1251

§ 1251. Congressional declaration of goals and policy

Currentness

**(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective**

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

**(1)** it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

**(2)** it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

**(3)** it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

**(4)** it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

**(5)** it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

**(6)** it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

**(7)** it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

**(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States**

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

**(c) Congressional policy toward Presidential activities with foreign countries**

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

**(d) Administrator of Environmental Protection Agency to administer chapter**

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

**(e) Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f) Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**(g) Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

**CREDIT(S)**

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter III. Standards and Enforcement (Refs & Annos)

33 U.S.C.A. § 1311

§ 1311. Effluent limitations

Currentness

**(a) Illegality of pollutant discharges except in compliance with law**

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

**(b) Timetable for achievement of objectives**

In order to carry out the objective of this chapter there shall be achieved--

**(1)(A)** not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

**(B)** for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

**(C)** not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.

**(2)(A)** for pollutants identified in subparagraphs (C), (D), and (F) of this paragraph, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 1325 of this title), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which

meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 1317 of this title;

**(B)** Repealed. Pub.L. 97-117, § 21(b), Dec. 29, 1981, 95 Stat. 1632.

**(C)** with respect to all toxic pollutants referred to in table 1 of Committee Print Numbered 95-30 of the Committee on Public Works and Transportation of the House of Representatives compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989;

**(D)** for all toxic pollutants listed under paragraph (1) of subsection (a) of section 1317 of this title which are not referred to in subparagraph (C) of this paragraph compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable, but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989;

**(E)** as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989, compliance with effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which in the case of pollutants identified pursuant to section 1314(a)(4) of this title shall require application of the best conventional pollutant control technology as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(4) of this title; and

**(F)** for all pollutants (other than those subject to subparagraphs (C), (D), or (E) of this paragraph) compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable but in no case later than 3 years after the date such limitations are established, and in no case later than March 31, 1989.

**(3)(A)** for effluent limitations under paragraph (1)(A)(i) of this subsection promulgated after January 1, 1982, and requiring a level of control substantially greater or based on fundamentally different control technology than under permits for an industrial category issued before such date, compliance as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989; and

**(B)** for any effluent limitation in accordance with paragraph (1)(A)(i), (2)(A)(i), or (2)(E) of this subsection established only on the basis of section 1342(a)(1) of this title in a permit issued after February 4, 1987, compliance as expeditiously as practicable but in no case later than three years after the date such limitations are established, and in no case later than March 31, 1989.

**(c) Modification of timetable**

The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

**(d) Review and revision of effluent limitations**

Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph.

**(e) All point discharge source application of effluent limitations**

Effluent limitations established pursuant to this section or section 1312 of this title shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this chapter.

**(f) Illegality of discharge of radiological, chemical, or biological warfare agents, high-level radioactive waste, or medical waste**

Notwithstanding any other provisions of this chapter it shall be unlawful to discharge any radiological, chemical, or biological warfare agent, any high-level radioactive waste, or any medical waste, into the navigable waters.

**(g) Modifications for certain nonconventional pollutants**

**(1) General authority**

The Administrator, with the concurrence of the State, may modify the requirements of subsection (b)(2)(A) of this section with respect to the discharge from any point source of ammonia, chlorine, color, iron, and total phenols (4AAP) (when determined by the Administrator to be a pollutant covered by subsection (b)(2)(F)) and any other pollutant which the Administrator lists under paragraph (4) of this subsection.

**(2) Requirements for granting modifications**

A modification under this subsection shall be granted only upon a showing by the owner or operator of a point source satisfactory to the Administrator that--

**(A)** such modified requirements will result at a minimum in compliance with the requirements of subsection (b)(1)(A) or (C) of this section, whichever is applicable;

**(B)** such modified requirements will not result in any additional requirements on any other point or nonpoint source; and

**(C)** such modification will not interfere with the attainment or maintenance of that water quality which shall assure protection of public water supplies, and the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities, in and on the water and such modification will not result in the discharge of pollutants in quantities which may reasonably be anticipated to pose an unacceptable risk to human health or the environment because of bioaccumulation, persistency in the environment, acute toxicity, chronic toxicity (including carcinogenicity, mutagenicity or teratogenicity), or synergistic propensities.

**(3) Limitation on authority to apply for subsection (c) modification**

If an owner or operator of a point source applies for a modification under this subsection with respect to the discharge of any pollutant, such owner or operator shall be eligible to apply for modification under subsection (c) of this section with respect to such pollutant only during the same time period as he is eligible to apply for a modification under this subsection.

**(4) Procedures for listing additional pollutants**

**(A) General authority**

Upon petition of any person, the Administrator may add any pollutant to the list of pollutants for which modification under this section is authorized (except for pollutants identified pursuant to section 1314(a)(4) of this title, toxic pollutants subject to section 1317(a) of this title, and the thermal component of discharges) in accordance with the provisions of this paragraph.

**(B) Requirements for listing**

**(i) Sufficient information**

The person petitioning for listing of an additional pollutant under this subsection shall submit to the Administrator sufficient information to make the determinations required by this subparagraph.

**(ii) Toxic criteria determination**

The Administrator shall determine whether or not the pollutant meets the criteria for listing as a toxic pollutant under section 1317(a) of this title.

**(iii) Listing as toxic pollutant**

If the Administrator determines that the pollutant meets the criteria for listing as a toxic pollutant under section 1317(a) of this title, the Administrator shall list the pollutant as a toxic pollutant under section 1317(a) of this title.

**(iv) Nonconventional criteria determination**

If the Administrator determines that the pollutant does not meet the criteria for listing as a toxic pollutant under such section and determines that adequate test methods and sufficient data are available to make the determinations required by paragraph (2) of this subsection with respect to the pollutant, the Administrator shall add the pollutant to the list of pollutants specified in paragraph (1) of this subsection for which modifications are authorized under this subsection.

**(C) Requirements for filing of petitions**

A petition for listing of a pollutant under this paragraph--

(i) must be filed not later than 270 days after the date of promulgation of an applicable effluent guideline under section 1314 of this title;

(ii) may be filed before promulgation of such guideline; and

(iii) may be filed with an application for a modification under paragraph (1) with respect to the discharge of such pollutant.

**(D) Deadline for approval of petition**

A decision to add a pollutant to the list of pollutants for which modifications under this subsection are authorized must be made within 270 days after the date of promulgation of an applicable effluent guideline under section 1314 of this title.

**(E) Burden of proof**

The burden of proof for making the determinations under subparagraph (B) shall be on the petitioner.

**(5) Removal of pollutants**

The Administrator may remove any pollutant from the list of pollutants for which modifications are authorized under this subsection if the Administrator determines that adequate test methods and sufficient data are no longer available for determining whether or not modifications may be granted with respect to such pollutant under paragraph (2) of this subsection.

**(h) Modification of secondary treatment requirements**

The Administrator, with the concurrence of the State, may issue a permit under section 1342 of this title which modifies the requirements of subsection (b)(1)(B) of this section with respect to the discharge of any pollutant from a publicly owned treatment works into marine waters, if the applicant demonstrates to the satisfaction of the Administrator that--

**(1)** there is an applicable water quality standard specific to the pollutant for which the modification is requested, which has been identified under section 1314(a)(6) of this title;

**(2)** the discharge of pollutants in accordance with such modified requirements will not interfere, alone or in combination with pollutants from other sources, with the attainment or maintenance of that water quality which assures protection of public water supplies and the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife, and allows recreational activities, in and on the water;

**(3)** the applicant has established a system for monitoring the impact of such discharge on a representative sample of aquatic biota, to the extent practicable, and the scope of such monitoring is limited to include only those scientific investigations which are necessary to study the effects of the proposed discharge;

**(4)** such modified requirements will not result in any additional requirements on any other point or nonpoint source;

**(5)** all applicable pretreatment requirements for sources introducing waste into such treatment works will be enforced;

**(6)** in the case of any treatment works serving a population of 50,000 or more, with respect to any toxic pollutant introduced into such works by an industrial discharger for which pollutant there is no applicable pretreatment requirement in effect, sources introducing waste into such works are in compliance with all applicable pretreatment requirements, the applicant will enforce such requirements, and the applicant has in effect a pretreatment program which, in combination with the treatment of discharges from such works, removes the same amount of such pollutant as would be removed if such works were to apply secondary treatment to discharges and if such works had no pretreatment program with respect to such pollutant;

**(7)** to the extent practicable, the applicant has established a schedule of activities designed to eliminate the entrance of toxic pollutants from nonindustrial sources into such treatment works;

**(8)** there will be no new or substantially increased discharges from the point source of the pollutant to which the modification applies above that volume of discharge specified in the permit;

**(9)** the applicant at the time such modification becomes effective will be discharging effluent which has received at least primary or equivalent treatment and which meets the criteria established under section 1314(a)(1) of this title after initial mixing in the waters surrounding or adjacent to the point at which such effluent is discharged.

For the purposes of this subsection the phrase "the discharge of any pollutant into marine waters" refers to a discharge into deep waters of the territorial sea or the waters of the contiguous zone, or into saline estuarine waters where there is strong tidal movement and other hydrological and geological characteristics which the Administrator determines necessary to allow compliance with paragraph (2) of this subsection, and section 1251(a)(2) of this title. For the purposes of paragraph (9), "primary or equivalent treatment" means treatment by screening, sedimentation, and skimming adequate to remove at least 30 percent of the biological oxygen demanding material and of the suspended solids in the treatment works influent, and disinfection, where appropriate. A municipality which applies secondary treatment shall be eligible to receive a permit pursuant to this subsection which modifies the requirements of subsection (b)(1)(B) of this section with respect to the discharge of any pollutant from any treatment works owned by such municipality into marine waters. No permit issued under this subsection shall authorize the discharge of sewage sludge into marine waters. In order for a permit to be issued under this subsection for the discharge of a pollutant into marine waters, such marine waters must exhibit characteristics assuring that water providing dilution does not contain significant amounts of previously discharged effluent from such treatment works. No permit issued under this subsection shall authorize the discharge of any pollutant into saline estuarine waters which at the time of application do not support a balanced indigenous population of shellfish, fish and wildlife, or allow recreation in and on the waters or which exhibit ambient water quality below applicable water quality standards adopted for the protection of public water supplies, shellfish, fish and wildlife or recreational activities or such other standards necessary to assure support and protection of such uses. The prohibition contained in the preceding sentence shall apply without regard to the presence or absence of a causal relationship between such characteristics and the applicant's current or proposed discharge. Notwithstanding any other provisions of this subsection, no permit may be issued under this subsection for discharge of a pollutant into the New York Bight Apex consisting of the ocean waters of the Atlantic Ocean westward of 73 degrees 30 minutes west longitude and northward of 40 degrees 10 minutes north latitude.

**(i) Municipal time extensions**

**(1)** Where construction is required in order for a planned or existing publicly owned treatment works to achieve limitations under subsection (b)(1)(B) or (b)(1)(C) of this section, but (A) construction cannot be completed within the time required in such subsection, or (B) the United States has failed to make financial assistance under this chapter available in time to achieve such limitations by the time specified in such subsection, the owner or operator of such treatment works may request the Administrator (or if appropriate the State) to issue a permit pursuant to section 1342 of this title or to modify a permit issued pursuant to that section to extend such time for compliance. Any such request shall be filed with the Administrator (or if appropriate the State) within 180 days after February 4, 1987. The Administrator (or if appropriate the State) may grant such request and issue or modify such a permit, which shall contain a schedule of compliance for the publicly owned treatment works based on the earliest date by which such financial assistance will be available from the United States and construction can be completed, but in no event later than July 1, 1988, and shall contain such other terms and conditions, including those necessary to carry out subsections (b) through (g) of section 1281 of this title, section 1317 of this title, and such interim effluent limitations applicable to that treatment works as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)(A)** Where a point source (other than a publicly owned treatment works) will not achieve the requirements of subsections (b)(1)(A) and (b)(1)(C) of this section and--

**(i)** if a permit issued prior to July 1, 1977, to such point source is based upon a discharge into a publicly owned treatment works; or

**(ii)** if such point source (other than a publicly owned treatment works) had before July 1, 1977, a contract (enforceable against such point source) to discharge into a publicly owned treatment works; or

**(iii)** if either an application made before July 1, 1977, for a construction grant under this chapter for a publicly owned treatment works, or engineering or architectural plans or working drawings made before July 1, 1977, for a publicly owned treatment works, show that such point source was to discharge into such publicly owned treatment works,

and such publicly owned treatment works is presently unable to accept such discharge without construction, and in the case of a discharge to an existing publicly owned treatment works, such treatment works has an extension pursuant to paragraph (1) of this subsection, the owner or operator of such point source may request the Administrator (or if appropriate the State) to issue or modify such a permit pursuant to such section 1342 of this title to extend such time for compliance. Any such request shall be filed with the Administrator (or if appropriate the State) within 180 days after December 27, 1977, or the filing of a request by the appropriate publicly owned treatment works under paragraph (1) of this subsection, whichever is later. If the Administrator (or if appropriate the State) finds that the owner or operator of such point source has acted in good faith, he may grant such request and issue or modify such a permit, which shall contain a schedule of compliance for the point source to achieve the requirements of subsections (b)(1)(A) and (C) of this section and shall contain such other terms and conditions, including pretreatment and interim effluent limitations and water conservation requirements applicable to that point source, as the Administrator determines are necessary to carry out the provisions of this chapter.

**(B)** No time modification granted by the Administrator (or if appropriate the State) pursuant to paragraph (2)(A) of this subsection shall extend beyond the earliest date practicable for compliance or beyond the date of any extension granted to the appropriate publicly owned treatment works pursuant to paragraph (1) of this subsection, but in no event shall it extend beyond July 1, 1988; and no such time modification shall be granted unless (i) the publicly owned treatment works will be in operation and available to the point source before July 1, 1988, and will meet the requirements of subsections (b)(1)(B) and (C) of this section after receiving the discharge from that point source; and (ii) the point source and the publicly owned treatment works

have entered into an enforceable contract requiring the point source to discharge into the publicly owned treatment works, the owner or operator of such point source to pay the costs required under section 1284 of this title, and the publicly owned treatment works to accept the discharge from the point source; and (iii) the permit for such point source requires that point source to meet all requirements under section 1317(a) and (b) of this title during the period of such time modification.

**(j) Modification procedures**

**(1)** Any application filed under this section for a modification of the provisions of--

**(A)** subsection (b)(1)(B) under subsection (h) of this section shall be filed not later that [1] the 365th day which begins after December 29, 1981, except that a publicly owned treatment works which prior to December 31, 1982, had a contractual arrangement to use a portion of the capacity of an ocean outfall operated by another publicly owned treatment works which has applied for or received modification under subsection (h), may apply for a modification of subsection (h) in its own right not later than 30 days after February 4, 1987, and except as provided in paragraph (5);

**(B)** subsection (b)(2)(A) as it applies to pollutants identified in subsection (b)(2)(F) shall be filed not later than 270 days after the date of promulgation of an applicable effluent guideline under section 1314 of this title or not later than 270 days after December 27, 1977, whichever is later.

**(2)** Subject to paragraph (3) of this section, any application for a modification filed under subsection (g) of this section shall not operate to stay any requirement under this chapter, unless in the judgment of the Administrator such a stay or the modification sought will not result in the discharge of pollutants in quantities which may reasonably be anticipated to pose an unacceptable risk to human health or the environment because of bioaccumulation, persistency in the environment, acute toxicity, chronic toxicity (including carcinogenicity, mutagenicity, or teratogenicity), or synergistic propensities, and that there is a substantial likelihood that the applicant will succeed on the merits of such application. In the case of an application filed under subsection (g) of this section, the Administrator may condition any stay granted under this paragraph on requiring the filing of a bond or other appropriate security to assure timely compliance with the requirements from which a modification is sought.

**(3) Compliance requirements under subsection (g)**

**(A) Effect of filing**

An application for a modification under subsection (g) and a petition for listing of a pollutant as a pollutant for which modifications are authorized under such subsection shall not stay the requirement that the person seeking such modification or listing comply with effluent limitations under this chapter for all pollutants not the subject of such application or petition.

**(B) Effect of disapproval**

Disapproval of an application for a modification under subsection (g) shall not stay the requirement that the person seeking such modification comply with all applicable effluent limitations under this chapter.

**(4) Deadline for subsection (g) decision**

An application for a modification with respect to a pollutant filed under subsection (g) must be approved or disapproved not later than 365 days after the date of such filing; except that in any case in which a petition for listing such pollutant as a pollutant for which modifications are authorized under such subsection is approved, such application must be approved or disapproved not later than 365 days after the date of approval of such petition.

**(5) Extension of application deadline**

**(A) In general**

In the 180-day period beginning on October 31, 1994, the city of San Diego, California, may apply for a modification pursuant to subsection (h) of the requirements of subsection (b)(1)(B) with respect to biological oxygen demand and total suspended solids in the effluent discharged into marine waters.

**(B) Application**

An application under this paragraph shall include a commitment by the applicant to implement a waste water reclamation program that, at a minimum, will--

**(i)** achieve a system capacity of 45,000,000 gallons of reclaimed waste water per day by January 1, 2010; and

**(ii)** result in a reduction in the quantity of suspended solids discharged by the applicant into the marine environment during the period of the modification.

**(C) Additional conditions**

The Administrator may not grant a modification pursuant to an application submitted under this paragraph unless the Administrator determines that such modification will result in removal of not less than 58 percent of the biological oxygen demand (on an annual average) and not less than 80 percent of total suspended solids (on a monthly average) in the discharge to which the application applies.

**(D) Preliminary decision deadline**

The Administrator shall announce a preliminary decision on an application submitted under this paragraph not later than 1 year after the date the application is submitted.

**(k) Innovative technology**

In the case of any facility subject to a permit under section 1342 of this title which proposes to comply with the requirements of subsection (b)(2)(A) or (b)(2)(E) of this section by replacing existing production capacity with an innovative production process which will result in an effluent reduction significantly greater than that required by the limitation otherwise applicable to such facility and moves toward the national goal of eliminating the discharge of all pollutants, or with the installation of an innovative control technique that has a substantial likelihood for enabling the facility to comply with the applicable effluent

limitation by achieving a significantly greater effluent reduction than that required by the applicable effluent limitation and moves toward the national goal of eliminating the discharge of all pollutants, or by achieving the required reduction with an innovative system that has the potential for significantly lower costs than the systems which have been determined by the Administrator to be economically achievable, the Administrator (or the State with an approved program under section 1342 of this title, in consultation with the Administrator) may establish a date for compliance under subsection (b)(2)(A) or (b)(2)(E) of this section no later than two years after the date for compliance with such effluent limitation which would otherwise be applicable under such subsection, if it is also determined that such innovative system has the potential for industrywide application.

**(l) Toxic pollutants**

Other than as provided in subsection (n) of this section, the Administrator may not modify any requirement of this section as it applies to any specific pollutant which is on the toxic pollutant list under section 1317(a)(1) of this title.

**(m) Modification of effluent limitation requirements for point sources**

**(1)** The Administrator, with the concurrence of the State, may issue a permit under section 1342 of this title which modifies the requirements of subsections (b)(1)(A) and (b)(2)(E) of this section, and of section 1343 of this title, with respect to effluent limitations to the extent such limitations relate to biochemical oxygen demand and pH from discharges by an industrial discharger in such State into deep waters of the territorial seas, if the applicant demonstrates and the Administrator finds that--

**(A)** the facility for which modification is sought is covered at the time of the enactment of this subsection by National Pollutant Discharge Elimination System permit number CA0005894 or CA0005282;

**(B)** the energy and environmental costs of meeting such requirements of subsections (b)(1)(A) and (b)(2)(E) and section 1343 of this title exceed by an unreasonable amount the benefits to be obtained, including the objectives of this chapter;

**(C)** the applicant has established a system for monitoring the impact of such discharges on a representative sample of aquatic biota;

**(D)** such modified requirements will not result in any additional requirements on any other point or nonpoint source;

**(E)** there will be no new or substantially increased discharges from the point source of the pollutant to which the modification applies above that volume of discharge specified in the permit;

**(F)** the discharge is into waters where there is strong tidal movement and other hydrological and geological characteristics which are necessary to allow compliance with this subsection and section 1251(a)(2) of this title;

**(G)** the applicant accepts as a condition to the permit a contractual [2] obligation to use funds in the amount required (but not less than $250,000 per year for ten years) for research and development of water pollution control technology, including but not limited to closed cycle technology;

**(H)** the facts and circumstances present a unique situation which, if relief is granted, will not establish a precedent or the relaxation of the requirements of this chapter applicable to similarly situated discharges; and

**(I)** no owner or operator of a facility comparable to that of the applicant situated in the United States has demonstrated that it would be put at a competitive disadvantage to the applicant (or the parent company or any subsidiary thereof) as a result of the issuance of a permit under this subsection.

**(2)** The effluent limitations established under a permit issued under paragraph (1) shall be sufficient to implement the applicable State water quality standards, to assure the protection of public water supplies and protection and propagation of a balanced, indigenous population of shellfish, fish, fauna, wildlife, and other aquatic organisms, and to allow recreational activities in and on the water. In setting such limitations, the Administrator shall take into account any seasonal variations and the need for an adequate margin of safety, considering the lack of essential knowledge concerning the relationship between effluent limitations and water quality and the lack of essential knowledge of the effects of discharges on beneficial uses of the receiving waters.

**(3)** A permit under this subsection may be issued for a period not to exceed five years, and such a permit may be renewed for one additional period not to exceed five years upon a demonstration by the applicant and a finding by the Administrator at the time of application for any such renewal that the provisions of this subsection are met.

**(4)** The Administrator may terminate a permit issued under this subsection if the Administrator determines that there has been a decline in ambient water quality of the receiving waters during the period of the permit even if a direct cause and effect relationship cannot be shown: *Provided*, That if the effluent from a source with a permit issued under this subsection is contributing to a decline in ambient water quality of the receiving waters, the Administrator shall terminate such permit.

**(n) Fundamentally different factors**

**(1) General rule**

The Administrator, with the concurrence of the State, may establish an alternative requirement under subsection (b)(2) or section 1317(b) of this title for a facility that modifies the requirements of national effluent limitation guidelines or categorical pretreatment standards that would otherwise be applicable to such facility, if the owner or operator of such facility demonstrates to the satisfaction of the Administrator that--

**(A)** the facility is fundamentally different with respect to the factors (other than cost) specified in section 1314(b) or 1314(g) of this title and considered by the Administrator in establishing such national effluent limitation guidelines or categorical pretreatment standards;

**(B)** the application--

**(i)** is based solely on information and supporting data submitted to the Administrator during the rulemaking for establishment of the applicable national effluent limitation guidelines or categorical pretreatment standard specifically raising the factors that are fundamentally different for such facility; or

**(ii)** is based on information and supporting data referred to in clause (i) and information and supporting data the applicant did not have a reasonable opportunity to submit during such rulemaking;

**(C)** the alternative requirement is no less stringent than justified by the fundamental difference; and

**(D)** the alternative requirement will not result in a non-water quality environmental impact which is markedly more adverse than the impact considered by the Administrator in establishing such national effluent limitation guideline or categorical pretreatment standard.

### (2) Time limit for applications

An application for an alternative requirement which modifies the requirements of an effluent limitation or pretreatment standard under this subsection must be submitted to the Administrator within 180 days after the date on which such limitation or standard is established or revised, as the case may be.

### (3) Time limit for decision

The Administrator shall approve or deny by final agency action an application submitted under this subsection within 180 days after the date such application is filed with the Administrator.

### (4) Submission of information

The Administrator may allow an applicant under this subsection to submit information and supporting data until the earlier of the date the application is approved or denied or the last day that the Administrator has to approve or deny such application.

### (5) Treatment of pending applications

For the purposes of this subsection, an application for an alternative requirement based on fundamentally different factors which is pending on February 4, 1987, shall be treated as having been submitted to the Administrator on the 180th day following February 4, 1987. The applicant may amend the application to take into account the provisions of this subsection.

### (6) Effect of submission of application

An application for an alternative requirement under this subsection shall not stay the applicant's obligation to comply with the effluent limitation guideline or categorical pretreatment standard which is the subject of the application.

### (7) Effect of denial

If an application for an alternative requirement which modifies the requirements of an effluent limitation or pretreatment standard under this subsection is denied by the Administrator, the applicant must comply with such limitation or standard as established or revised, as the case may be.

**(8) Reports**

By January 1, 1997, and January 1 of every odd-numbered year thereafter, the Administrator shall submit to the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report on the status of applications for alternative requirements which modify the requirements of effluent limitations under section 1311 or 1314 of this title or any national categorical pretreatment standard under section 1317(b) of this title filed before, on, or after February 4, 1987.

**(o) Application fees**

The Administrator shall prescribe and collect from each applicant fees reflecting the reasonable administrative costs incurred in reviewing and processing applications for modifications submitted to the Administrator pursuant to subsections (c), (g), (i), (k), (m), and (n) of this section, section 1314(d)(4) of this title, and section 1326(a) of this title. All amounts collected by the Administrator under this subsection shall be deposited into a special fund of the Treasury entitled "Water Permits and Related Services" which shall thereafter be available for appropriation to carry out activities of the Environmental Protection Agency for which such fees were collected.

**(p) Modified permit for coal remining operations**

**(1) In general**

Subject to paragraphs (2) through (4) of this subsection, the Administrator, or the State in any case which the State has an approved permit program under section 1342(b) of this title, may issue a permit under section 1342 of this title which modifies the requirements of subsection (b)(2)(A) of this section with respect to the pH level of any pre-existing discharge, and with respect to pre-existing discharges of iron and manganese from the remined area of any coal remining operation or with respect to the pH level or level of iron or manganese in any pre-existing discharge affected by the remining operation. Such modified requirements shall apply the best available technology economically achievable on a case-by-case basis, using best professional judgment, to set specific numerical effluent limitations in each permit.

**(2) Limitations**

The Administrator or the State may only issue a permit pursuant to paragraph (1) if the applicant demonstrates to the satisfaction of the Administrator or the State, as the case may be, that the coal remining operation will result in the potential for improved water quality from the remining operation but in no event shall such a permit allow the pH level of any discharge, and in no event shall such a permit allow the discharges of iron and manganese, to exceed the levels being discharged from the remined area before the coal remining operation begins. No discharge from, or affected by, the remining operation shall exceed State water quality standards established under section 1313 of this title.

**(3) Definitions**

For purposes of this subsection--

**(A) Coal remining operation**

The term "coal remining operation" means a coal mining operation which begins after February 4, 1987 at a site on which coal mining was conducted before August 3, 1977.

**(B) Remined area**

The term "remined area" means only that area of any coal remining operation on which coal mining was conducted before August 3, 1977.

**(C) Pre-existing discharge**

The term "pre-existing discharge" means any discharge at the time of permit application under this subsection.

**(4) Applicability of strip mining laws**

Nothing in this subsection shall affect the application of the Surface Mining Control and Reclamation Act of 1977 to any coal remining operation, including the application of such Act to suspended solids.

**CREDIT(S)**

(June 30, 1948, c. 758, Title III, § 301, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 844; amended Pub.L. 95-217, §§ 42-47, 53(c), Dec. 27, 1977, 91 Stat. 1582-1586, 1590; Pub.L. 97-117, §§ 21, 22(a)-(d), Dec. 29, 1981, 95 Stat. 1631, 1632; Pub.L. 97-440, Jan. 8, 1983, 96 Stat. 2289; Pub.L. 100-4, Title III, §§ 301(a) to (e), 302(a) to (d), 303(a), (b)(1), (c) to (f), 304(a), 305, 306(a), (b), 307, Feb. 4, 1987, 101 Stat. 29-37; Pub.L. 100-688, Title III, § 3202(b), Nov. 18, 1988, 102 Stat. 4154; Pub.L. 103-431, § 2, Oct. 31, 1994, 108 Stat. 4396; Pub.L. 104-66, Title II, § 2021(b), Dec. 21, 1995, 109 Stat. 727.)

Notes of Decisions (396)

**Footnotes**

1    So in original. Probably should be "than".
2    So in original. Probably should be "contractual".

33 U.S.C.A. § 1311, 33 USCA § 1311

Current through PL 117-57.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XI. General Provisions, Peer Review, and Administrative Simplification (Refs & Annos)
        Part A. General Provisions (Refs & Annos)

42 U.S.C.A. § 1313

§ 1313. Assistance for United States citizens returned from foreign countries

Effective: August 31, 2021
Currentness

**(a) Authorization; reimbursement; utilization of facilities of public or private agencies and organizations**

**(1)** The Secretary is authorized to provide temporary assistance to citizens of the United States and to dependents of citizens of the United States, if they (A) are identified by the Department of State as having returned, or been brought, from a foreign country to the United States because of the destitution of the citizen of the United States or the illness of such citizen or any of his dependents or because of war, threat of war, invasion, or similar crisis, and (B) are without available resources.

**(2)** Except in such cases or classes of cases as are set forth in regulations of the Secretary, provision shall be made for reimbursement to the United States by the recipients of the temporary assistance to cover the cost thereof.

**(3)** The Secretary may provide assistance under paragraph (1) directly or through utilization of the services and facilities of appropriate public or private agencies and organizations, in accordance with agreements providing for payment, in advance or by way of reimbursement, as may be determined by the Secretary, of the cost thereof. Such cost shall be determined by such statistical, sampling, or other method as may be provided in the agreement.

**(b) Plans and arrangements for assistance; consultations**

The Secretary is authorized to develop plans and make arrangements for provision of temporary assistance within the United States to individuals specified in subsection (a)(1). Such plans shall be developed and such arrangements shall be made after consultation with the Secretary of State, the Attorney General, and the Secretary of Defense. To the extent feasible, assistance provided under subsection (a) shall be provided in accordance with the plans developed pursuant to this subsection, as modified from time to time by the Secretary.

(c) "Temporary assistance" defined

For purposes of this section, the term "temporary assistance" means money payments, medical care, temporary billeting, transportation, and other goods and services necessary for the health or welfare of individuals (including guidance, counseling, and other welfare services) furnished to them within the United States upon their arrival in the United States and for such period after their arrival, not exceeding ninety days, as may be provided in regulations of the Secretary; except that assistance under this section may be furnished beyond such ninety-day period in the case of any citizen or dependent upon a finding by the Secretary that the circumstances involved necessitate or justify the furnishing of assistance beyond such period in that particular case.

**(d) Maximum total amount of temporary assistance**

The total amount of temporary assistance provided under this section shall not exceed $1,000,000 during any fiscal year beginning after September 30, 2009, except that, in the case of fiscal years 2021 and 2022, the total amount of such assistance provided during each such fiscal year shall not exceed $10,000,000.

**(e) Authority of Secretary to accept gifts**

**(1)** The Secretary may accept on behalf of the United States gifts, in cash or in kind, for use in carrying out the program established under this section. Gifts in the form of cash shall be credited to the appropriation account from which this program is funded, in addition to amounts otherwise appropriated, and shall remain available until expended.

**(2)** Gifts accepted under paragraph (1) shall be available for obligation or other use by the United States only to the extent and in the amounts provided in appropriation Acts.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title XI, § 1113, as added Pub.L. 87-64, Title III, § 302, June 30, 1961, 75 Stat. 142; amended Pub.L. 87-543, Title I, § 133, July 25, 1962, 76 Stat. 196; Pub.L. 88-347, June 30, 1964, 78 Stat. 236; Pub.L. 90-36, § 2, June 29, 1967, 81 Stat. 94; Pub.L. 90-248, Title V, § 503, Jan. 2, 1968, 81 Stat. 934; Pub.L. 91-41, § 4, July 9, 1969, 83 Stat. 45; Pub.L. 92-40, July 1, 1971, 85 Stat. 96; Pub.L. 94-44, §§ 1, 2, June 28, 1975, 89 Stat. 235; Pub.L. 101-382, Title I, § 140, Aug. 20, 1990, 104 Stat. 654; Pub.L. 101-508, Title V, § 5056(a), Nov. 5, 1990, 104 Stat. 1388-229; Pub.L. 108-11, Title I, § 1701, Apr. 16, 2003, 117 Stat. 585; Pub.L. 109-250, § 1, July 27, 2006, 120 Stat. 652; Pub.L. 111-127, § 2, Jan. 27, 2010, 124 Stat. 4; Pub.L. 115-57, § 2(a), Sept. 12, 2017, 131 Stat. 1148; Pub.L. 116-148, § 2(a), July 13, 2020, 134 Stat. 661; Pub.L. 117-39, § 2(a), Aug. 31, 2021, 135 Stat. 336.)

42 U.S.C.A. § 1313, 42 USCA § 1313
Current through PL 117-57.

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XI. General Provisions, Peer Review, and Administrative Simplification (Refs & Annos)
        Part A. General Provisions (Refs & Annos)

42 U.S.C.A. § 1314

§ 1314. Public advisory groups

Effective: December 8, 2003
Currentness

**(a) Advisory Council on Public Welfare; appointment and functions of initial Council**

The Secretary shall, during 1964, appoint an Advisory Council on Public Welfare for the purpose of reviewing the administration of the public assistance and child welfare services programs for which funds are appropriated pursuant to this chapter and making recommendations for improvement of such administration, and reviewing the status of and making recommendations with respect to the public assistance programs for which funds are so appropriated, especially in relation to the old-age, survivors, and disability insurance program, with respect to the fiscal capacities of the States and the Federal Government, and with respect to any other matters bearing on the amount and proportion of the Federal and State shares in the public assistance and child welfare services programs.

**(b) Membership and representation of interests on initial Council**

The Council shall be appointed by the Secretary without regard to the provisions of Title 5 governing appointments in the competitive service and shall consist of twelve persons who shall, to the extent possible, be representatives of employers and employees in equal numbers, representatives of State or Federal agencies concerned with the administration or financing of the public assistance and child welfare services programs, representatives of nonprofit private organizations concerned with social welfare programs, other persons with special knowledge, experience, or qualifications with respect to such programs, and members of the public.

**(c) Technical and other assistance for initial Council; availability of data**

The Council is authorized to engage such technical assistance as may be required to carry out its functions, and the Secretary shall, in addition, make available to the Council such secretarial, clerical, and other assistance and such pertinent data prepared by the Department of Health and Human Services as it may require to carry out such functions.

**(d) Termination of initial Council's existence on submission of report**

The Council shall make a report of its findings and recommendations (including recommendations for changes in the provisions of this chapter) to the Secretary, such report to be submitted not later than July 1, 1966, after which date such Council shall cease to exist.

**(e) Succeeding Councils; appointment; functions; membership; representation of interests; assistance and data; termination**

The Secretary shall also from time to time thereafter appoint an Advisory Council on Public Welfare, with the same functions and constituted in the same manner as prescribed for the Advisory Council in the preceding subsections of this section. Each Council so appointed shall report its findings and recommendations, as prescribed in subsection (d), not later than July 1 of the second year after the year in which it is appointed, after which date such Council shall cease to exist.

**(f) Advisory committees; functions; reports by Secretary**

The Secretary may also appoint, without regard to the provisions of Title 5 governing appointments in the competitive service, such advisory committees as he may deem advisable to advise and consult with him in carrying out any of his functions under this chapter. The Secretary shall report to the Congress annually on the number of such committees and on the membership and activities of each such committee.

**(g) Compensation and travel expenses**

Members of the Council or of any advisory committee appointed under this section who are not regular full-time employees of the United States shall, while serving on business of the Council or any such committee, be entitled to receive compensation at rates fixed by the Secretary, but not exceeding $75 per day, including travel time; and while so serving away from their homes or regular places of business, they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of Title 5 for persons in Government service employed intermittently.

**(h) Exemption from conflict of interest laws of members of Council or advisory committees; exceptions**

**(1)** Any member of the Council or any advisory committee appointed under this chapter, who is not a regular full-time employee of the United States, is hereby exempted, with respect to such appointment, from the operation of sections 203, 205, and 209 of Title 18, except as otherwise specified in paragraph (2) of this subsection.

**(2)** The exemption granted by paragraph (1) shall not extend--

**(A)** to the receipt or payment of salary in connection with the appointee's Government service from any source other than the employer of the appointee at the time of his appointment, or

**(B)** during the period of such appointment, to the prosecution or participation in the prosecution, by any person so appointed, of any claim against the Government involving any matter with which such person, during such period, is or was directly connected by reason of such appointment.

**CREDIT(S)**

(Aug. 14, 1935, c. 531, Title XI, § 1114, as added Pub.L. 87-543, Title I, § 121, July 25, 1962, 76 Stat. 190; amended Pub.L. 90-248, Title IV, § 403(e), Jan. 2, 1968, 81 Stat. 932; Pub.L. 98-369, Div. B, Title VI, § 2663(e)(4), (j)(2)(D)(iv), July 18, 1984,

🏳 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
Title 33. Navigation and Navigable Waters (Refs & Annos)
Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1342

§ 1342. National pollutant discharge elimination system

Effective: January 14, 2019
Currentness

**(a) Permits for discharge of pollutants**

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend

beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which--

    **(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

    **(B)** are for fixed terms not exceeding five years; and

    **(C)** can be terminated or modified for cause including, but not limited to, the following:

        **(i)** violation of any condition of the permit;

        **(ii)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

        **(iii)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

    **(D)** control the disposal of pollutants into wells;

**(2)(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

**(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

**(6)** To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

**(7)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

**(8)** To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

**(9)** To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator**

**(1)** Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

**(2)** Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

**(3)** Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The

Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

**(4) Limitations on partial permit program returns and withdrawals**

A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

**(A)** a State partial permit program approved under subsection (n)(3) only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

**(B)** a State partial permit program approved under subsection (n)(4) only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

**(d) Notification of Administrator**

**(1)** Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

**(2)** No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

**(3)** The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

**(4)** In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

**(e) Waiver of notification requirement**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

**(f) Point source categories**

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

**(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants**

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

**(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works**

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

**(i) Federal enforcement not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(j) Public information**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

**(k) Compliance with permits**

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

**(l) Limitation on permit requirement**

**(1) Agricultural return flows**

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

**(2) Stormwater runoff from oil, gas, and mining operations**

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

**(3) Silvicultural activities**

**(A) NPDES permit requirements for silvicultural activities**

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

**(B) Other requirements**

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

**(C)** The authorization provided in Section [1] 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6) [2] of this title for the silviculture activities listed in 1342(l)(3)(A) [2] of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A) [2] of this title.

**(m) Additional pretreatment of conventional pollutants not required**

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect

State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

**(n) Partial permit program**

**(1) State submission**

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

**(2) Minimum coverage**

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b).

**(3) Approval of major category partial permit programs**

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

**(A)** such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

**(B)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b).

**(4) Approval of major component partial permit programs**

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) if--

**(A)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b); and

**(B)** the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

**(o) Anti-backsliding**

**(1) General prohibition**

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

**(2) Exceptions**

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

**(A)** material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

**(B)(i)** information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

**(ii)** the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B);

**(C)** a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

**(D)** the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

**(E)** the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

**(3) Limitations**

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

**(p) Municipal and industrial stormwater discharges**

**(1) General rule**

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

**(2) Exceptions**

Paragraph (1) shall not apply with respect to the following stormwater discharges:

**(A)** A discharge with respect to which a permit has been issued under this section before February 4, 1987.

**(B)** A discharge associated with industrial activity.

**(C)** A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

**(D)** A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

**(E)** A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

**(3) Permit requirements**

**(A) Industrial discharges**

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

**(B) Municipal discharge**

Permits for discharges from municipal storm sewers--

**(i)** may be issued on a system- or jurisdiction-wide basis;

**(ii)** shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

**(iii)** shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

**(4) Permit application requirements**

**(A) Industrial and large municipal discharges**

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(B) Other municipal discharges**

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(5) Studies**

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

**(A)** identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

**(B)** determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

**(C)** establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

**(6) Regulations**

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

**(q) Combined sewer overflows**

**(1) Requirement for permits, orders, and decrees**

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000, for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

**(2) Water quality and designated use review guidance**

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

**(3) Report**

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

**(r) Discharges incidental to the normal operation of recreational vessels**

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

**(s) Integrated plans**

**(1) Definition of integrated plan**

In this subsection, the term "integrated plan" means a plan developed in accordance with the Integrated Municipal Stormwater and Wastewater Planning Approach Framework, issued by the Environmental Protection Agency and dated June 5, 2012.

**(2) In general**

The Administrator (or a State, in the case of a permit program approved by the Administrator) shall inform municipalities of the opportunity to develop an integrated plan that may be incorporated into a permit under this section.

**(3) Scope**

**(A) Scope of permit incorporating integrated plan**

A permit issued under this section that incorporates an integrated plan may integrate all requirements under this chapter addressed in the integrated plan, including requirements relating to--

**(i)** a combined sewer overflow;

**(ii)** a capacity, management, operation, and maintenance program for sanitary sewer collection systems;

**(iii)** a municipal stormwater discharge;

**(iv)** a municipal wastewater discharge; and

**(v)** a water quality-based effluent limitation to implement an applicable wasteload allocation in a total maximum daily load.

**(B) Inclusions in integrated plan**

An integrated plan incorporated into a permit issued under this section may include the implementation of--

**(i)** projects, including innovative projects, to reclaim, recycle, or reuse water; and

**(ii)** green infrastructure.

**(4) Compliance schedules**

**(A) In general**

A permit issued under this section that incorporates an integrated plan may include a schedule of compliance, under which actions taken to meet any applicable water quality-based effluent limitation may be implemented over more than 1 permit term if the schedule of compliance--

**(i)** is authorized by State water quality standards; and

**(ii)** meets the requirements of section 122.47 of title 40, Code of Federal Regulations (as in effect on January 14, 2019).

**(B) Time for compliance**

For purposes of subparagraph (A)(ii), the requirement of section 122.47 of title 40, Code of Federal Regulations, for compliance by an applicable statutory deadline under this chapter does not prohibit implementation of an applicable water quality-based effluent limitation over more than 1 permit term.

**(C) Review**

A schedule of compliance incorporated into a permit issued under this section may be reviewed at the time the permit is renewed to determine whether the schedule should be modified.

**(5) Existing authorities retained**

**(A) Applicable standards**

Nothing in this subsection modifies any obligation to comply with applicable technology and water quality-based effluent limitations under this chapter.

**(B) Flexibility**

Nothing in this subsection reduces or eliminates any flexibility available under this chapter, including the authority of a State to revise a water quality standard after a use attainability analysis under section 131.10(g) of title 40, Code of Federal Regulations (or a successor regulation), subject to the approval of the Administrator under section 1313(c) of this title.

**(6) Clarification of State authority**

**(A) In general**

Nothing in section 1311(b)(1)(C) of this title precludes a State from authorizing in the water quality standards of the State the issuance of a schedule of compliance to meet water quality-based effluent limitations in permits that incorporate provisions of an integrated plan.

**(B) Transition rule**

In any case in which a discharge is subject to a judicial order or consent decree, as of January 14, 2019, resolving an enforcement action under this chapter, any schedule of compliance issued pursuant to an authorization in a State water quality standard may not revise a schedule of compliance in that order or decree to be less stringent, unless the order or decree is modified by agreement of the parties and the court.

## CREDIT(S)

(June 30, 1948, c. 758, Title IV, § 402, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub.L. 95-217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub.L. 100-4, Title IV, §§ 401 to 404(a), (c), formerly (d), 405, Feb. 4, 1987, 101 Stat. 65 to 67, 69; Pub.L. 102-580, Title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub.L. 104-66, Title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub.L. 106-554, § 1(a)(4) [Div. B, Title I, § 112(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-224; Pub.L. 110-288, § 2, July 29, 2008, 122 Stat. 2650; Pub.L. 113-79, Title XII, § 12313, Feb. 7, 2014, 128 Stat. 992; Pub.L. 115-436, § 3(a), Jan. 14, 2019, 132 Stat. 5558.)

Notes of Decisions (286)

## Footnotes

| | |
|---|---|
| 1 | So in original. Probably should not be capitalized. |
| 2 | So in original. Probably should be preceded by "section". |

33 U.S.C.A. § 1342, 33 USCA § 1342
Current through PL 117-57.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

ADD35

14

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>   Title 33. Navigation and Navigable Waters (Refs & Annos)
>     Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
>       Subchapter V. General Provisions

33 U.S.C.A. § 1362

§ 1362. Definitions

Effective: January 14, 2019

Currentness

Except as otherwise specifically provided, when used in this chapter:

**(1)** The term "State water pollution control agency" means the State agency designated by the Governor having responsibility for enforcing State laws relating to the abatement of pollution.

**(2)** The term "interstate agency" means an agency of two or more States established by or pursuant to an agreement or compact approved by the Congress, or any other agency of two or more States, having substantial powers or duties pertaining to the control of pollution as determined and approved by the Administrator.

**(3)** The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

**(4)** The term "municipality" means a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 1288 of this title.

**(5)** The term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

**(6)** The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) "sewage from vessels or a discharge incidental to the normal operation of a vessel of the Armed Forces" within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

**(7)** The term "navigable waters" means the waters of the United States, including the territorial seas.

**(8)** The term "territorial seas" means the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles.

**(9)** The term "contiguous zone" means the entire zone established or to be established by the United States under article 24 of the Convention of the Territorial Sea and the Contiguous Zone.

**(10)** The term "ocean" means any portion of the high seas beyond the contiguous zone.

**(11)** The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

**(12)** The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

**(13)** The term "toxic pollutant" means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring.

**(14)** The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

**(15)** The term "biological monitoring" shall mean the determination of the effects on aquatic life, including accumulation of pollutants in tissue, in receiving waters due to the discharge of pollutants (A) by techniques and procedures, including sampling of organisms representative of appropriate levels of the food chain appropriate to the volume and the physical, chemical, and biological characteristics of the effluent, and (B) at appropriate frequencies and locations.

**(16)** The term "discharge" when used without qualification includes a discharge of a pollutant, and a discharge of pollutants.

**(17)** The term "schedule of compliance" means a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard.

**(18)** The term "industrial user" means those industries identified in the Standard Industrial Classification Manual, Bureau of the Budget, 1967, as amended and supplemented, under the category of "Division D--Manufacturing" and such other classes of significant waste producers as, by regulation, the Administrator deems appropriate.

**(19)** The term "pollution" means the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water.

**(20)** The term "medical waste" means isolation wastes; infectious agents; human blood and blood products; pathological wastes; sharps; body parts; contaminated bedding; surgical wastes and potentially contaminated laboratory wastes; dialysis wastes; and such additional medical items as the Administrator shall prescribe by regulation.

**(21) Coastal recreation waters**

**(A) In general**

The term "coastal recreation waters" means--

**(i)** the Great Lakes; and

**(ii)** marine coastal waters (including coastal estuaries) that are designated under section 1313(c) of this title by a State for use for swimming, bathing, surfing, or similar water contact activities.

**(B) Exclusions**

The term "coastal recreation waters" does not include--

**(i)** inland waters; or

**(ii)** waters upstream of the mouth of a river or stream having an unimpaired natural connection with the open sea.

**(22) Floatable material**

**(A) In general**

The term "floatable material" means any foreign matter that may float or remain suspended in the water column.

**(B) Inclusions**

The term "floatable material" includes--

**(i)** plastic;

**(ii)** aluminum cans;

**(iii)** wood products;

**(iv)** bottles; and

**(v)** paper products.

**(23) Pathogen indicator**

The term "pathogen indicator" means a substance that indicates the potential for human infectious disease.

**(24) Oil and gas exploration and production**

The term "oil and gas exploration, production, processing, or treatment operations or transmission facilities" means all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, whether or not such field activities or operations may be considered to be construction activities.

**(25) Recreational vessel**

**(A) In general**

The term "recreational vessel" means any vessel that is--

**(i)** manufactured or used primarily for pleasure; or

**(ii)** leased, rented, or chartered to a person for the pleasure of that person.

**(B) Exclusion**

The term "recreational vessel" does not include a vessel that is subject to Coast Guard inspection and that--

**(i)** is engaged in commercial use; or

**(ii)** carries paying passengers.

**(26) Treatment works**

The term "treatment works" has the meaning given the term in section 1292 of this title.

**(27) Green infrastructure**

The term "green infrastructure" means the range of measures that use plant or soil systems, permeable pavement or other permeable surfaces or substrates, stormwater harvest and reuse, or landscaping to store, infiltrate, or evapotranspirate stormwater and reduce flows to sewer systems or to surface waters.

### CREDIT(S)

(June 30, 1948, c. 758, Title V, § 502, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 886; amended Pub.L. 95-217, § 33(b), Dec. 27, 1977, 91 Stat. 1577; Pub.L. 100-4, Title V, §§ 502(a), 503, Feb. 4, 1987, 101 Stat. 75; Pub.L. 100-688, Title III, § 3202(a), Nov. 18, 1988, 102 Stat. 4154; Pub.L. 104-106, Div. A, Title III, § 325(c)(3), Feb. 10, 1996, 110 Stat. 259; Pub.L. 106-284, § 5, Oct. 10, 2000, 114 Stat. 875; Pub.L. 109-58, Title III, § 323, Aug. 8, 2005, 119 Stat. 694; Pub.L. 110-288, § 3, July 29, 2008, 122 Stat. 2650; Pub.L. 113-121, Title V, § 5012(b), June 10, 2014, 128 Stat. 1328; Pub.L. 115-436, § 5(a), Jan. 14, 2019, 132 Stat. 5561.)

Notes of Decisions (246)

33 U.S.C.A. § 1362, 33 USCA § 1362
Current through PL 117-57.

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter V. General Provisions

33 U.S.C.A. § 1369

§ 1369. Administrative procedure and judicial review

Effective: December 4, 2018

Currentness

**(a) Subpenas**

**(1)** For purposes of obtaining information under section 1315 of this title, or carrying out section 1367(e) of this title, the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for effluent data, upon a showing satisfactory to the Administrator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subsection, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator, to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(2)** The district courts of the United States are authorized, upon application by the Administrator, to issue subpenas for attendance and testimony of witnesses and the production of relevant papers, books, and documents, for purposes of obtaining information under sections 1314(b) and (c) of this title. Any papers, books, documents, or other information or part thereof, obtained by reason of such a subpena shall be subject to the same requirements as are provided in paragraph (1) of this subsection.

**(b) Review of Administrator's actions; selection of court; fees**

**(1)** Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(l) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days

from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement.

### (3) Award of fees

In any judicial proceeding under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party whenever it determines that such award is appropriate.

### (4) Discharges incidental to normal operation of vessels

#### (A) In general

Except as provided in subparagraph (B), any interested person may file a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating in accordance with the requirements of this subsection.

#### (B) Venue exception

Subject to section 1322(p)(7)(C)(v) of this title, a petition for review of a final agency action under section 1322(p) of this title of the Administrator or the Secretary of the department in which the Coast Guard is operating may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

## (c) Additional evidence

In any judicial proceeding brought under subsection (b) of this section in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

## CREDIT(S)

(June 30, 1948, c. 758, Title V, § 509, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 891; amended Pub.L. 93-207, § 1(6), Dec. 28, 1973, 87 Stat. 906; Pub.L. 100-4, Title III, § 308(b), Title IV, § 406(d)(3), Title V, § 505(a), (b), Feb. 4, 1987, 101 Stat. 39, 73, 75; Pub.L. 100-236, § 2, Jan. 8, 1988, 101 Stat. 1732; Pub.L. 115-282, Title IX, § 903(c)(4), Dec. 4, 2018, 132 Stat. 4356.)

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter D. Water Programs
Part 122. EPA Administered Permit Programs: The National Pollutant Discharge Elimination System (Refs & Annos)
Subpart A. Definitions and General Program Requirements

40 C.F.R. § 122.4

§ 122.4 Prohibitions (applicable to State NPDES programs, see § 123.25).

Currentness

No permit may be issued:

(a) When the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA;

(b) When the applicant is required to obtain a State or other appropriate certification under section 401 of CWA and § 124.53 and that certification has not been obtained or waived;

(c) By the State Director where the Regional Administrator has objected to issuance of the permit under § 123.44;

(d) When the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States;

(e) When, in the judgment of the Secretary, anchorage and navigation in or on any of the waters of the United States would be substantially impaired by the discharge;

(f) For the discharge of any radiological, chemical, or biological warfare agent or high-level radioactive waste;

(g) For any discharge inconsistent with a plan or plan amendment approved under section 208(b) of CWA;

(h) For any discharge to the territorial sea, the waters of the contiguous zone, or the oceans in the following circumstances:

(1) Before the promulgation of guidelines under section 403(c) of CWA (for determining degradation of the waters of the territorial seas, the contiguous zone, and the oceans) unless the Director determines permit issuance to be in the public interest; or

(2) After promulgation of guidelines under section 403(c) of CWA, when insufficient information exists to make a reasonable judgment whether the discharge complies with them.

(i) To a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards. The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by sections 301(b)(1)(A) and 301(b)(1)(B) of CWA, and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged, must demonstrate, before the close of the public comment period, that:

(1) There are sufficient remaining pollutant load allocations to allow for the discharge; and

(2) The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards. The Director may waive the submission of information by the new source or new discharger required by paragraph (i) of this section if the Director determines that the Director already has adequate information to evaluate the request. An explanation of the development of limitations to meet the criteria of this paragraph (i)(2) is to be included in the fact sheet to the permit under § 124.56(b)(1) of this chapter.

**Credits**

[50 FR 6940, Feb. 19, 1985; 65 FR 30905, May 15, 2000]

SOURCE: 45 FR 33418, May 19, 1980, as amended at 48 FR 14153, Apr. 1, 1983, unless otherwise noted.

AUTHORITY: The Clean Water Act, 33 U.S.C. 1251 et seq.

Notes of Decisions (23)

Current through November 18, 2021; 86 FR 64407.

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 122. EPA Administered Permit Programs: The National Pollutant Discharge Elimination System (Refs & Annos)
          Subpart C. Permit Conditions

40 C.F.R. § 122.41

§ 122.41 Conditions applicable to all permits (applicable to State programs, see § 123.25).

Effective: January 4, 2021

Currentness

The following conditions apply to all NPDES permits. Additional conditions applicable to NPDES permits are in § 122.42. All conditions applicable to NPDES permits shall be incorporated into the permits either expressly or by reference. If incorporated by reference, a specific citation to these regulations (or the corresponding approved State regulations) must be given in the permit.

(a) Duty to comply. The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or denial of a permit renewal application.

(1) The permittee shall comply with effluent standards or prohibitions established under section 307(a) of the Clean Water Act for toxic pollutants and with standards for sewage sludge use or disposal established under section 405(d) of the CWA within the time provided in the regulations that establish these standards or prohibitions or standards for sewage sludge use or disposal, even if the permit has not yet been modified to incorporate the requirement.

(2) The Clean Water Act provides that any person who violates section 301, 302, 306, 307, 308, 318 or 405 of the Act, or any permit condition or limitation implementing any such sections in a permit issued under section 402, or any requirement imposed in a pretreatment program approved under sections 402(a)(3) or 402(b)(8) of the Act, is subject to a civil penalty not to exceed $25,000 per day for each violation. The Clean Water Act provides that any person who negligently violates sections 301, 302, 306, 307, 308, 318, or 405 of the Act, or any condition or limitation implementing any of such sections in a permit issued under section 402 of the Act, or any requirement imposed in a pretreatment program approved under section 402(a)(3) or 402(b)(8) of the Act, is subject to criminal penalties of $2,500 to $25,000 per day of violation, or imprisonment of not more than 1 year, or both. In the case of a second or subsequent conviction for a negligent violation, a person shall be subject to criminal penalties of not more than $50,000 per day of violation, or by imprisonment of not more than 2 years, or both. Any person who knowingly violates such sections, or such conditions or limitations is subject to criminal penalties of $5,000 to $50,000 per day of violation, or imprisonment for not more than 3 years, or both. In the case of a second or subsequent conviction for a knowing violation, a person shall be subject to criminal penalties of not more than $100,000 per day of violation, or imprisonment of not more than 6 years, or both. Any person who knowingly violates section 301, 302, 303, 306, 307, 308, 318 or 405 of the Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of the Act, and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more

than $250,000 or imprisonment of not more than 15 years, or both. In the case of a second or subsequent conviction for a knowing endangerment violation, a person shall be subject to a fine of not more than $500,000 or by imprisonment of not more than 30 years, or both. An organization, as defined in section 309(c)(3)(B)(iii) of the CWA, shall, upon conviction of violating the imminent danger provision, be subject to a fine of not more than $1,000,000 and can be fined up to $2,000,000 for second or subsequent convictions.

(3) Any person may be assessed an administrative penalty by the Administrator for violating section 301, 302, 306, 307, 308, 318 or 405 of this Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act. Administrative penalties for Class I violations are not to exceed $10,000 per violation, with the maximum amount of any Class I penalty assessed not to exceed $25,000. Penalties for Class II violations are not to exceed $10,000 per day for each day during which the violation continues, with the maximum amount of any Class II penalty not to exceed $125,000.

(b) Duty to reapply. If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must apply for and obtain a new permit.

(c) Need to halt or reduce activity not a defense. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

(d) Duty to mitigate. The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment.

(e) Proper operation and maintenance. The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities or similar systems which are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of the permit.

(f) Permit actions. This permit may be modified, revoked and reissued, or terminated for cause. The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition.

(g) Property rights. This permit does not convey any property rights of any sort, or any exclusive privilege.

(h) Duty to provide information. The permittee shall furnish to the Director, within a reasonable time, any information which the Director may request to determine whether cause exists for modifying, revoking and reissuing, or terminating this permit or to determine compliance with this permit. The permittee shall also furnish to the Director upon request, copies of records required to be kept by this permit.

(i) Inspection and entry. The permittee shall allow the Director, or an authorized representative (including an authorized contractor acting as a representative of the Administrator), upon presentation of credentials and other documents as may be required by law, to:

(1) Enter upon the permittee's premises where a regulated facility or activity is located or conducted, or where records must be kept under the conditions of this permit;

(2) Have access to and copy, at reasonable times, any records that must be kept under the conditions of this permit;

(3) Inspect at reasonable times any facilities, equipment (including monitoring and control equipment), practices, or operations regulated or required under this permit; and

(4) Sample or monitor at reasonable times, for the purposes of assuring permit compliance or as otherwise authorized by the Clean Water Act, any substances or parameters at any location.

(j) Monitoring and records.

(1) Samples and measurements taken for the purpose of monitoring shall be representative of the monitored activity.

(2) Except for records of monitoring information required by this permit related to the permittee's sewage sludge use and disposal activities, which shall be retained for a period of at least five years (or longer as required by 40 CFR part 503), the permittee shall retain records of all monitoring information, including all calibration and maintenance records and all original strip chart recordings for continuous monitoring instrumentation, copies of all reports required by this permit, and records of all data used to complete the application for this permit, for a period of at least 3 years from the date of the sample, measurement, report or application. This period may be extended by request of the Director at any time.

(3) Records of monitoring information shall include:

(i) The date, exact place, and time of sampling or measurements;

(ii) The individual(s) who performed the sampling or measurements;

(iii) The date(s) analyses were performed;

(iv) The individual(s) who performed the analyses;

(v) The analytical techniques or methods used; and

(vi) The results of such analyses.

(4) Monitoring must be conducted according to test procedures approved under 40 CFR Part 136 unless another method is required under 40 CFR subchapters N or O.

(5) The Clean Water Act provides that any person who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this permit shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than 2 years, or both. If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment is a fine of not more than $20,000 per day of violation, or by imprisonment of not more than 4 years, or both.

(k) Signatory requirement.

(1) All applications, reports, or information submitted to the Director shall be signed and certified. (See § 122.22)

(2) The CWA provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or non-compliance shall, upon conviction, be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than 6 months per violation, or by both.

(l) Reporting requirements.—

(1) Planned changes. The permittee shall give notice to the Director as soon as possible of any planned physical alterations or additions to the permitted facility. Notice is required only when:

(i) The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in § 122.29(b); or

(ii) The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants which are subject neither to effluent limitations in the permit, nor to notification requirements under § 122.42(a)(1).

(iii) The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan;

(2) Anticipated noncompliance. The permittee shall give advance notice to the Director of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements.

(3) Transfers. This permit is not transferable to any person except after notice to the Director. The Director may require modification or revocation and reissuance of the permit to change the name of the permittee and incorporate such other requirements as may be necessary under the Clean Water Act. (See § 122.61; in some cases, modification or revocation and reissuance is mandatory.)

(4) Monitoring reports. Monitoring results shall be reported at the intervals specified elsewhere in this permit.

(i) Monitoring results must be reported on a Discharge Monitoring Report (DMR) or forms provided or specified by the Director for reporting results of monitoring of sludge use or disposal practices. As of December 21, 2016 all reports and forms submitted in compliance with this section must be submitted electronically by the permittee to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. Part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of part 127, permittees may be required to report electronically if specified by a particular permit or if required to do so by state law.

(ii) If the permittee monitors any pollutant more frequently than required by the permit using test procedures approved under 40 CFR Part 136, or another method required for an industry-specific waste stream under 40 CFR subchapters N or O, the results of such monitoring shall be included in the calculation and reporting of the data submitted in the DMR or sludge reporting form specified by the Director.

(iii) Calculations for all limitations which require averaging of measurements shall utilize an arithmetic mean unless otherwise specified by the Director in the permit.

(5) Compliance schedules. Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of this permit shall be submitted no later than 14 days following each schedule date.

(6) Twenty-four hour reporting.

(i) The permittee shall report any noncompliance which may endanger health or the environment. Any information shall be provided orally within 24 hours from the time the permittee becomes aware of the circumstances. A report shall also be provided within 5 days of the time the permittee becomes aware of the circumstances. The report shall contain a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times), and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance. For noncompliance events related to combined sewer overflows, sanitary sewer overflows, or bypass events, these reports must include the data described above (with the exception of time of discovery) as well as the type of event (combined sewer overflows, sanitary sewer overflows, or bypass events), type of sewer overflow structure (e.g., manhole, combine sewer overflow outfall), discharge volumes untreated by the treatment works treating domestic sewage, types of human health and environmental impacts of the sewer overflow event, and whether the noncompliance was related to wet weather. As of December 21, 2020 all reports related to combined sewer overflows, sanitary sewer overflows, or bypass events submitted in compliance with this section must be submitted electronically by the permittee to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. Part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of part 127, permittees may be required to electronically submit reports related to combined sewer overflows, sanitary sewer overflows, or bypass events under this section by a particular permit or if required to do so by state law. The Director may also require permittees

to electronically submit reports not related to combined sewer overflows, sanitary sewer overflows, or bypass events under this section.

(ii) The following shall be included as information which must be reported within 24 hours under this paragraph.

(A) Any unanticipated bypass which exceeds any effluent limitation in the permit. (See § 122.41(g).

(B) Any upset which exceeds any effluent limitation in the permit.

(C) Violation of a maximum daily discharge limitation for any of the pollutants listed by the Director in the permit to be reported within 24 hours. (See § 122.44(g).)

(iii) The Director may waive the written report on a case-by-case basis for reports under paragraph (l)(6)(ii) of this section if the oral report has been received within 24 hours.

(7) Other noncompliance. The permittee shall report all instances of noncompliance not reported under paragraphs (l) (4), (5), and (6) of this section, at the time monitoring reports are submitted. The reports shall contain the information listed in paragraph (l)(6). For noncompliance events related to combined sewer overflows, sanitary sewer overflows, or bypass events, these reports shall contain the information described in paragraph (l)(6) and the applicable required data in appendix A to 40 CFR part 127. As of December 21, 2025 or an EPA–approved alternative date (see 40 CFR 127.24(e) or (f)), all reports related to combined sewer overflows, sanitary sewer overflows, or bypass events submitted in compliance with this section must be submitted electronically by the permittee to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. 40 CFR part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of 40 CFR part 127, permittees may be required to electronically submit reports related to combined sewer overflows, sanitary sewer overflows, or bypass events under this section by a particular permit or if required to do so by state law. The Director may also require permittees to electronically submit reports not related to combined sewer overflows, sanitary sewer overflows, or bypass events under this section.

(8) Other information. Where the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to the Director, it shall promptly submit such facts or information.

(9) Identification of the initial recipient for NPDES electronic reporting data. The owner, operator, or the duly authorized representative of an NPDES–regulated entity is required to electronically submit the required NPDES information (as specified in appendix A to 40 CFR part 127) to the appropriate initial recipient, as determined by EPA, and as defined in § 127.2(b) of this chapter. EPA will identify and publish the list of initial recipients on its Web site and in the Federal Register, by state and by NPDES data group [see § 127.2(c) of this chapter]. EPA will update and maintain this listing.

(m) Bypass—

(1) Definitions.

(i) Bypass means the intentional diversion of waste streams from any portion of a treatment facility.

(ii) Severe property damage means substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production.

(2) Bypass not exceeding limitations. The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the provisions of paragraphs (m)(3) and (m)(4) of this section.

(3) Notice—

(i) Anticipated bypass. If the permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible, at least ten days before the date of the bypass. As of December 21, 2025 or an EPA–approved alternative date (see 40 CFR 127.24(e) or (f)), all notices submitted in compliance with this section must be submitted electronically by the permittee to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. 40 CFR part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of 40 CFR part 127, permittees may be required to report electronically if specified by a particular permit or if required to do so by state law.

(ii) Unanticipated bypass. The permittee shall submit notice of an unanticipated bypass as required in paragraph (l)(6) of this section (24–hour notice). As of December 21, 2025 or an EPA–approved alternative date (see 40 CFR 127.24(e) or (f)), all notices submitted in compliance with this section must be submitted electronically by the permittee to the Director or initial recipient, as defined in 40 CFR 127.2(b), in compliance with this section and 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127. 40 CFR part 127 is not intended to undo existing requirements for electronic reporting. Prior to this date, and independent of 40 CFR part 127, permittees may be required to report electronically if specified by a particular permit or if required to do so by state law.

(4) Prohibition of bypass.

(i) Bypass is prohibited, and the Director may take enforcement action against a permittee for bypass, unless:

(A) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(B) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if

adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

(C) The permittee submitted notices as required under paragraph (m)(3) of this section.

(ii) The Director may approve an anticipated bypass, after considering its adverse effects, if the Director determines that it will meet the three conditions listed above in paragraph (m)(4)(i) of this section.

(n) Upset—

(1) Definition. Upset means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

(2) Effect of an upset. An upset constitutes an affirmative defense to an action brought for noncompliance with such technology based permit effluent limitations if the requirements of paragraph (n)(3) of this section are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review.

(3) Conditions necessary for a demonstration of upset. A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

(i) An upset occurred and that the permittee can identify the cause(s) of the upset;

(ii) The permitted facility was at the time being properly operated; and

(iii) The permittee submitted notice of the upset as required in paragraph (l)(6)(ii)(B) of this section (24 hour notice).

(iv) The permittee complied with any remedial measures required under paragraph (d) of this section.

(4) Burden of proof. In any enforcement proceeding the permittee seeking to establish the occurrence of an upset has the burden of proof.

(Clean Water Act (33 U.S.C. 1251 et seq.), Safe Drinking Water Act (42 U.S.C. 300f et seq.), Clean Air Act (42 U.S.C. 7401 et seq.), Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.))

Editorial Note: In paragraphs (j)(2), (4) and (l)(4)(ii), there are references to 40 CFR part 503. These references are to a proposed rule which was published at 54 FR 5746, Feb. 6, 1989. There is currently no part 503 in the Code of Federal Regulations.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 122. EPA Administered Permit Programs: The National Pollutant Discharge Elimination System (Refs & Annos)
          Subpart C. Permit Conditions

40 C.F.R. § 122.44

§ 122.44 Establishing limitations, standards, and other permit conditions (applicable to State NPDES programs, see § 123.25).

Effective: June 12, 2019

Currentness

In addition to the conditions established under § 122.43(a), each NPDES permit shall include conditions meeting the following requirements when applicable.

(a)(1) Technology-based effluent limitations and standards based on: effluent limitations and standards promulgated under section 301 of the CWA, or new source performance standards promulgated under section 306 of CWA, on case-by-case effluent limitations determined under section 402(a)(1) of CWA, or a combination of the three, in accordance with § 125.3 of this chapter. For new sources or new dischargers, these technology based limitations and standards are subject to the provisions of § 122.29(d) (protection period).

(2) Monitoring waivers for certain guideline-listed pollutants.

(i) The Director may authorize a discharger subject to technology-based effluent limitations guidelines and standards in an NPDES permit to forego sampling of a pollutant found at 40 CFR Subchapter N of this chapter if the discharger has demonstrated through sampling and other technical factors that the pollutant is not present in the discharge or is present only at background levels from intake water and without any increase in the pollutant due to activities of the discharger.

(ii) This waiver is good only for the term of the permit and is not available during the term of the first permit issued to a discharger.

(iii) Any request for this waiver must be submitted when applying for a reissued permit or modification of a reissued permit. The request must demonstrate through sampling or other technical information, including information generated during an earlier permit term that the pollutant is not present in the discharge or is present only at background levels from intake water and without any increase in the pollutant due to activities of the discharger.

(iv) Any grant of the monitoring waiver must be included in the permit as an express permit condition and the reasons supporting the grant must be documented in the permit's fact sheet or statement of basis.

(v) This provision does not supersede certification processes and requirements already established in existing effluent limitations guidelines and standards.

(b)(1) Other effluent limitations and standards under sections 301, 302, 303, 307, 318, and 405 of CWA. If any applicable toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under section 307(a) of CWA for a toxic pollutant and that standard or prohibition is more stringent than any limitation on the pollutant in the permit, the Director shall institute proceedings under these regulations to modify or revoke and reissue the permit to conform to the toxic effluent standard or prohibition. See also § 122.41(a).

(2) Standards for sewage sludge use or disposal under section 405(d) of the CWA unless those standards have been included in a permit issued under the appropriate provisions of subtitle C of the Solid Waste Disposal Act, Part C of Safe Drinking Water Act, the Marine Protection, Research, and Sanctuaries Act of 1972, or the Clean Air Act, or under State permit programs approved by the Administrator. When there are no applicable standards for sewage sludge use or disposal, the permit may include requirements developed on a case-by-case basis to protect public health and the environment from any adverse effects which may occur from toxic pollutants in sewage sludge. If any applicable standard for sewage sludge use or disposal is promulgated under section 405(d) of the CWA and that standard is more stringent than any limitation on the pollutant or practice in the permit, the Director may initiate proceedings under these regulations to modify or revoke and reissue the permit to conform to the standard for sewage sludge use or disposal.

(3) Requirements applicable to cooling water intake structures under section 316(b) of the CWA, in accordance with part 125, subparts I, J, and N of this chapter.

(c) Reopener clause: For any permit issued to a treatment works treating domestic sewage (including "sludge-only facilities"), the Director shall include a reopener clause to incorporate any applicable standard for sewage sludge use or disposal promulgated under section 405(d) of the CWA. The Director may promptly modify or revoke and reissue any permit containing the reopener clause required by this paragraph if the standard for sewage sludge use or disposal is more stringent than any requirements for sludge use or disposal in the permit, or controls a pollutant or practice not limited in the permit.

(d) Water quality standards and State requirements: any requirements in addition to or more stringent than promulgated effluent limitations guidelines or standards under sections 301, 304, 306, 307, 318, and 405 of CWA necessary to:

(1) Achieve water quality standards established under section 303 of the CWA, including State narrative criteria for water quality.

(i) Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality.

(ii) When determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a State water quality standard, the permitting authority shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water.

(iii) When the permitting authority determines, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria within a State water quality standard for an individual pollutant, the permit must contain effluent limits for that pollutant.

(iv) When the permitting authority determines, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the numeric criterion for whole effluent toxicity, the permit must contain effluent limits for whole effluent toxicity.

(v) Except as provided in this subparagraph, when the permitting authority determines, using the procedures in paragraph (d)(1)(ii) of this section, toxicity testing data, or other information, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative criterion within an applicable State water quality standard, the permit must contain effluent limits for whole effluent toxicity. Limits on whole effluent toxicity are not necessary where the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit, using the procedures in paragraph (d)(1)(ii) of this section, that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards.

(vi) Where a State has not established a water quality criterion for a specific chemical pollutant that is present in an effluent at a concentration that causes, has the reasonable potential to cause, or contributes to an excursion above a narrative criterion within an applicable State water quality standard, the permitting authority must establish effluent limits using one or more of the following options:

(A) Establish effluent limits using a calculated numeric water quality criterion for the pollutant which the permitting authority demonstrates will attain and maintain applicable narrative water quality criteria and will fully protect the designated use. Such a criterion may be derived using a proposed State criterion, or an explicit State policy or regulation interpreting its narrative water quality criterion, supplemented with other relevant information which may include: EPA's Water Quality Standards Handbook, October 1983, risk assessment data, exposure data, information about the pollutant from the Food and Drug Administration, and current EPA criteria documents; or

(B) Establish effluent limits on a case-by-case basis, using EPA's water quality criteria, published under section 304(a) of the CWA, supplemented where necessary by other relevant information; or

(C) Establish effluent limitations on an indicator parameter for the pollutant of concern, provided:

(1) The permit identifies which pollutants are intended to be controlled by the use of the effluent limitation;

(2) The fact sheet required by § 124.56 sets forth the basis for the limit, including a finding that compliance with the effluent limit on the indicator parameter will result in controls on the pollutant of concern which are sufficient to attain and maintain applicable water quality standards;

(3) The permit requires all effluent and ambient monitoring necessary to show that during the term of the permit the limit on the indicator parameter continues to attain and maintain applicable water quality standards; and

(4) The permit contains a reopener clause allowing the permitting authority to modify or revoke and reissue the permit if the limits on the indicator parameter no longer attain and maintain applicable water quality standards.

(vii) When developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that:

(A) The level of water quality to be achieved by limits on point sources established under this paragraph is derived from, and complies with all applicable water quality standards; and

(B) Effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 CFR 130.7.

(2) Attain or maintain a specified water quality through water quality related effluent limits established under section 302 of CWA;

(3) Conform to the conditions to a State certification under section 401 of the CWA that meets the requirements of § 124.53 when EPA is the permitting authority. If a State certification is stayed by a court of competent jurisdiction or an appropriate State board or agency, EPA shall notify the State that the Agency will deem certification waived unless a finally effective State certification is received within sixty days from the date of the notice. If the State does not forward a finally effective certification within the sixty day period, EPA shall include conditions in the permit that may be necessary to meet EPA's obligation under section 301(b)(1)(C) of the CWA;

(4) Conform to applicable water quality requirements under section 401(a)(2) of CWA when the discharge affects a State other than the certifying State;

(5) Incorporate any more stringent limitations, treatment standards, or schedule of compliance requirements established under Federal or State law or regulations in accordance with section 301(b)(1)(C) of CWA;

(6) Ensure consistency with the requirements of a Water Quality Management plan approved by EPA under section 208(b) of CWA;

(7) Incorporate section 403(c) criteria under part 125, subpart M, for ocean discharges;

(8) Incorporate alternative effluent limitations or standards where warranted by "fundamentally different factors," under 40 CFR part 125, subpart D;

(9) Incorporate any other appropriate requirements, conditions, or limitations (other than effluent limitations) into a new source permit to the extent allowed by the National Environmental Policy Act, 42 U.S.C. 4321 et seq. and section 511 of the CWA, when EPA is the permit issuing authority. (See § 122.29(c)).

(e) Technology–based controls for toxic pollutants. Limitations established under paragraphs (a), (b), or (d) of this section, to control pollutants meeting the criteria listed in paragraph (e)(1) of this section. Limitations will be established in accordance with paragraph (e)(2) of this section. An explanation of the development of these limitations shall be included in the fact sheet under § 124.56(b)(1)(i).

(1) Limitations must control all toxic pollutants which the Director determines (based on information reported in a permit application under § 122.21(g)(7) or in a notification under § 122.42(a)(1) or on other information) are or may be discharged at a level greater than the level which can be achieved by the technology-based treatment requirements appropriate to the permittee under § 125.3(c) of this chapter; or

(2) The requirement that the limitations control the pollutants meeting the criteria of paragraph (e)(1) of this section will be satisfied by:

(i) Limitations on those pollutants; or

(ii) Limitations on other pollutants which, in the judgment of the Director, will provide treatment of the pollutants under paragraph (e)(1) of this section to the levels required by § 125.3(c).

(f) Notification level. A "notification level" which exceeds the notification level of § 122.42(a)(1)(i), (ii) or (iii), upon a petition from the permittee or on the Director's initiative. This new notification level may not exceed the level which can be achieved by the technology-based treatment requirements appropriate to the permittee under § 125.3(c).

(g) Twenty-four hour reporting. Pollutants for which the permittee must report violations of maximum daily discharge limitations under § 122.41(1)(6)(ii)(C) (24–hour reporting) shall be listed in the permit. This list shall include any toxic pollutant or hazardous substance, or any pollutant specifically identified as the method to control a toxic pollutant or hazardous substance.

(h) Durations for permits, as set forth in § 122.46.

(i) Monitoring requirements. In addition to § 122.48, the following monitoring requirements:

(1) To assure compliance with permit limitations, requirements to monitor:

(i) The mass (or other measurement specified in the permit) for each pollutant limited in the permit;

(ii) The volume of effluent discharged from each outfall;

(iii) Other measurements as appropriate including pollutants in internal waste streams under § 122.45(i); pollutants in intake water for net limitations under § 122.45(f); frequency, rate of discharge, etc., for noncontinuous discharges under § 122.45(e); pollutants subject to notification requirements under § 122.42(a); and pollutants in sewage sludge or other monitoring as specified in 40 CFR part 503; or as determined to be necessary on a case-by-case basis pursuant to section 405(d)(4) of the CWA.

(iv) According to sufficiently sensitive test procedures (i.e., methods) approved under 40 CFR part 136 for the analysis of pollutants or pollutant parameters or required under 40 CFR chapter I, subchapter N or O.

(A) For the purposes of this paragraph, a method is "sufficiently sensitive" when:

(1) The method minimum level (ML) is at or below the level of the effluent limit established in the permit for the measured pollutant or pollutant parameter; or

(2) The method has the lowest ML of the analytical methods approved under 40 CFR part 136 or required under 40 CFR chapter I, subchapter N or O for the measured pollutant or pollutant parameter.

Note to paragraph (i)(1)(iv)(A): Consistent with 40 CFR part 136, applicants or permittees have the option of providing matrix or sample specific minimum levels rather than the published levels. Further, where an applicant or permittee can demonstrate that, despite a good faith effort to use a method that would otherwise meet the definition of "sufficiently sensitive", the analytical results are not consistent with the QA/QC specifications for that method, then the Director may determine that the method is not performing adequately and the Director should select a different method from the remaining EPA–approved methods that is sufficiently sensitive consistent with 40 CFR 122.44(i)(1)(iv)(A). Where no other EPA–approved methods exist, the Director should select a method consistent with 40 CFR 122.44(i)(1)(iv)(B).

(B) In the case of pollutants or pollutant parameters for which there are no approved methods under 40 CFR part 136 or methods are not otherwise required under 40 CFR chapter I, subchapter N or O, monitoring shall be conducted according to a test procedure specified in the permit for such pollutants or pollutant parameters.

(2) Except as provided in paragraphs (i)(4) and (5) of this section, requirements to report monitoring results shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the discharge, but in no case less than once a year. For sewage sludge use or disposal practices, requirements to monitor and report results shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the sewage sludge use or disposal practice; minimally this shall be as specified in 40 CFR part 503 (where applicable), but in no case less than once a year. All results must be electronically reported in compliance with 40 CFR part 3 (including, in all cases, subpart D to part 3), § 122.22, and 40 CFR part 127.

(3) Requirements to report monitoring results for storm water discharges associated with industrial activity which are subject to an effluent limitation guideline shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the discharge, but in no case less than once a year.

(4) Requirements to report monitoring results for storm water discharges associated with industrial activity (other than those addressed in paragraph (i)(3) of this section) shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the discharge. At a minimum, a permit for such a discharge must require:

(i) The discharger to conduct an annual inspection of the facility site to identify areas contributing to a storm water discharge associated with industrial activity and evaluate whether measures to reduce pollutant loadings identified in a storm water pollution prevention plan are adequate and properly implemented in accordance with the terms of the permit or whether additional control measures are needed;

(ii) The discharger to maintain for a period of three years a record summarizing the results of the inspection and a certification that the facility is in compliance with the plan and the permit, and identifying any incidents of non-compliance;

(iii) Such report and certification be signed in accordance with § 122.22; and

(iv) Permits for storm water discharges associated with industrial activity from inactive mining operations may, where annual inspections are impracticable, require certification once every three years by a Registered Professional Engineer that the facility is in compliance with the permit, or alternative requirements.

(5) Permits which do not require the submittal of monitoring result reports at least annually shall require that the permittee report all instances of noncompliance not reported under § 122.41(l) (1), (4), (5), and (6) at least annually.

(j) Pretreatment program for POTWs. Requirements for POTWs to:

(1) Identify, in terms of character and volume of pollutants, any Significant Industrial Users discharging into the POTW subject to Pretreatment Standards under section 307(b) of CWA and 40 CFR part 403.

(2)(i) Submit a local program when required by and in accordance with 40 CFR part 403 to assure compliance with pretreatment standards to the extent applicable under section 307(b). The local program shall be incorporated into the permit as described in 40 CFR part 403. The program must require all indirect dischargers to the POTW to comply with the reporting requirements of 40 CFR part 403.

(ii) Provide a written technical evaluation of the need to revise local limits under 40 CFR 403.5(c)(1), following permit issuance or reissuance.

(3) For POTWs which are "sludge-only facilities," a requirement to develop a pretreatment program under 40 CFR part 403 when the Director determines that a pretreatment program is necessary to assure compliance with Section 405(d) of the CWA.

(k) Best management practices (BMPs) to control or abate the discharge of pollutants when:

(1) Authorized under section 304(e) of the CWA for the control of toxic pollutants and hazardous substances from ancillary industrial activities;

(2) Authorized under section 402(p) of the CWA for the control of storm water discharges;

(3) Numeric effluent limitations are infeasible; or

(4) The practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA.

Note to Paragraph (k)(4): Additional technical information on BMPs and the elements of BMPs is contained in the following documents: Guidance Manual for Developing Best Management Practices (BMPs), October 1993, EPA No. 833/B–93–004, NTIS No. PB 94–178324, ERIC No. W498); Storm Water Management for Construction Activities: Developing Pollution Prevention Plans and Best Management Practices, September 1992, EPA No. 832/R–92–005, NTIS No. PB 92–235951, ERIC No. N482); Storm Water Management for Construction Activities, Developing Pollution Prevention Plans and Best Management Practices: Summary Guidance, EPA 833/R–92–001, NTIS No. PB 93–223550; ERIC No. W139; Storm Water Management for Industrial Activities, Developing Pollution Prevention Plans and Best Management Practices, September 1992; EPA 832/R–92–006, NTIS No. PB 92–235969, ERIC No. N477; Storm Water Management for Industrial Activities, Developing Pollution Prevention Plans and Best Management Practices: Summary Guidance, EPA 833/R–92–002, NTIS No. PB 94–133782; ERIC No. W492. These and other EPA guidance documents can be obtained through the National Service Center for Environmental Publications (NSCEP) at http://www.epa.gov/nscep. In addition, States may have BMP guidance documents. These EPA guidance documents are listed here only for informational purposes; they are not binding and EPA does not intend that these guidance documents have any mandatory, regulatory effect by virtue of their listing in this note.

(l) Reissued permits.

(1) Except as provided in paragraph (l)(2) of this section when a permit is renewed or reissued, interim effluent limitations, standards or conditions must be at least as stringent as the final effluent limitations, standards, or conditions in the previous permit (unless the circumstances on which the previous permit was based have materially and substantially changed since the time the permit was issued and would constitute cause for permit modification or revocation and reissuance under § 122.62.)

(2) In the case of effluent limitations established on the basis of Section 402(a)(1)(B) of the CWA, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 304(b) subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit.

(i) Exceptions—A permit with respect to which paragraph (l)(2) of this section applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant, if—

(A) Material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

(B)(1) Information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

(2) The Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under section 402(a)(1)(b);

(C) A less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

(D) The permittee has received a permit modification under section 301(c), 301(g), 301(h), 301(i), 301(k), 301(n), or 316(a); or

(E) The permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

(ii) Limitations. In no event may a permit with respect to which paragraph (l)(2) of this section applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, issued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 303 applicable to such waters.

(m) Privately owned treatment works. For a privately owned treatment works, any conditions expressly applicable to any user, as a limited copermittee, that may be necessary in the permit issued to the treatment works to ensure compliance with applicable requirements under this part. Alternatively, the Director may issue separate permits to the treatment works and to its users, or may require a separate permit application from any user. The Director's decision to issue a permit with no conditions applicable to any user, to impose conditions on one or more users, to issue separate permits, or to require separate applications, and the basis for that decision, shall be stated in the fact sheet for the draft permit for the treatment works.

(n) Grants. Any conditions imposed in grants made by the Administrator to POTWs under sections 201 and 204 of CWA which are reasonably necessary for the achievement of effluent limitations under section 301 of CWA.

(o) Sewage sludge. Requirements under section 405 of CWA governing the disposal of sewage sludge from publicly owned treatment works or any other treatment works treating domestic sewage for any use for which regulations have been established, in accordance with any applicable regulations.

(p) Coast Guard. When a permit is issued to a facility that may operate at certain times as a means of transportation over water, a condition that the discharge shall comply with any applicable regulations promulgated by the Secretary of the department

in which the Coast Guard is operating, that establish specifications for safe transportation, handling, carriage, and storage of pollutants.

(q) Navigation. Any conditions that the Secretary of the Army considers necessary to ensure that navigation and anchorage will not be substantially impaired, in accordance with § 124.59 of this chapter.

(r) Great Lakes. When a permit is issued to a facility that discharges into the Great Lakes System (as defined in 40 CFR 132.2), conditions promulgated by the State, Tribe, or EPA pursuant to 40 CFR part 132.

(s) Qualifying State, Tribal, or local programs.

(1) For storm water discharges associated with small construction activity identified in § 122.26(b)(15), the Director may include permit conditions that incorporate qualifying State, Tribal, or local erosion and sediment control program requirements by reference. Where a qualifying State, Tribal, or local program does not include one or more of the elements in this paragraph (s)(1), then the Director must include those elements as conditions in the permit. A qualifying State, Tribal, or local erosion and sediment control program is one that includes:

(i) Requirements for construction site operators to implement appropriate erosion and sediment control best management practices;

(ii) Requirements for construction site operators to control waste such as discarded building materials, concrete truck washout, chemicals, litter, and sanitary waste at the construction site that may cause adverse impacts to water quality;

(iii) Requirements for construction site operators to develop and implement a storm water pollution prevention plan. (A storm water pollution prevention plan includes site descriptions, descriptions of appropriate control measures, copies of approved State, Tribal or local requirements, maintenance procedures, inspection procedures, and identification of non-storm water discharges); and

(iv) Requirements to submit a site plan for review that incorporates consideration of potential water quality impacts.

(2) For storm water discharges from construction activity identified in § 122.26(b)(14)(x), the Director may include permit conditions that incorporate qualifying State, Tribal, or local erosion and sediment control program requirements by reference. A qualifying State, Tribal or local erosion and sediment control program is one that includes the elements listed in paragraph (s)(1) of this section and any additional requirements necessary to achieve the applicable technology-based standards of "best available technology" and "best conventional technology" based on the best professional judgment of the permit writer.

**Credits**

[49 FR 31842, Aug. 8, 1984; 49 FR 38049, Sept. 26, 1984; 50 FR 6940, Feb. 19, 1985; 50 FR 7912, Feb. 27, 1985; 54 FR 256, Jan. 4, 1989; 54 FR 18783, May 2, 1989; 54 FR 23835, 23896, June 2, 1989; 57 FR 11413, April 2, 1992; 57 FR 33049, July 24, 1992; 58 FR 18016, April 7, 1993; 60 FR 15386, March 23, 1995; 64 FR 42469, Aug. 4, 1999; 64 FR 43426, Aug. 10, 1999; 64 FR 68847, Dec. 8, 1999; 65 FR 30908, May 15, 2000; 65 FR 43661, July 13, 2000; 66 FR 53048, Oct. 18, 2001;

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 122. EPA Administered Permit Programs: The National Pollutant Discharge Elimination System (Refs & Annos)
          Subpart C. Permit Conditions

40 C.F.R. § 122.45

§ 122.45 Calculating NPDES permit conditions (applicable to State NPDES programs, see § 123.25).

Currentness

(a) Outfalls and discharge points. All permit effluent limitations, standards and prohibitions shall be established for each outfall or discharge point of the permitted facility, except as otherwise provided under § 122.44(k) (BMPs where limitations are infeasible) and paragraph (i) of this section (limitations on internal waste streams).

(b) Production-based limitations.

(1) In the case of POTWs, permit effluent limitations, standards, or prohibitions shall be calculated based on design flow.

(2)(i) Except in the case of POTWs or as provided in paragraph (b)(2)(ii) of this section, calculation of any permit limitations, standards, or prohibitions which are based on production (or other measure of operation) shall be based not upon the designed production capacity but rather upon a reasonable measure of actual production of the facility. For new sources or new dischargers, actual production shall be estimated using projected production. The time period of the measure of production shall correspond to the time period of the calculated permit limitations; for example, monthly production shall be used to calculate average monthly discharge limitations.

(ii)(A)(1) The Director may include a condition establishing alternate permit limitations, standards, or prohibitions based upon anticipated increased (not to exceed maximum production capability) or decreased production levels.

(2) For the automotive manufacturing industry only, the Regional Administrator shall, and the State Director may establish a condition under paragraph (b)(2)(ii)(A)(1) of this section if the applicant satisfactorily demonstrates to the Director at the time the application is submitted that its actual production, as indicated in paragraph (b)(2)(i) of this section, is substantially below maximum production capability and that there is a reasonable potential for an increase above actual production during the duration of the permit.

(B) If the Director establishes permit conditions under paragraph (b)(2)(ii)(A) of this section:

(1) The permit shall require the permittee to notify the Director at least two business days prior to a month in which the permittee expects to operate at a level higher than the lowest production level identified in the

permit. The notice shall specify the anticipated level and the period during which the permittee expects to operate at the alternate level. If the notice covers more than one month, the notice shall specify the reasons for the anticipated production level increase. New notice of discharge at alternate levels is required to cover a period or production level not covered by prior notice or, if during two consecutive months otherwise covered by a notice, the production level at the permitted facility does not in fact meet the higher level designated in the notice.

(2) The permittee shall comply with the limitations, standards, or prohibitions that correspond to the lowest level of production specified in the permit, unless the permittee has notified the Director under paragraph (b)(2)(ii) (B)(1) of this section, in which case the permittee shall comply with the lower of the actual level of production during each month or the level specified in the notice.

(3) The permittee shall submit with the DMR the level of production that actually occurred during each month and the limitations, standards, or prohibitions applicable to that level of production.

(c) Metals. All permit effluent limitations, standards, or prohibitions for a metal shall be expressed in terms of "total recoverable metal" as defined in 40 CFR part 136 unless:

(1) An applicable effluent standard or limitation has been promulgated under the CWA and specifies the limitation for the metal in the dissolved or valent or total form; or

(2) In establishing permit limitations on a case-by-case basis under § 125.3, it is necessary to express the limitation on the metal in the dissolved or valent or total form to carry out the provisions of the CWA; or

(3) All approved analytical methods for the metal inherently measure only its dissolved form (e.g., hexavalent chromium).

(d) Continuous discharges. For continuous discharges all permit effluent limitations, standards, and prohibitions, including those necessary to achieve water quality standards, shall unless impracticable be stated as:

(1) Maximum daily and average monthly discharge limitations for all dischargers other than publicly owned treatment works; and

(2) Average weekly and average monthly discharge limitations for POTWs.

(e) Non-continuous discharges. Discharges which are not continuous, as defined in § 122.2, shall be particularly described and limited, considering the following factors, as appropriate:

(1) Frequency (for example, a batch discharge shall not occur more than once every 3 weeks);

(2) Total mass (for example, not to exceed 100 kilograms of zinc and 200 kilograms of chromium per batch discharge);

(3) Maximum rate of discharge of pollutants during the discharge (for example, not to exceed 2 kilograms of zinc per minute); and

(4) Prohibition or limitation of specified pollutants by mass, concentration, or other appropriate measure (for example, shall not contain at any time more than 0.1 mg/1 zinc or more than 250 grams ( ¼ kilogram) of zinc in any discharge).

(f) Mass limitations.

(1) All pollutants limited in permits shall have limitations, standards or prohibitions expressed in terms of mass except:

(i) For pH, temperature, radiation, or other pollutants which cannot appropriately be expressed by mass;

(ii) When applicable standards and limitations are expressed in terms of other units of measurement; or

(iii) If in establishing permit limitations on a case-by-case basis under § 125.3, limitations expressed in terms of mass are infeasible because the mass of the pollutant discharged cannot be related to a measure of operation (for example, discharges of TSS from certain mining operations), and permit conditions ensure that dilution will not be used as a substitute for treatment.

(2) Pollutants limited in terms of mass additionally may be limited in terms of other units of measurement, and the permit shall require the permittee to comply with both limitations.

(g) Pollutants in intake water.

(1) Upon request of the discharger, technology-based effluent limitations or standards shall be adjusted to reflect credit for pollutants in the discharger's intake water if:

(i) The applicable effluent limitations and standards contained in 40 CFR subchapter N specifically provide that they shall be applied on a net basis; or

(ii) The discharger demonstrates that the control system it proposes or uses to meet applicable technology-based limitations and standards would, if properly installed and operated, meet the limitations and standards in the absence of pollutants in the intake waters.

(2) Credit for generic pollutants such as biochemical oxygen demand (BOD) or total suspended solids (TSS) should not be granted unless the permittee demonstrates that the constituents of the generic measure in the effluent are substantially similar to the constituents of the generic measure in the intake water or unless appropriate additional limits are placed on process water pollutants either at the outfall or elsewhere.

(3) Credit shall be granted only to the extent necessary to meet the applicable limitation or standard, up to a maximum value equal to the influent value. Additional monitoring may be necessary to determine eligibility for credits and compliance with permit limits.

(4) Credit shall be granted only if the discharger demonstrates that the intake water is drawn from the same body of water into which the discharge is made. The Director may waive this requirement if he finds that no environmental degradation will result.

(5) This section does not apply to the discharge of raw water clarifier sludge generated from the treatment of intake water.

(h) Internal waste streams.

(1) When permit effluent limitations or standards imposed at the point of discharge are impractical or infeasible, effluent limitations or standards for discharges of pollutants may be imposed on internal waste streams before mixing with other waste streams or cooling water streams. In those instances, the monitoring required by § 122.48 shall also be applied to the internal waste streams.

(2) Limits on internal waste streams will be imposed only when the fact sheet under § 124.56 sets forth the exceptional circumstances which make such limitations necessary, such as when the final discharge point is inaccessible (for example, under 10 meters of water), the wastes at the point of discharge are so diluted as to make monitoring impracticable, or the interferences among pollutants at the point of discharge would make detection or analysis impracticable.

(i) Disposal of pollutants into wells, into POTWs or by land application. Permit limitations and standards shall be calculated as provided in § 122.50.

**Credits**

[49 FR 38049, Sept. 26, 1984; 50 FR 4514, Jan. 31, 1985; 54 FR 258, Jan. 4, 1989; 54 FR 18784, May 2, 1989; 65 FR 30909, May 15, 2000]

SOURCE: 45 FR 33418, May 19, 1980, as amended at 48 FR 14153, Apr. 1, 1983, unless otherwise noted.

AUTHORITY: The Clean Water Act, 33 U.S.C. 1251 et seq.

Notes of Decisions (13)

Current through November 18, 2021; 86 FR 64407.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter D. Water Programs
Part 124. Procedures for Decisionmaking (Refs & Annos)
Subpart A. General Program Requirements

40 C.F.R. § 124.4

§ 124.4 Consolidation of permit processing.

Currentness

(a)(1) Whenever a facility or activity requires a permit under more than one statute covered by these regulations, processing of two or more applications for those permits may be consolidated. The first step in consolidation is to prepare each draft permit at the same time.

(2) Whenever draft permits are prepared at the same time, the statements of basis (required under § 124.7 for EPA-issued permits only) or fact sheets (§ 124.8), administrative records (required under § 124.9 for EPA-issued permits only), public comment periods (§ 124.10), and any public hearings (§ 124.12) on those permits should also be consolidated. The final permits may be issued together. They need not be issued together if in the judgment of the Regional Administrator or State Director(s), joint processing would result in unreasonable delay in the issuance of one or more permits.

(b) Whenever an existing facility or activity requires additional permits under one or more of the statutes covered by these regulations, the permitting authority may coordinate the expiration date(s) of the new permit(s) with the expiration date(s) of the existing permit(s) so that all permits expire simultaneously. Processing of the subsequent applications for renewal permits may then be consolidated.

(c) Processing of permit applications under paragraph (a) or (b) of this section may be consolidated as follows:

(1) The Director may consolidate permit processing at his or her discretion whenever a facility or activity requires all permits either from EPA or from an approved State.

(2) The Regional Administrator and the State Director(s) may agree to consolidate draft permits whenever a facility or activity requires permits from both EPA and an approved State.

(3) Permit applicants may recommend whether or not the processing of their applications should be consolidated.

(d) [Reserved]

Case: 21-70282, 11/24/2021, ID: 12297366, DktEntry: 33-2, Page 71 of 90

(e) Except with the written consent of the permit applicant, the Regional Administrator shall not consolidate processing a PSD permit with any other permit under paragraph (a) or (b) of this section when to do so would delay issuance of the PSD permit more than one year from the effective date of the application under § 124.3(f).

**Credits**

[65 FR 30910, May 15, 2000]

SOURCE: 45 FR 33484, May 19, 1980, as amended at 48 FR 14264, April 1, 1983; 58 FR 67983, Dec. 22, 1993; 65 FR 30910, May 15, 2000, unless otherwise noted.

AUTHORITY: Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.; Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Clean Water Act, 33 U.S.C. 1251 et seq.; Clean Air Act, 42 U.S.C. 7401 et seq.

Current through November 18, 2021; 86 FR 64407.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter D. Water Programs
Part 124. Procedures for Decisionmaking (Refs & Annos)
Subpart A. General Program Requirements

40 C.F.R. § 124.19

§ 124.19 Appeal of RCRA, UIC, NPDES and PSD Permits.

Effective: June 11, 2021
Currentness

(a) Petitioning for review of a permit decision.

(1) Initiating an appeal. Appeal from a RCRA, UIC, NPDES, or PSD final permit decision issued under § 124.15 of this part, or a decision to deny a permit for the active life of a RCRA hazardous waste management facility or unit under § 270.29 of this chapter, is commenced by filing a petition for review with the Clerk of the Environmental Appeals Board within the time prescribed in paragraph (a)(3) of this section.

(2) Who may file? Any person who filed comments on the draft permit or participated in a public hearing on the draft permit may file a petition for review as provided in this section. Additionally, any person who failed to file comments or failed to participate in the public hearing on the draft permit may petition for administrative review of any permit conditions set forth in the final permit decision, but only to the extent that those final permit conditions reflect changes from the proposed draft permit.

(3) Filing deadline. A petition for review must be filed with the Clerk of the Environmental Appeals Board within 30 days after the Regional Administrator serves notice of the issuance of a RCRA, UIC, NPDES, or PSD final permit decision under § 124.15 or a decision to deny a permit for the active life of a RCRA hazardous waste management facility or unit under § 270.29 of this chapter. A petition is filed when it is received by the Clerk of the Environmental Appeals Board at the address specified for the appropriate method of delivery as provided in paragraph (i)(2) of this section.

(4) Petition contents.

(i) In addition to meeting the requirements in paragraph (d) of this section, a petition for review must identify the contested permit condition or other specific challenge to the permit decision and clearly set forth, with legal and factual support, petitioner's contentions for why the permit decision should be reviewed. The petition must demonstrate that each challenge to the permit decision is based on:

(A) A finding of fact or conclusion of law that is clearly erroneous; or

(B) An exercise of discretion or an important policy consideration that the Environmental Appeals Board should, in its discretion, review.

(ii) Petitioners must demonstrate, by providing specific citation to the administrative record, including the document name and page number, that each issue being raised in the petition was raised during the public comment period (including any public hearing) to the extent required by § 124.13. For each issue raised that was not raised previously, the petition must explain why such issues were not required to be raised during the public comment period as provided in § 124.13. Additionally, if the petition raises an issue that the Regional Administrator addressed in the response to comments document issued pursuant to § 124.17, then petitioner must provide a citation to the relevant comment and response and explain why the Regional Administrator's response to the comment was clearly erroneous or otherwise warrants review.

(b) Response(s) to a petition for review.

(1) In a PSD or other new source permit appeal, the Regional Administrator must file a response to the petition for review, a certified index of the administrative record, and the relevant portions of the administrative record within 21 days after the service of the petition. The response brief must respond to arguments raised by the appellant, together with specific citation or other appropriate reference to the record (e.g., by including the document name and page number).

(2) In all other permit appeals under this section, the Regional Administrator must file a response to the petition, a certified index of the administrative record, and the relevant portions of the administrative record within 30 days after the service of a petition.

(3) A permit applicant who did not file a petition but who wishes to participate in the appeal process must file a notice of appearance and a response to the petition. Such documents must be filed by the deadlines provided in paragraph (b)(1) or (2) of this section, as appropriate.

(4) The State or Tribal authority where the permitted facility or site is or is proposed to be located (if that authority is not the permit issuer) must also file a notice of appearance and a response if it wishes to participate in the appeal. Such response must be filed by the deadlines provided in paragraph (b)(1) or (2) of this section, as appropriate.

(c) Replies.

(1) In PSD and other new source permit appeals, the Environmental Appeals Board will apply a presumption against the filing of a reply brief. By motion, petitioner may seek leave of the Environmental Appeals Board to file a reply to the response, which the Environmental Appeals Board, in its discretion, may grant. The motion must be filed simultaneously with the proposed reply within 10 days after service of the response. In its motion, petitioner must specify those arguments in the response to which petitioner seeks to reply and the reasons petitioner believes it is necessary to file a reply to those arguments. Petitioner may not raise new issues or arguments in the motion or in the reply.

(2) In all other permit appeals under this section, petitioner may file a reply within 15 days after service of the response. Petitioner may not raise new issues or arguments in the reply.

(d) Content and form of briefs.

(1) Content requirements. All briefs filed under this section must contain, under appropriate headings:

(i) A table of contents, with page references;

(ii) A table of authorities with references to the pages of the brief where they are cited;

(iii) A table of attachments, if required under paragraph (d)(2) of this section; and

(iv) A statement of compliance with the word limitation.

(2) Attachments. Parts of the record to which the parties wish to direct the Environmental Appeals Board's attention may be appended to the brief submitted. If the brief includes attachments, a table must be included that provides the title of each appended document and assigns a label identifying where it may be found (e.g., Excerpts from the Response to Comments Document * * * Attachment 1).

(3) Length. Unless otherwise ordered by the Environmental Appeals Board, petitions and response briefs may not exceed 14,000 words, and all other briefs may not exceed 7,000 words. Filers may rely on the word-processing system used to determine the word count. In lieu of a word limitation, filers may comply with a 30–page limit for petitions and response briefs, or a 15–page limit for replies. Headings, footnotes, and quotations count toward the word limitation. The table of contents, table of authorities, table of attachments (if any), statement requesting oral argument (if any), statement of compliance with the word limitation, and any attachments do not count toward the word limitation. The Environmental Appeals Board may exclude any petition, response, or other brief that does not meet word limitations. Where a party can demonstrate a compelling and documented need to exceed such limitations, such party must seek advance leave of the Environmental Appeals Board to file a longer brief. Such requests are discouraged and will be granted only in unusual circumstances.

(e) Participation by amicus curiae. Any interested person may file an amicus brief in any appeal pending before the Environmental Appeals Board under this section. The deadline for filing such brief is 15 days after the filing of the response brief, except that amicus briefs in PSD or other new source permit appeals must be filed within 21 days after the filing of the petition. Amicus briefs must comply with all procedural requirements of this section.

(f) Motions.

(1) In general. A request for an order or other relief must be made by written motion unless these rules prescribe another form.

(2) Contents of a motion. A motion must state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to support the motion. In advance of filing a motion, parties must attempt to ascertain whether the other party(ies) concur(s) or object(s) to the motion and must indicate in the motion the attempt made and the response obtained.

(3) Response to motion. Any party may file a response to a motion. Responses must state with particularity the grounds for opposition and the legal argument necessary to support the motion. The response must be filed within 15 days after service of the motion unless the Environmental Appeals Board shortens or extends the time for response.

(4) Reply. Any reply to a response filed under paragraph (f)(3) of this section must be filed within 10 days after service of the response. A reply must not introduce any new issues or arguments and may respond only to matters presented in the response.

(5) Length. Unless otherwise ordered by the Environmental Appeals Board, motions and any responses or replies may not exceed 7000 words. Filers may rely on the word-processing system used to determine the word count. In lieu of a word limitation, filers may comply with a 15–page limit. Headings, footnotes, and quotations count toward the word or page-length limitation. The Environmental Appeals Board may exclude any motion that does not meet word limitations. Where a party can demonstrate a compelling and documented need to exceed such limitations, such party must seek advance leave of the Environmental Appeals Board. Such requests are discouraged and will be granted only in unusual circumstances.

(6) Disposition of a motion for a procedural order. The Environmental Appeals Board may act on a motion for a procedural order at any time without awaiting a response.

(g) Timing of motions for extension of time. Parties must file motions for extensions of time sufficiently in advance of the due date to allow other parties to have a reasonable opportunity to respond to the request for more time and to provide the Environmental Appeals Board with a reasonable opportunity to issue an order.

(h) Oral argument. The Environmental Appeals Board may hold oral argument on its own initiative or at its discretion in response to a request by one or more of the parties. To request oral argument, a party must include in its substantive brief a statement explaining why oral argument should be permitted. The Environmental Appeals Board will apply a presumption against oral argument in PSD or other new source permit appeals. The Environmental Appeals Board may, by order, establish additional procedures governing any oral argument before the Environmental Appeals Board.

(i) Filing and service requirements. Documents filed under this section, including the petition for review, must be filed with the Clerk of the Environmental Appeals Board. A document is filed when it is received by the Clerk of the Environmental Appeals Board at the address specified for the appropriate method of delivery as provided in paragraph (i)(2) of this section. Service of a document between parties to an appeal or by the Environmental Appeals Board on a party is complete upon mailing for U.S. mail or EPA internal mail, when placed in the custody of a reliable commercial delivery service, or upon transmission for facsimile or email.

(1) Caption and other filing requirements. Every document filed with the Environmental Appeals Board must specifically identify in the caption the permit applicant, the permitted facility, and the permit number. All documents that are filed must be signed by the person filing the documents or the representative of the person filing the documents. Each filing must also indicate the signer's name, address, and telephone number, as well as an email address, and facsimile number, if any.

(2) Method of filing. Unless otherwise permitted under these rules, documents must be filed either by using the Environmental Appeals Board's electronic filing system, by U.S. mail, or by hand delivery or courier (including delivery by

U.S. Express Mail or by a commercial delivery service). In addition, a motion or a response to a motion may be submitted by facsimile if the submission contains no attachments. Upon filing a motion or response to a motion by facsimile, the sender must, within one business day, submit the original copy to the Clerk of the Environmental Appeals Board either electronically, by mail, or by hand delivery or courier. The Environmental Appeals Board may by order require filing by facsimile or the Board's electronic filing system, subject to any appropriate conditions and limitations.

(i) Electronic filing. Documents that are filed electronically must be submitted using the Environmental Appeals Board's electronic filing system, subject to any appropriate conditions and limitations imposed by order of the Environmental Appeals Board. All documents filed electronically must include the full name of the person filing below the signature line. Compliance with Environmental Appeals Board electronic filing requirements constitutes compliance with applicable signature requirements.

(ii) Filing by U.S. Mail. Documents that are sent by U.S. Postal Service (except by U.S. Express Mail) must be sent to the official mailing address of the Clerk of the Environmental Appeals Board at: U.S. Environmental Protection Agency, Environmental Appeals Board, 1200 Pennsylvania Avenue NW., Mail Code 1103M, Washington, DC 20460–0001. The original and two copies of each document must be filed. The person filing the documents must include a cover letter to the Clerk of the Environmental Appeals Board clearly identifying the documents that are being submitted, the name of the party on whose behalf the documents are being submitted, as well as the name of the person filing the documents, his or her address, telephone number and, if available, fax number and email address.

(iii) Filing by hand delivery or courier. Documents delivered by hand or courier (including deliveries by U.S. Express Mail or by a commercial delivery service) must be delivered to the Clerk of the Environmental Appeals Board at: U.S. Environmental Protection Agency, Environmental Appeals Board, WJC East Building, 1201 Constitution Avenue NW, Room 3332, Washington, DC 20004.

(3) Service—

(i) Service information. The first document filed by any person shall contain the name, mailing address, telephone number, and email address of an individual authorized to receive service relating to the proceeding. Parties shall promptly file any changes in this information with the Clerk of the Environmental Appeals Board, and serve copies on all parties to the proceeding. If a party fails to furnish such information and any changes thereto, service to the party's last known address shall satisfy the requirements of paragraph (i)(3) of this section.

(ii) Service requirements for parties. Petitioner must serve the petition for review on the Regional Administrator and the permit applicant (if the applicant is not the petitioner). Once an appeal is docketed, every document filed with the Environmental Appeals Board must be served on all other parties. Service must be by first class U.S. mail, by any reliable commercial delivery service, or, if agreed to by the parties, by facsimile or other electronic means, including but not necessarily limited to email. A party who consents to service by facsimile or other electronic means must file an acknowledgement of its consent (identifying the type of electronic means agreed to and the electronic address to be used) with the Clerk of the Environmental Appeals Board. The Environmental Appeals Board may by order authorize or require service by facsimile, email, or other electronic means, subject to any appropriate conditions and limitations.

(iii) Service of rulings, orders, and decisions. The Clerk of the Environmental Appeals Board must serve copies of rulings, orders, and decisions on all parties. Service may be made by U.S. mail (including by certified mail or return

receipt requested, Overnight Express and Priority Mail), EPA's internal mail, any reliable commercial delivery service, or electronic means (including but not necessarily limited to facsimile and email).

(4) Proof of service. A certificate of service must be appended to each document filed stating the names of persons served, the date and manner of service, as well as the electronic, mailing, or hand delivery address, or facsimile number, as appropriate.

(j) Withdrawal of permit or portions of permit by Regional Administrator. The Regional Administrator, at any time prior to 30 days after the Regional Administrator files its response to the petition for review under paragraph (b) of this section, may, upon notification to the Environmental Appeals Board and any interested parties, withdraw the permit and prepare a new draft permit under § 124.6 addressing the portions so withdrawn. The new draft permit must proceed through the same process of public comment and opportunity for a public hearing as would apply to any other draft permit subject to this part. Any portions of the permit that are not withdrawn and that are not stayed under § 124.16(a) continue to apply. If the Environmental Appeals Board has held oral argument, the Regional Administrator may not unilaterally withdraw the permit, but instead must request that the Environmental Appeals Board grant a voluntary remand of the permit or any portion thereof.

(k) Petitioner request for dismissal of petition. Petitioner, by motion, may request to have the Environmental Appeals Board dismiss its appeal. The motion must briefly state the reason for its request.

(l) Final disposition and judicial review.

(1) A petition to the Environmental Appeals Board under paragraph (a) of this section is, under 5 U.S.C. 704, a prerequisite to seeking judicial review of the final agency action.

(2) For purposes of judicial review under the appropriate Act, final agency action on a permit occurs when agency review procedures under this section are exhausted and the Regional Administrator subsequently issues a final permit decision under this paragraph (l). A final permit decision must be issued by the Regional Administrator:

(i) When the Environmental Appeals Board issues notice to the parties that the petition for review has been denied;

(ii) When the Environmental Appeals Board issues a decision on the merits of the appeal and the decision does not include a remand of the proceedings; or

(iii) Upon the completion of remand proceedings if the proceedings are remanded, unless the Environmental Appeals Board's remand order specifically provides that appeal of the remand decision will be required to exhaust administrative remedies.

(3) The Regional Administrator must promptly publish notice of any final agency action in the Federal Register regarding the following permits:

(i) PSD permits;

(ii) Outer continental shelf permits issued under 40 CFR part 55;

(iii) Federal Title V operating permits issued under 40 CFR part 71;

(iv) Acid Rain permits appealed under 40 CFR part 78;

(v) Tribal Major Non–Attainment NSR permits issued under 40 CFR 49.166 through 49.173; and

(vi) Tribal Minor NSR permits issued under 40 CFR 49.151 through 49.161.

(m) Motions for reconsideration or clarification. Motions to reconsider or clarify any final disposition of the Environmental Appeals Board must be filed within 10 days after service of that order. Motions for reconsideration must set forth the matters claimed to have been erroneously decided and the nature of the alleged errors. Motions for clarification must set forth with specificity the portion of the decision for which clarification is being sought and the reason clarification is necessary. Motions for reconsideration or clarification under this provision must be directed to, and decided by, the Environmental Appeals Board. Motions for reconsideration or clarification directed to the Administrator, rather than the Environmental Appeals Board, will not be considered, unless such motion relates to a matter that the Environmental Appeals Board has referred to the Administrator pursuant to § 124.2 and for which the Administrator has issued the final order. A motion for reconsideration or clarification does not stay the effective date of the final order unless the Environmental Appeals Board specifically so orders.

(n) Board authority. In exercising its duties and responsibilities under this part, the Environmental Appeals Board may do all acts and take all measures necessary for the efficient, fair, and impartial adjudication of issues arising in an appeal under this part including, but not limited to, imposing procedural sanctions against a party who, without adequate justification, fails or refuses to comply with this part or an order of the Environmental Appeals Board. Such sanctions may include drawing adverse inferences against a party, striking a party's pleadings or other submissions from the record, and denying any or all relief sought by the party in the proceeding. Additionally, for good cause, the Board may relax or suspend the filing requirements prescribed by these rules or Board order.

(o) General NPDES permits.

(1) Persons affected by an NPDES general permit may not file a petition under this section or otherwise challenge the conditions of a general permit in further Agency proceedings. Instead, they may do either of the following:

(i) Challenge the general permit by filing an action in court; or

(ii) Apply for an individual NPDES permit under § 122.21 as authorized in § 122.28 of this chapter and may then petition the Environmental Appeals Board to review the individual permit as provided by this section.

(2) As provided in § 122.28(b)(3) of this chapter, any interested person may also petition the Director to require an individual NPDES permit for any discharger eligible for authorization to discharge under an NPDES general permit.

(p) Authority to initiate review. The Environmental Appeals Board also may decide on its own initiative to review any condition of any RCRA, UIC, NPDES, or PSD permit decision issued under this part for which review is available under paragraph (a) of this section. The Environmental Appeals Board must act under this paragraph (p) within 30 days of the service date of notice of the Regional Administrator's action.

**Credits**

[54 FR 9607, March 7, 1989; 57 FR 5335, Feb. 13, 1992; 65 FR 30911, May 15, 2000; 78 FR 5285, Jan. 25, 2013; 82 FR 2236, Jan. 9, 2017; 82 FR 8500, Jan. 26, 2017; 82 FR 14325, March 20, 2017; 83 FR 4599, Feb. 1, 2018; 85 FR 51657, Aug. 21, 2020; 86 FR 31176, June 11, 2021]

SOURCE: 45 FR 33484, May 19, 1980, as amended at 48 FR 14264, April 1, 1983; 58 FR 67983, Dec. 22, 1993; 65 FR 30910, May 15, 2000, unless otherwise noted.

AUTHORITY: Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.; Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Clean Water Act, 33 U.S.C. 1251 et seq.; Clean Air Act, 42 U.S.C. 7401 et seq.

Notes of Decisions (79)

Current through November 12, 2021, 86 FR 62891

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 131. Water Quality Standards (Refs & Annos)
          Subpart A. General Provisions

40 C.F.R. § 131.3

§ 131.3 Definitions.

Effective: October 20, 2015
Currentness

(a) The Act means the Clean Water Act (Public Law 92–500, as amended, (33 U.S.C. 1251 et seq.) ).

(b) Criteria are elements of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use. When criteria are met, water quality will generally protect the designated use.

(c) Section 304(a) criteria are developed by EPA under authority of section 304(a) of the Act based on the latest scientific information on the relationship that the effect of a constituent concentration has on particular aquatic species and/or human health. This information is issued periodically to the States as guidance for use in developing criteria.

(d) Toxic pollutants are those pollutants listed by the Administrator under section 307(a) of the Act.

(e) Existing uses are those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards.

(f) Designated uses are those uses specified in water quality standards for each water body or segment whether or not they are being attained.

(g) Use attainability analysis is a structured scientific assessment of the factors affecting the attainment of the use which may include physical, chemical, biological, and economic factors as described in § 131.10(g).

(h) Water quality limited segment means any segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 of the Act.

(i) Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses. Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the Act.

(j) States include: The 50 States, the District of Columbia, Guam, the Commonwealth of Puerto Rico, Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, and Indian Tribes that EPA determines to be eligible for purposes of the water quality standards program.

(k) Federal Indian Reservation, Indian Reservation, or Reservation means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation."

(l) Indian Tribe or Tribe means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation.

(m) Highest attainable use is the modified aquatic life, wildlife, or recreation use that is both closest to the uses specified in section 101(a)(2) of the Act and attainable, based on the evaluation of the factor(s) in § 131.10(g) that preclude(s) attainment of the use and any other information or analyses that were used to evaluate attainability. There is no required highest attainable use where the State demonstrates the relevant use specified in section 101(a)(2) of the Act and sub-categories of such a use are not attainable.

(n) Practicable, in the context of § 131.12(a)(2)(ii), means technologically possible, able to be put into practice, and economically viable.

(o) A water quality standards variance (WQS variance) is a time-limited designated use and criterion for a specific pollutant(s) or water quality parameter(s) that reflect the highest attainable condition during the term of the WQS variance.

(p) Pollutant Minimization Program, in the context of § 131.14, is a structured set of activities to improve processes and pollutant controls that will prevent and reduce pollutant loadings.

(q) Non–101(a)(2) use is any use unrelated to the protection and propagation of fish, shellfish, wildlife or recreation in or on the water.

**Credits**
[56 FR 64893, Dec. 12, 1991; 59 FR 64344, Dec. 14, 1994; 80 FR 51046, Aug. 21, 2015]

SOURCE: 48 FR 51405, Nov. 8, 1983; 57 FR 60910, Dec. 22, 1992, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter D. Water Programs
Part 131. Water Quality Standards (Refs & Annos)
Subpart B. Establishment of Water Quality Standards

40 C.F.R. § 131.10

§ 131.10 Designation of uses.

Effective: October 20, 2015
Currentness

(a) Each State must specify appropriate water uses to be achieved and protected. The classification of the waters of the State must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial, and other purposes including navigation. If adopting new or revised designated uses other than the uses specified in section 101(a)(2) of the Act, or removing designated uses, States must submit documentation justifying how their consideration of the use and value of water for those uses listed in this paragraph appropriately supports the State's action. A use attainability analysis may be used to satisfy this requirement. In no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States.

(b) In designating uses of a water body and the appropriate criteria for those uses, the State shall take into consideration the water quality standards of downstream waters and shall ensure that its water quality standards provide for the attainment and maintenance of the water quality standards of downstream waters.

(c) States may adopt sub-categories of a use and set the appropriate criteria to reflect varying needs of such sub-categories of uses, for instance, to differentiate between cold water and warm water fisheries.

(d) At a minimum, uses are deemed attainable if they can be achieved by the imposition of effluent limits required under sections 301(b) and 306 of the Act and cost-effective and reasonable best management practices for nonpoint source control.

(e) [Reserved by 80 FR 51047]

(f) States may adopt seasonal uses as an alternative to reclassifying a water body or segment thereof to uses requiring less stringent water quality criteria. If seasonal uses are adopted, water quality criteria should be adjusted to reflect the seasonal uses, however, such criteria shall not preclude the attainment and maintenance of a more protective use in another season.

(g) States may designate a use, or remove a use that is not an existing use, if the State conducts a use attainability analysis as specified in paragraph (j) of this section that demonstrates attaining the use is not feasible because of one of the six factors in this paragraph. If a State adopts a new or revised water quality standard based on a required use attainability analysis, the State shall also adopt the highest attainable use, as defined in § 131.3(m).

(1) Naturally occurring pollutant concentrations prevent the attainment of the use; or

(2) Natural, ephemeral, intermittent or low flow conditions or water levels prevent the attainment of the use, unless these conditions may be compensated for by the discharge of sufficient volume of effluent discharges without violating State water conservation requirements to enable uses to be met; or

(3) Human caused conditions or sources of pollution prevent the attainment of the use and cannot be remedied or would cause more environmental damage to correct than to leave in place; or

(4) Dams, diversions or other types of hydrologic modifications preclude the attainment of the use, and it is not feasible to restore the water body to its original condition or to operate such modification in a way that would result in the attainment of the use; or

(5) Physical conditions related to the natural features of the water body, such as the lack of a proper substrate, cover, flow, depth, pools, riffles, and the like, unrelated to water quality, preclude attainment of aquatic life protection uses; or

(6) Controls more stringent than those required by sections 301(b) and 306 of the Act would result in substantial and widespread economic and social impact.

(h) States may not remove designated uses if:

(1) They are existing uses, as defined in § 131.3, unless a use requiring more stringent criteria is added; or

(2) Such uses will be attained by implementing effluent limits required under sections 301(b) and 306 of the Act and by implementing cost-effective and reasonable best management practices for nonpoint source control.

(i) Where existing water quality standards specify designated uses less than those which are presently being attained, the State shall revise its standards to reflect the uses actually being attained.

(j) A State must conduct a use attainability analysis as described in § 131.3(g), and paragraph (g) of this section, whenever:

(1) The State designates for the first time, or has previously designated for a water body, uses that do not include the uses specified in section 101(a)(2) of the Act; or

(2) The State wishes to remove a designated use that is specified in section 101(a)(2) of the Act, to remove a sub-category of such a use, or to designate a sub-category of such a use that requires criteria less stringent than previously applicable.

(k) A State is not required to conduct a use attainability analysis whenever:

(1) The State designates for the first time, or has previously designated for a water body, uses that include the uses specified in section 101(a)(2) of the Act; or

(2) The State designates a sub-category of a use specified in section 101(a)(2) of the Act that requires criteria at least as stringent as previously applicable; or

(3) The State wishes to remove or revise a designated use that is a non–101(a)(2) use. In this instance, as required by paragraph (a) of this section, the State must submit documentation justifying how its consideration of the use and value of water for those uses listed in paragraph (a) appropriately supports the State's action, which may be satisfied through a use attainability analysis.

**Credits**
[80 FR 51047, Aug. 21, 2015]

SOURCE: 48 FR 51405, Nov. 8, 1983; 57 FR 60910, Dec. 22, 1992, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (45)

Current through November 12, 2021, 86 FR 62891

**End of Document**                                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
 Title 40. Protection of Environment
  Chapter I. Environmental Protection Agency (Refs & Annos)
   Subchapter D. Water Programs
    Part 131. Water Quality Standards (Refs & Annos)
     Subpart B. Establishment of Water Quality Standards

40 C.F.R. § 131.11

§ 131.11 Criteria.

Effective: October 20, 2015
Currentness

(a) Inclusion of pollutants:

(1) States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use. For waters with multiple use designations, the criteria shall support the most sensitive use.

(2) Toxic pollutants. States must review water quality data and information on discharges to identify specific water bodies where toxic pollutants may be adversely affecting water quality or the attainment of the designated water use or where the levels of toxic pollutants are at a level to warrant concern and must adopt criteria for such toxic pollutants applicable to the water body sufficient to protect the designated use. Where a State adopts narrative criteria for toxic pollutants to protect designated uses, the State must provide information identifying the method by which the State intends to regulate point source discharges of toxic pollutants on water quality limited segments based on such narrative criteria. Such information may be included as part of the standards or may be included in documents generated by the State in response to the Water Quality Planning and Management Regulations (40 CFR part 130).

(b) Form of criteria: In establishing criteria, States should:

(1) Establish numerical values based on:

(i) 304(a) Guidance; or

(ii) 304(a) Guidance modified to reflect site-specific conditions; or

(iii) Other scientifically defensible methods;

(2) Establish narrative criteria or criteria based upon biomonitoring methods where numerical criteria cannot be established or to supplement numerical criteria.

**Credits**

[80 FR 51047, Aug. 21, 2015]

SOURCE: 48 FR 51405, Nov. 8, 1983; 57 FR 60910, Dec. 22, 1992, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (51)

Current through November 12, 2021, 86 FR 62891

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
 Title 40. Protection of Environment
  Chapter I. Environmental Protection Agency (Refs & Annos)
   Subchapter D. Water Programs
    Part 131. Water Quality Standards (Refs & Annos)
     Subpart B. Establishment of Water Quality Standards

40 C.F.R. § 131.12

§ 131.12 Antidegradation policy and implementation methods.

Effective: October 20, 2015
Currentness

(a) The State shall develop and adopt a statewide antidegradation policy. The antidegradation policy shall, at a minimum, be consistent with the following:

(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

(2) Where the quality of the waters exceeds levels necessary to support the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

(i) The State may identify waters for the protections described in paragraph (a)(2) of this section on a parameter-by-parameter basis or on a water body-by-water body basis. Where the State identifies waters for antidegradation protection on a water body-by-water body basis, the State shall provide an opportunity for public involvement in any decisions about whether the protections described in paragraph (a)(2) of this section will be afforded to a water body, and the factors considered when making those decisions. Further, the State shall not exclude a water body from the protections described in paragraph (a)(2) of this section solely because water quality does not exceed levels necessary to support all of the uses specified in section 101(a)(2) of the Act.

(ii) Before allowing any lowering of high water quality, pursuant to paragraph (a)(2) of this section, the State shall find, after an analysis of alternatives, that such a lowering is necessary to accommodate important economic or social development in the area in which the waters are located. The analysis of alternatives shall evaluate a range of practicable alternatives that would prevent or lessen the degradation associated with the proposed activity. When the analysis of alternatives identifies one or more practicable alternatives, the State shall only find that a lowering is necessary if one such alternative is selected for implementation.

(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected.

(4) In those cases where potential water quality impairment associated with a thermal discharge is involved, the antidegradation policy and implementing method shall be consistent with section 316 of the Act.

(b) The State shall develop methods for implementing the antidegradation policy that are, at a minimum, consistent with the State's policy and with paragraph (a) of this section. The State shall provide an opportunity for public involvement during the development and any subsequent revisions of the implementation methods, and shall make the methods available to the public.

**Credits**
[80 FR 51048, Aug. 21, 2015]

SOURCE: 48 FR 51405, Nov. 8, 1983; 57 FR 60910, Dec. 22, 1992, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (82)

Current through November 12, 2021, 86 FR 62891

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.



Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 133. Secondary Treatment Regulation (Refs & Annos)

40 C.F.R. § 133.102

§ 133.102 Secondary treatment.

Currentness

The following paragraphs describe the minimum level of effluent quality attainable by secondary treatment in terms of the parameters—$BOD_5$, SS and pH. All requirements for each parameter shall be achieved except as provided for in §§ 133.103 and 133.105.

(a) $BOD_5$.

  (1) The 30–day average shall not exceed 30 mg/l.

  (2) The 7–day average shall not exceed 45 mg/l.

  (3) The 30–day average percent removal shall not be less than 85 percent.

  (4) At the option of the NPDES permitting authority, in lieu of the parameter $BOD_5$ and the levels of the effluent quality specified in paragraphs (a)(1), (a)(2) and (a)(3), the parameter $CBOD_5$ may be substituted with the following levels of the $CBOD_5$ effluent quality provided:

    (i) The 30–day average shall not exceed 25 mg/l.

    (ii) The 7–day average shall not exceed 40 mg/l.

    (iii) The 30–day average percent removal shall not be less than 85 percent.

(b) SS.

  (1) The 30–day average shall not exceed 30 mg/l.

  (2) The 7–day average shall not exceed 45 mg/l.

(3) The 30–day average percent removal shall not be less than 85 percent.

(c) pH. The effluent values for pH shall be maintained within the limits of 6.0 to 9.0 unless the publicly owned treatment works demonstrates that: (1) Inorganic chemicals are not added to the waste stream as part of the treatment process; and (2) contributions from industrial sources do not cause the pH of the effluent to be less than 6.0 or greater than 9.0.

**Credits**

[49 FR 40405, Oct. 16, 1984; 50 FR 23387, June 3, 1985]

SOURCE: 38 FR 22298, Aug. 17, 1973; 49 FR 37006, Sept. 20, 1984, unless otherwise noted.

AUTHORITY: Secs. 301(b)(1)(B), 304(d)(1), 304(d)(4), 308, and 501 of the Federal Water Pollution Control Act as amended by the Federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Municipal Wastewater Treatment Construction Grant Amendments of 1981; 33 U.S.C. 1311(b)(1)(B), 1314(d) (1) and (4), 1318, and 1361; 86 Stat. 816, Pub. L. 92-500; 91 Stat. 1567, Pub. L. 95-217; 95 Stat. 1623, Pub. L. 97-117.

Notes of Decisions (17)

Current through November 12, 2021, 86 FR 62891

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.