No. 21-70282
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY AND COUNTY OF SAN FRANCISCO,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

*On Petition for Review of Agency Action of the U.S. Environmental Protection Agency*

**BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, CALIFORNIA ASSOCIATION OF SANITATION AGENCIES, OREGON ASSOCIATION OF CLEAN WATER AGENCIES, BUFFALO SEWER AUTHORITY, CITIZENS ENERGY GROUP, CITY OF NEW YORK, CITY OF TACOMA, LOUISVILLE/JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT, METRO WATER RECOVERY, NORTHEAST OHIO REGIONAL SEWER DISTRICT, AND SPRINGFIELD SEWER AND WATER COMMISSION IN SUPPORT OF PETITIONER'S PETITION FOR REHEARING *EN BANC***

Sylvia O. Hinds-Radix
Corporation Counsel of the City of New York
Hilary Meltzer
Assistant Corporation Counsel
100 Church Street
New York, NY 10007
(212) 356-2070
hmeltzer@law.nyc.gov

*Counsel for Amicus Curiae*
*City of New York*

David Y. Chung
Elizabeth B. Dawson
Lynn T. Phan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500
dchung@crowell.com

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state as follows:

1.    **National Association of Clean Water Agencies** does not issue stock, does not have a parent corporation, and is not owned, either in whole or in part, by any publicly held corporation.

2.    **California Association of Sanitation Agencies** does not issue stock, does not have a parent corporation, and is not owned, either in whole or in part, by any publicly held corporation.

3.    **Oregon Association of Clean Water Agencies** does not issue stock, does not have a parent corporation, and is not owned, either in whole or in part, by any publicly held corporation.

4.    The remaining *amici curiae* are not "nongovernmental corporations" and thus are not subject to the requirements in Fed. R. App. P. 26.1 or 29(a)(4)(A). They have no parent corporations or stock, and they are not owned, either in whole in part, by any publicly held corporation.

*/s/* David Y. Chung
David Y. Chung

Dated: September 22, 2023

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES .................................................................................. iii

INTERESTS OF THE *AMICI* ............................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 2

ARGUMENT ......................................................................................................... 6

I.     Review Is Warranted Because the Panel Majority Misunderstood the CWA and Resurrected a Flawed Regulatory and Enforcement Scheme that Congress Deliberately Abandoned. ....................................................... 6

II.    Review Is Warranted Because the Panel's Majority's Decision Will Harm Communities Nationwide. ............................................................... 13

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bethlehem Steel Corp. v. EPA*,
  538 F.2d 513 (2d Cir. 1976) ............................................................8, 9

*Conservation Law Found., Inc. v. Mass. Water Res. Auth.*,
  Civ. A. No. 22-10626, 2023 WL 2072429 (D. Mass. Feb. 17,
  2023) ...........................................................................................17, 18, 19

*E.I. du Pont de Nemours & Co. v. Train*,
  430 U.S. 112 (1977)........................................................................5, 13

*EPA v. Cal. ex rel. State Water Res. Control Bd.*,
  426 U.S. 200 (1976)........................................................................7, 8, 9

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995).............................................................15

*Nat. Res. Def. Council, Inc. v. Costle*,
  568 F.2d 1369 (D.C. Cir. 1977).........................................................14

*Nat. Res. Def. Council v. EPA*,
  808 F.3d 556 (2d Cir. 2015) ..............................................................10

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*,
  268 F.3d 255 (4th Cir. 2001) .............................................................14

*Trs. for Alaska v. EPA*,
  749 F.2d 549 (9th Cir. 1984) ...............................................................7

*United States v. Trident Seafoods Corp.*,
  60 F.3d 556 (9th Cir. 1995) ...............................................................15

*Va. Elec. & Power Co. v. Costle*,
  566 F.2d 446 (4th Cir. 1977) ...............................................................8

**Statutes**

33 U.S.C. § 1311 ................................................................................3

33 U.S.C. § 1311(b)(1)................................................................6, 7, 10

33 U.S.C. § 1311(b)(1)(C) .................................................................9

33 U.S.C. § 1319 ..............................................................................15

33 U.S.C. § 1342(b)(1)(B) ...............................................................12

33 U.S.C. § 1342(k) .....................................................................4, 10

33 U.S.C. § 1362(11) ......................................................................16

33 U.S.C. § 1365 ..............................................................................15

33 U.S.C. § 1365(a)(1) ...................................................................17

33 U.S.C. § 1369(b) ........................................................................16

**Regulations**

40 C.F.R. § 122.46 ..........................................................................12

40 C.F.R. §§ 122.62–122.63 ...........................................................12

40 C.F.R. § 123.44 ..........................................................................11

40 C.F.R. § 124.19 ..........................................................................11

**Rules**

Fed. R. App. P. 26.1 ...........................................................................i

Fed. R. App. P. 29(a) .........................................................................1

**Other Authorities**

45 Fed. Reg. 33,290 (May 19, 1980) ...............................................11

59 Fed. Reg. 18,688 (Apr. 19, 1994) ...............................................14

H.R. Rep. No. 92-911 (1972).................................................................9, 12

S. Rep. No. 92-414 (1971) ........................................................8, 9, 16, 17

U.S. EPA, *Watershed Academy Web: Introduction to the Clean Water Act* § 34 ...............................................................................................7

## INTERESTS OF THE *AMICI*[1]

*Amici curiae* represent public entities that provide water supply, water conservation, flood and stormwater management, and wastewater treatment services to the public. The National Association of Clean Water Agencies ("NACWA") represents the interests of over 350 municipal clean water agencies that own, operate, and manage publicly-owned treatment works, wastewater sewer systems, stormwater sewer systems, water reclamation districts, and all aspects of wastewater collection, treatment, and disposal. California Association of Sanitation Agencies and Oregon Association of Clean Water Agencies are each comprised of over 125 local public agencies that provide wastewater collection, treatment, water recycling, renewable energy, and biosolids management services to millions of residents, businesses, industries, and institutions.

NACWA members, including the individual utility *Amici* lending their voices from around the country, hold Clean Water Act ("CWA" or "Act") National Pollutant Discharge Elimination System ("NPDES") permits, the violation of which puts them at risk of substantial civil and criminal penalties and injunctive action. And, like San Francisco, *Amici* and their members count on their NPDES

---

[1] No counsel for a party authored this brief in whole or in part; no person other than the *amici curiae*, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a). All parties have consented to the filing of this brief.

1

permits to provide clear notice of their compliance obligations and a shield against liability for discharges made in compliance with those permits.

The divided panel's decision upholding permit conditions that simply prohibit "polluting" or "causing or contributing to the violation of water quality standards" runs contrary to the CWA's text, history, and purpose, guts the Act's well-established permit shield, and deprives San Francisco of fair notice, turning compliance into a moving target. Left to stand, the majority's decision undermines the regulatory certainty that is foundational to NPDES permitting and leaves *Amici*'s members and other dischargers whose permits include such generic water quality prohibitions exposed to inconsistent and arbitrary enforcement actions. For these reasons, *Amici* have a significant interest in the proper interpretation of the CWA and rehearing *en banc*.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

It has been said that an ounce of prevention is worth a pound of cure. Early failed legislative schemes that relied on retroactive enforcement of water quality standards proved that axiom to be true in the case of protecting our Nation's waters. With the 1972 CWA, Congress sought to address this issue by establishing a system whereby permittees must seek permission to discharge into a navigable water, and regulators must tell permittees exactly what they must do to protect water quality *before* those discharges are authorized. The panel majority's decision

threatens to undo Congress's meticulous work in overhauling U.S. water pollution control laws to the detriment of municipalities, their public ratepayers, and water quality nationwide.

San Francisco's petition persuasively explains (at 10–17) how rehearing *en banc* is warranted because the panel majority's decision conflicts with this Court's precedent and creates a split among the courts of appeals. *Amici* write separately to underscore how the decision conflicts with the CWA's text, history, and purpose and Supreme Court precedent, and to highlight the far-reaching consequences for public clean water utilities and the communities they serve if the panel majority's decision is left to stand.

As EPA admits and the majority acknowledged (at 30–31), generic prohibitions against "polluting" or "causing or contributing to the violation of water quality standards" are frequently included in NPDES permits issued to public clean water utilities and other permittees nationwide. Despite this routine inclusion, however, such prohibitions contravene the CWA's text and Congressional intent by ignoring the statute's explicit distinction between enforceable "effluent limitations" and aspirational "water quality standards" found in CWA Section 301 (33 U.S.C. § 1311). Simply stated, water quality standards apply to waterbodies, effluent limitations apply to discharges. But the panel majority would inappropriately allow permit writers to treat broadly applicable

3

water quality standards themselves as specific "limitations" with which individual dischargers must comply.

Such a conflation of effluent limitations and water quality standards effectively revives the faulty approach that Congress intentionally abandoned in 1972. Congress's enactment of the CWA marked a dramatic shift away from prior water pollution control laws whereby regulators had to await impairment in the quality of receiving waters before attempting to identify and retroactively address specific sources of pollution. In stark contrast, the CWA places the burden on permittees to apply for a permit before discharging, and on permit writers to establish discharger-specific effluent limitations that are sufficiently precise that permittees can readily determine whether individual discharges are compliant. By relieving permit writers of the duty to promulgate discharger-specific limitations, the panel majority's decision contravenes Congress's intent.

The panel majority's decision also eviscerates the CWA's "permit shield" provision (33 U.S.C. § 1342(k)). Under the U.S. Supreme Court's and EPA's longstanding interpretation of that provision, a permittee in compliance with the terms of its NPDES permit is deemed to have fulfilled its CWA compliance obligations. If the permittee discloses all relevant information, it is the permit writer's obligation to include all the defined limits necessary to comply with the CWA, including ensuring the protection of applicable water quality standards.

The issuance of a permit is how permit writers provide clear and final notice to permittees of their compliance obligations. As the Supreme Court has stated, the permit shield "serves the purpose of giving permits finality." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977). If, however, permit writers can forgo their duties to craft discharger-specific limitations and instead include generic requirements such as "do not pollute" and "do not violate water quality standards," the permit shield is meaningless. Such generic prohibitions turn CWA compliance into a moving target, stripping the permit of finality and leaving permittees exposed to enforcement actions from both regulators and third parties that allege violations of unstated and unknown control requirements, which are ultimately derived by reviewing courts outside of the permitting process.

For municipalities nationwide, such constant uncertainty is untenable. Clean water agencies, on top of their indispensable role in protecting public health, are playing a vital role in addressing the risks posed by climate change, cyber-attacks, aging infrastructure, affordability challenges, and emerging contaminants such as per- and polyfluoroalkyl substances ("PFAS"). All these efforts, whether undertaken pursuant to the CWA or other laws and initiatives, require advanced planning, significant financial investment of limited public monies, and lengthy construction activities. Language in NPDES permits allowing regulators and

outside parties to change the rules of CWA compliance at any time and undermine these vital efforts must not be allowed to stand.

Contrary to the panel majority's assumptions, *Amici* are not, through this position, seeking "less regulation." Rather, they seek more clarity and certainty. The very clarity and certainty, in fact, that the NPDES permit shield and CWA Section 301 were designed to provide. The Court should grant rehearing *en banc* to provide this clarity and certainty, avoid unnecessary harm to communities nationwide, and uphold the letter and spirit of the CWA.

## ARGUMENT

## I. Review Is Warranted Because the Panel Majority Misunderstood the CWA and Resurrected a Flawed Regulatory and Enforcement Scheme that Congress Deliberately Abandoned.

The panel majority's decision is inconsistent with the CWA's text and purpose in several ways. *First*, as the dissent explains (at 55–56), generic water quality prohibitions ignore the CWA's explicit distinction between the "effluent limitations" that a permit writer must devise and impose on a permittee's discharges, and the "water quality standards" applicable to the waters that receive not only the permittee's discharges, but pollutants from other sources. CWA Section 301(b)(1) plainly illustrates this distinction by requiring permit writers to establish "effluent limitations" and "any more stringent limitation[s]" that are "necessary to *meet*" or "required to *implement* any applicable water quality

standard[.]" 33 U.S.C. § 1311(b)(1) (emphasis added). As EPA has itself long noted, "[w]ater quality standards are not directly enforceable, despite commonly held beliefs," but are instead enforced through discharge-specific effluent limitations developed during the NPDES permitting process. *See U.S. EPA, Watershed Academy Web: Introduction to the Clean Water Act* § 34, https://cfpub.epa.gov/watertrain/moduleFrame.cfm?parent_object_id=2673 (last visited Sept. 18, 2023). Rather than treat water quality standards as guideposts for discharger-specific effluent limitations as Congress intended, however, the panel majority allows permit writers to improperly treat the standards themselves as the discharger-specific limitations.

Numerous courts, including this Court, have highlighted the statutory distinction between discharger-specific effluent limitations and the receiving water's water quality standards. *E.g.*, *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 204–05 (1976) (CWA marked a shift away from water quality standards governing all dischargers to "restriction[s] . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources"); *Trs. for Alaska v. EPA*, 749 F.2d 549, 557 (9th Cir. 1984) ("Effluent limitations are a means of *achieving* water quality standards."). As the Second Circuit aptly summarized, "although water quality standards and effluent limitations are related . . . the two are entirely different

7

concepts and the difference is at the heart of the 1972 Amendments." *Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 515 (2d Cir. 1976); *accord Va. Elec. & Power Co. v. Costle*, 566 F.2d 446, 451 n.17 (4th Cir. 1977) (same).

*Second*, by blurring this statutory distinction, the panel majority disregarded Congress's intent to abandon the critically flawed, pre-1972 approach to water pollution control. As the Supreme Court explained, prior water pollution control laws, which relied on water quality standards as the primary mechanism for the enforcement and abatement of water pollution, "proved ineffective." *EPA*, 426 U.S. at 202. Regulators had to "work backward from an overpolluted body of water to determine which point sources" needed to be abated to achieve water quality standards. *Id.* at 204. This *ex post* scheme necessarily meant that regulators could only bring enforcement actions *after* water quality standards had already been violated. *See* S. Rep. No. 92-414, at 4 (1971) (enforcement actions could be brought when "wastes discharged by polluters reduce water quality below the standards"). Without clear, discharger-specific limits, the CWA's predecessor statutes "ma[d]e it very difficult to develop and enforce standards to govern the conduct of individual polluters." *EPA*, 426 U.S. at 202–03.

Congress enacted the CWA to address its "dissatisfaction with water quality standards as a method of pollution control" by replacing that ineffective scheme with a permitting program that requires discharger-specific effluent limitations.

*Bethlehem Steel Corp.*, 538 F.2d at 515. Under the new scheme, Congress intended for water quality standards to serve only as a "measure of program effectiveness and performance, *not a means of elimination and enforcement*." S. Rep. No. 92-414, at 8 (emphasis added). Accordingly, the CWA regulates discharges from specific point sources by relying on the establishment and enforcement of effluent limitations, and Congress intended for regulators to use the newly established NPDES permit program to "apply *specific* effluent limitations for each [] source." *Id.* at 44 (emphasis added). Those effluent limitations apply at the point of discharge, rather than to the receiving water itself. *See* H.R. Rep. No. 92-911, at 102 (1972) (under § 301(b)(1)(C), "more stringent *effluent limitations* . . . [are] to be established consistent with . . . water quality standards) (emphasis added).

The panel majority's decision affirming generic prohibitions that merely parrot water quality standards without translating them into effluent limitations upends Congress's careful design and revives the faulty, ineffective scheme that imposes on individual dischargers the precarious and often impossible task of evaluating their compliance obligations through reference to water quality standards to which they and other nearby dischargers "must *collectively conform*." *See EPA*, 426 U.S. at 204–05 (emphasis added). Although Congress acknowledged the "great difficulty associated with establishing reliable and enforceable precise effluent limitations on the basis of a given stream quality," S. Rep. No. 92-414, at

8, Congress ambitiously expected that permit writers would apply their expertise to establish water-quality based effluent limitations where needed. 33 U.S.C. § 1311(b)(1)(C). Even if crafting such limits is difficult, permit writers "cannot simply give up and refuse to issue more specific guidelines" by demanding that permittees feel their own way through determining compliance, as the panel majority's decision would allow. *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 578 (2d Cir. 2015).

*Third*, the panel majority's decision is inconsistent with the CWA's permit shield. *See* 33 U.S.C. § 1342(k). As the dissent explains (at 48), under CWA Section 1342(k), a permittee that complies with the conditions in its NPDES permit is deemed to be in compliance with the CWA.[2] According to EPA, a primary purpose for issuing a permit "is to prescribe with specificity the requirements that a [permit holder] will have to meet . . . so that the [permit holder] can plan and

---

[2] This is true even where permitted discharges are made to waterbodies not currently in compliance with existing water quality standards. Dissent at 48 (quotations and citations omitted). This is an important point to consider in the context of generic requirements not to "cause *or contribute*" to water quality standards violations, as arguably any discharge, including those otherwise authorized by the permit, could be construed as "contributing" to water quality standards violations in such instances. Likewise, even where water quality standards are being attained, any discharge could be viewed as violating the type of generic ban against "polluting" contained in San Francisco's permit, despite the fact that the entire purpose of the NPDES program is to authorize the discharge of certain pollutants.

operate with knowledge of what rules apply[.]" EPA Consolidated Permit Regulations, 45 Fed. Reg. 33,290, 33,312 (May 19, 1980). The permit shield "places the burden on permit writers rather than permittees to search through the applicable regulations and correctly apply them to the permittee through its permit." *Id.* As long as a permit applicant provides all the necessary information to a permit writer, it is the permit writer's responsibility to incorporate into the permit all the limits that are necessary to comply with the CWA. *Id.*

Despite its own clear language to the contrary, EPA asserts that generic prohibitions are merely "backstop" provisions. Such a position not only eliminates the protections afforded by the permit shield, it ignores the multiple layers of review the CWA provides for ensuring NPDES permits contain all necessary requirements, as well as regulations allowing permit writers to reopen and modify existing permits where appropriate even absent any "backstop" generic prohibitions. For example, there are multiple opportunities during the permitting process for EPA and the public to review and seek to challenge or modify any permit they believe does not include all the controls and conditions necessary to protect water quality. EPA can also deny the issuance of any state-issued NPDES permit that does not comply with the CWA. *See* 40 C.F.R. § 123.44.

Likewise, citizen groups may challenge an issued permit under CWA Section 509(b). *See* 40 C.F.R. § 124.19 (procedures for petitioning for review of a

permit decision). Such challenges must be brought in the court of appeals within 120 days, as Congress wanted to "ensure that administrative actions are reviewable, but that the review will not unduly impede enforcement." H.R. Rep. No. 92-911, at 136.

Once adopted, an NPDES permit is subject to a five-year statutory term. 33 U.S.C. § 1342(b)(1)(B); 40 C.F.R. § 122.46. During that term, EPA or state permitting authorities—though critically, for *Amici*, not outside citizen groups— may modify, revoke, or reissue a permit as needed to incorporate any necessary limits on toxic pollutants, address material changes in a permit holder's discharges, or correct technical errors, among other reasons. 40 C.F.R. §§ 122.62–122.63. Such modifications are done outside of an enforcement context and provide permittees fair notice and due process. Additionally, if an issue is identified that does not rise to the level of modifying a permit, it can be addressed during permit renewal. These numerous opportunities to reject, revise, or later update a permit belie the need for any sort of "backstop" provision.

Under the panel majority's decision, permittees could be subject to new requirements that they could not possibly have known, and forced to litigate in a later enforcement action what limits are stringent enough to achieve water quality standards. Yet the Supreme Court has expressly held that the very purpose of the permit shield is to "relieve [permit holders] of having to litigate . . . the question

[of] whether their permits are sufficiently strict." *E.I. du Pont*, 430 U.S. at 138 n.28. This Court should grant rehearing and issue an opinion consistent with the Supreme Court's reasoning.

## II. Review Is Warranted Because the Panel's Majority's Decision Will Harm Communities Nationwide.

Rehearing *en banc* is essential for the additional reason that the panel majority's decision is one of exceptional importance to communities across the country. The decision converts CWA compliance into a moving target and leaves permittees exposed to inconsistent, *post-hoc* enforcement.

As stewards of public funds, municipal clean water agencies should not be required to implement system upgrades and controls to comply with the CWA, only to be told months or years later that they guessed wrong. Improvements needed to meet increasingly stringent CWA requirements typically entail long-term financial and technical planning, as well as large-scale and often disruptive construction projects. Given the significant resources needed to maintain and upgrade the Nation's wastewater and stormwater infrastructure, it is crucial that NACWA members and other permittees have a clear understanding of their

compliance obligations to make informed decisions and appropriately balance competing resource demands.[3]

Clean water utilities currently are facing an unprecedented number of challenges, including replacing aging infrastructure, increasing system resiliency in the face of climate change, addressing emerging contaminants, and fending off cybersecurity threats. Generic water quality prohibitions compound these challenges by introducing untenable uncertainty and calling into question significant investments of public funds utilities have made—and are continuing to make—in upgrading wastewater and stormwater systems.[4]

The panel majority's decision also improperly shifts the burden of decision-making from permit writers to permittees and, should enforcement ensue, to citizen plaintiffs and courts. Both regulators and permittees "need to have an identifiable standard upon which to determine . . . compliance." *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1378 (D.C. Cir. 1977); *see also Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 268 (4th Cir. 2001) ("The

---

[3] Ripple effects would also be felt by upstream industries if utilities must ultimately impose more stringent pretreatment requirements.

[4] Clean water agencies operating combined sewer systems like San Francisco's have also spent billions of dollars implementing extensive controls to address the water quality impacts of combined sewer overflows ("CSO") pursuant to the CWA's CSO Control Policy. *See* 59 Fed. Reg. 18,688 (Apr. 19, 1994) (codified at 33 U.S.C. § 1342(q)).

proper interpretation of the [CWA] regulations is that . . . [w]ater quality based limits are established where the permitting authority reasonably anticipates the discharge of pollutants by the permittee at levels that have the reasonable potential to cause or contribute to an excursion above any state water quality criterion.") (internal quotation marks and citation omitted).

Generic water quality prohibitions, however, upend this carefully constructed process. They do nothing to inform permittees how to comply with the CWA or their permit, yet they can be invoked by agency enforcement staff and even citizen plaintiffs to impose substantial penalties against permittees and throw the permitting program into chaos by allowing *post-hoc* changes to permits already in effect. *See* 33 U.S.C. §§ 1319, 1365.

This shifting of responsibilities raises fair notice concerns. Permit writers must give permittees fair notice of their compliance obligations such that permittees are "able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform[.]" *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29, 1333–34 (D.C. Cir. 1995); *see also United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) ("[T]he responsibility to promulgate clear and unambiguous standards is on the agency" and "[i]f the language is faulty, the agency ha[s] the means and obligation to amend" the permit.) (cleaned up, citation omitted).

Congress acknowledged the importance of precise effluent limitations for providing notice to permit holders when it enacted the CWA and explicitly defined "effluent limitation" to mean "restrictions . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources[.]" 33 U.S.C. § 1362(11). Congress included this definition "so that control requirements are not met by narrative statements of obligation, but rather are *specific* requirements of *specificity* as to the quantities, rates, and concentration of physical, chemical, biological and other constituents discharged from point sources." S. Rep. No. 92-414, at 77 (emphasis added). Prohibitions on "polluting" or "causing or contributing to the violation of water quality standards" are the antithesis of such specificity.

Rather than give permittees fair notice, generic prohibitions allow regulators and third parties to second guess permitting decisions and enforce unlisted limits well after the statutory timeframe provided for permit objections under 33 U.S.C. § 1369(b). A practical consequence of the panel's decision is that any citizen can assume the role of permit writer to the extent they can persuade a court that a limit or action may be necessary to achieve compliance with water quality standards at any time during the permit's term. Such an outcome inappropriately converts the statutorily time-limited right of citizens to object to a permit into an unlimited ability to rewrite an existing permit under the guise of citizen enforcement.

16

This is not what Congress envisioned when enacting the CWA's citizen suit provision. Congress specifically disclaimed "'common law' or court-developed definition[s] of water quality" and expected that citizen suit enforcement "would not require reanalysis of . . . matters [that] have been settled in the administrative procedure leading to the establishment of such effluent" limitations. S. Rep. No. 92-414, at 79. Rather, Congress expected that *permit writers* would determine and detail what limits are needed to ensure discharges will not cause or contribute to violations of water quality standards, and that subsequent citizen suit enforcement of those limits would be judged based on "an objective evidentiary standard." *Id.* The panel's decision frustrates Congress's intent.

Apart from being inappropriate in the context of the CWA's strict liability scheme, which imposes severe penalties even for inadvertent violations, such an outcome has serious policy ramifications. *See* 33 U.S.C. § 1365(a)(1). Though addressing an unrelated CWA enforcement issue, a federal court recently outlined several key policy concerns with allowing citizen groups to unilaterally upend NPDES permitting requirements outside the statutory process for objecting to a permit. *See Conservation Law Found., Inc. v. Mass. Water Res. Auth.*, Civ. A. No. 22-10626, 2023 WL 2072429 (D. Mass. Feb. 17, 2023) ("*CLF*").

First, giving citizens rather than regulators the final say in what constitutes appropriate enforcement is "likely to result in a mishmash of inconsistent actions

17

and remedies[.]" *See id.* at *4. This problematic outcome is likewise inevitable should generic prohibitions be permitted to stand here, as courts will invariably reach different conclusions about what water quality protections are necessary based on the disparate records and legal arguments before them, even where scientific and technical considerations point to the same result.

Second, allowing these sorts of *post hoc* attacks on permits risks undermining the expertise of permit writers, scientists, and other subject matter experts within EPA and state environmental agencies. The *CLF* court explained how, "as a practical matter, citizen groups largely lack the engineering and systems expertise that needs [to] be brought to bear in insuring that a remedial action is appropriate to the nature of the violation and that any cost imposed will not outweigh the benefit achieved." *Id.* This consideration cannot be overstated in the context of municipal permittees, who are both environmental stewards and stewards of public funds responsible for providing *affordable* clean water to communities. The complexity of wastewater and stormwater systems, affordability of rates, and limits of existing technologies must all be considered in enforcement actions involving public clean water agencies. Third party groups are ill-equipped to appropriately consider these factors.

Finally, the *CLF* court noted that, while "the EPA Administrator is a politically appointed official answerable to the President, Congress, and the public

18

. . . , a citizen group [is] answerable only to its own members." *Id.* Citizen groups lack accountability that would require them to consider and balance the interests of numerous affected stakeholders, including impacted communities and individual ratepayers. In contrast to the EPA Administrator and state agency heads—who are political officials answerable to the President (or Governors), legislatures, and the public—citizen groups serve more targeted interests, and those interests may frequently be at odds with other public concerns. To be sure, citizens have an important right to enforce water pollution control requirements, but not to single-handedly write them as the panel majority's decision would allow.

Rehearing is warranted to avoid these negative policy implications, which are of exceptional importance to *Amici* and municipalities nationwide.

## CONCLUSION

*Amici* join Petitioner in requesting that this Court grant the Petition for Rehearing *En Banc*.

DATED this 22nd day of September, 2023.

Georgia M. Pestana
Corporation Counsel of the City of
New York

By: /s/ Hilary Meltzer
Hilary Meltzer
Assistant Corporation Counsel
100 Church Street
New York, NY 10007
(212) 356-2070
hmeltzer@law.nyc.gov

*Counsel for Amicus Curiae*
*City of New York*

/s/ David Y. Chung
David Y. Chung
Elizabeth B. Dawson
Lynn T. Phan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
dchung@crowell.com
edawson@crowell.com
lphan@crowell.com
(202) 624-2500

*Counsel for Amici Curiae National*
*Association of Clean Water Agencies,*
*California Association of Sanitation*
*Agencies, Oregon Association of Clean*
*Water Agencies, Buffalo Sewer*
*Authority, Citizens Energy Group, City*
*of Tacoma, Louisville/Jefferson County*
*Metropolitan Sewer District, Metro*
*Water Recovery, Northeast Ohio*
*Regional Sewer District, and*
*Springfield Water and Sewer*
*Commission*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to Fed. R. App. P. 29(a)(5) that this brief contains 4,199 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman proportionally spaced typeface.

/s/ David Y. Chung
David Y. Chung

## **CERTIFICATE OF SERVICE**

I certify that on September 22, 2023, I caused to be filed an electronic copy of the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit via the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ David Y. Chung
David Y. Chung